UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ORGANIC TRADE ASSOCIATION, *et al,*

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.,*

    Defendants.

Civil Case No. 1:17-cv-01875-RMC

**PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT AND OPPOSITION TO
PLAINTIFF'S MOTION FOR LEAVE TO AMEND**

## <u>TABLE OF CONTENTS</u>

**PAGE**

INTRODUCTION ........................................................................................................................ 3

BACKGROUND ....................................................................................................................... 5

APPLICABLE STANDARDS OF REVIEW ............................................................................ 5

ARGUMENT ............................................................................................................................ 7

    **A.   ALL THREE PLAINTIFFS HAVE STANDING TO CHALLENGE DEFENDANTS' UNLAWFUL ACTIONS. ..7**

        1.   All Plaintiffs Have Demonstrated Organizational Standing. ................................................. 7

        2.   Plaintiffs ASPCA and AWI are Within the Zone of Interests of the OFPA. ................................... 25

        3.   Plaintiffs OTA and AWI Have Demonstrated Associational Standing on Behalf of Their Members. ............................................................................................................................................ 28

    **B.   NONE OF THE CLAIMS IN THE SECOND AMENDED COMPLAINT ARE MOOT ...........................40**

    **C.   COUNTS ONE AND THREE SURVIVE A FED. R. CIV. P. 12(B)(6) CHALLENGE. ...........................46**

        1.   Count One States a Claim Upon Which Relief May Be Granted. .................................................. 46

        2.   Count Three States a Claim Upon Which Relief May Be Granted. ............................................... 52

    **D.   THE COURT SHOULD GRANT PLAINTIFF'S REQUEST FOR LEAVE TO AMEND. ...........................58**

Pursuant to this Court's Scheduling Order, ECF No. 33, Plaintiffs respectfully submit this consolidated response in opposition to Defendants' Motion to Dismiss Second Amended Complaint and Opposition to Plaintiff's Motion for Leave to Amend, ECF No. 43 (hereinafter, "Motion").[1]

## INTRODUCTION

The Plaintiffs' Second Amended Complaint ("SAC") encompasses a single course of interlocking administrative actions that unfolded across five rulemakings and seven Federal Register publications over the last fourteen months.[2] The saga began with the publication of a Final Rule, the OLPP, in January 2017, and was followed by three final rules, each of which serially delayed the effective date of the OLPP, and ended with the withdrawal of the OLPP in March 2018.

Each interim administrative action between publication of the OLPP and its withdrawal was kindling for the flame that consumed it, and each has been challenged in this lawsuit. None of these actions can be viewed in isolation because Defendants have relied on each successive

---

[1] The Plaintiffs are referred to herein as Organic Trade Association ("OTA"); The American Society for the Prevention of Cruelty to Animals ("ASPCA"); Animal Welfare Institute ("AWI"); and, collectively, as "Plaintiffs." Defendants are referred to herein as "USDA or "the Secretary" and collectively "Defendants," depending on the context.

[2] (1) 82 Fed. Reg. at 7042-92 (January 19, 2017) (*Organic Livestock and Poultry Practices Final Rule*) (hereinafter, "OLPP" or "Final Rule")

(2) 82 Fed. Reg. at 9967 (February 9, 2017) ("*Final rule; delay of effective date.*") (hereinafter, "First Delay Rule")

(3) 82 Fed. Reg. at 21,677 (May 10, 2017) ("*Final rule; delay of effective date.*") (hereinafter, "Second Delay Rule")

(4) 82 Fed. Reg. 21,742 (May 10, 2017)("*Proposed Rule*")("hereinafter, "Proposed Third Delay Rule")

(5) 82 Fed. Reg. 52,643 (Nov.14, 2017)("*Final Rule: delay of effective Date*") (hereinafter, the "Third Delay Rule")

(6) 82 Fed. Reg. 59,988-992 (Dec. 18, 2018) ("*National Organic Program (NOP); Organic Livestock Production Practices—Withdrawal*") (hereinafter, "Proposed Withdrawal")

(7) 83 Fed. Reg. 10775-783 (March 13, 2018) ("*Final Rule; Withdrawal*") ("Withdrawal Rule")

action and cited to parts of each administrative record in the Withdrawal Rule.[3] Prior to the final

withdrawal rule proceeding initiated in December 2017, USDA had not disclosed its scientific,

economic, or legal grounds for delay or withdrawal. Now, it is apparent that a breathtaking

repudiation of more than twenty years of organic program policy, standards development, and

implementation is underway. *See e.g.*, SAC ¶¶ 1-15. The SAC consolidates the allegations

arising from each challenged administrative action into a single, cohesive pleading.

The OLPP was the product of more than ten years of agency and public process arising

from "recommendations provided by USDA's Office of Inspector General and nine separate

recommendations from the National Organic Standards Board."[4] 82 Fed. Reg. at 7082. The

recommendations accepted by the agency were based on long-standing and well-settled agency

constructions of the Organic Foods Production Act ("OFPA") with regard to organic standards

for livestock care, and the role of the NOSB in developing those standards. The OLPP clarified

and extended animal care assurances on organic farms. The Withdrawal Rule relied on a novel

and erroneous construction of the OFPA that conflicts with, and contradicts, statutory mandates

set by Congress for organic standards for livestock care, and the role of the NOSB in developing

those standards. The Withdrawal Rule conflicts with every prior administration's approach to

---

[3] A few examples of the Withdrawal Rule's reliance on the prior proceedings are: 83 Fed. Reg. 10775 ("Related Documents" section citing each of the aforementioned rulemakings); *id.* at 10778 (citing AMS actions at April 2017 NOSB meeting); *id.* at 10781 (rejecting enlargement of comment period because parties "had the opportunity to comment on the underlying OLPP final rule in 2016 as well as the rulemaking in 2017 that culminated in the delay of the effect [date] of the OLPP final rule until May 14, 2018.); *id.* at 10779 ("After publication of the OLPP final rule, AMS discovered a mathematical error in the calculation of benefits."); *id.* at 10782 ("As a result of reviewing the calculation of estimated benefits, AMS reassessed the economic basis for the rulemaking as well as the validity of the estimated benefits.")
[4] The National Organic Standards Board ("NOSB") is an expert advisory body created by Congress to advise the USDA on development and implementation of organic standards. *See* 7 U.S.C. § 6503(c); 7 U.S.C. § 6509(d)(2); 7 U.S.C. § 6509(g); 7 U.S.C. § 6518(a); 7 U.S.C. § 6518(k)(1).

organic rulemaking under the OFPA and the APA. The SAC presents several first-impression questions of law under these statutes and issues of major significance to all organic farmers, consumers of organic food products, and farm animal welfare advocates.

## BACKGROUND

The facts of this case are stated in detail in the Background section of Plaintiffs' SAC, ¶¶ 52-273, and will not be restated here.

## APPLICABLE STANDARDS OF REVIEW

A motion to dismiss under FED. R. CIV. P. 12(B)(1) tests the factual allegations necessary to establish the Court's subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Additionally,

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.

Warth v. Seldin, 422 U.S. 490, 501-02 (1975) (internal citations omitted); *see also Hudson v. Am. Fed'n of Gov't Employees*, No. CV 17-1867 (JEB), 2018 WL 707431, at *3 (D.D.C. Feb. 5, 2018) (noting the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."). The inquiry is not intended to be overly burdensome and the D.C. Circuit Court has noted, "the impropriety of transforming Rule 12(b)(1) motions into summary-judgment motions is well-settled." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), *citing Gordon v. National Youth Work Alliance,* 675 F.2d 356, 363 n. 18 (D.C.Cir. 1982)

A membership association may sue on its own behalf and on behalf of its members. *See, e.g., United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 552, (1996); *accord Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) ("An organization ... can assert standing on its own behalf, on behalf of its members or both.") For organizational standing, the standard is the same as the one for individuals: the organization must show "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision."
*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*"); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378, (1982) (noting "we conduct the same inquiry as in the case of an individual").

An association may sue on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests the organization seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 15 (D.D.C. 2001) citing *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim."), citing *Bennett v. Spear,* 520 U.S. 154, 168 (1997) (internal quotation marks omitted).

Challenges under FED. R. CIV. P. 12(B)(6) are met when the complaint contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when it contains factual allegations that, if

proved, would "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Banneker Ventures, LLC v. Graham,* 798 F.3d 1119, 1129 (D.C. Cir. 2015) (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678). In this inquiry, a court must "draw all reasonable inferences from those allegations in the plaintiff's favor." *Id.*

FED. R. CIV. P. 15(A)(2) provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires." Leave to amend or supplement should be "freely granted when [it] will promote the economic and speedy disposition of the entire controversy between the parties," but it may be denied in the rare event that the proposed amendment or supplementation is futile or will cause undue delay or prejudice to the rights of other parties. *Hall v. Cent. Intelligence Agency*, 437 F.3d 94, 101 (D.C. Cir. 2006).

## ARGUMENT

### A. ALL THREE PLAINTIFFS HAVE STANDING TO CHALLENGE DEFENDANTS' UNLAWFUL ACTIONS.

#### 1. All Plaintiffs Have Demonstrated Organizational Standing.

##### a. Plaintiff OTA has organizational standing to challenge Defendants on the postponement and withdrawal of OLPP.

"USDA's repeated violations of the OFPA and APA injures both OTA as an organization and OTA's members." SAC ¶ 23

To establish organizational standing, a plaintiff "must make the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011). "When plaintiffs challenge an action taken without required procedural safeguards, they must establish the agency action threatens their concrete interest." *Fla. Audubon Soc'y,* 94 F.3d 658,

664 (D.C.Cir. 1996); *see also Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (noting once a concrete interest is demonstrated "the normal standards for immediacy and redressability are relaxed")

OTA is a "business association for organic agriculture and products…and is the leading voice for the organic trade in the United States …"  SAC ¶ 21. OTA's "mission is to promote, develop and protect organic standards, ensure the due process rights of its members…"  SAC ¶ 22  OTA submitted written comments and testimony on all NOSB recommendations that led to the OLPP and all on all proceedings involving the OLPP.  *Id.* "OTA's members rely on the organic label to ensure that organic food was produced with high and consistently applied standards, including animal welfare standards…"  SAC ¶ 24. Last, OTA's mission is to promote and protect the growth of organic trade to benefit the environment, farmers and consumers…."  *See Declaration of Laura Batcha,* OTA Exec. Director, ECF No. 34, Attachment 15 at ¶ 11

Prior to passage of the OFPA there was a welter of voluntary private and state organic standards and little reciprocity between the various industry participants that hampered growth. *See generally* 65 Fed. Reg. at 80,677-78 (Dec. 2000) (Final Rule creating NOP) (Final Regulatory Flexibility Analysis); *id.* at 80,677.  OTA in its first incarnation was created to attempt to mitigate these restrictions on the ability to grow the organic trade by attempting harmonization with the various entities. *See Exhibit X* Declaration of Laura Batcha, at ¶ 2 ("Batcha Dec.") These efforts were underway prior to the passage of the OFPA. *Id.*

OTA led the industry effort to create voluntary national organic standards. *See* Batcha Dec. at ¶ 3;  65 Fed. Reg. at 80,676 ("To address these problems in the late 1980's, the organic industry attempted to establish a national voluntary organic certification program."); *see generally* Senate Committee on Agriculture, Forestry and Nutrition, *Report of the Committee on*

*Agriculture, Forestry and Nutrition to Accompany S. 2830 Together with Additional and Minority Views*, S. Rep. No. 101-357, (1990) (discussion of need for single national standard; inability of marketplace to solve the problem); 65 Fed. Reg. at 80,667 (referencing "the industry developed standards recently proposed by the Organic Trade Association.")  As an organization OTA served to work with multiple bodies and industry participants and states to harmonize disparate organic standards and urge reciprocity among certification programs. *See* Batcha Dec. at ¶ 2

OTA supported the passage of the OFPA, and in particular supported two key purposes, the creation of a uniform national standard enforceable by USDA, Batcha Dec ¶ 4, and the creation of the National Organic Standards Board to ensure a public-private partnership would be at the heart of organic standards development going forward. *See* Batcha Dec. at ¶3; *see also SAC* at ¶¶'s 62-68 (citing legislative history of NOSB creation); *See* 65 Fed. Reg. at 80678 (noting OTA published guidelines for the organic industry); *see e.g.* 65 Fed. Reg. at 80563("The NOSB recommended that the final rule contain a commercial availability provision based upon the guidelines developed by the American Organic Standards project of the Organic Trade Association.")

As an organization, during this time OTA transformed from a clearing house interacting with many market and certification participants to an organization focused on the USDA's NOP and the role of the NOSB.  *See* Batcha Dec. at ¶6; 65 Fed. Reg. at 80666 (describing transition to federal program).  Similarly, "industry developed standards" were rejected because "it would be difficult to develop consensus standards."  *Id.* Since that time the USDA has consistently rejected private standards and certifications that result in "better than you" organic claims.  *See* Batcha

Dec. at ¶12; *see also SAC* at ¶ 248 (review of Economic Research Service Report conclusions regarding value of single, federal labeling standard)[5]

In the Withdrawal Rule USDA reversed course on the single national standard and the role of the NOSB. 83 Fed. Reg. at 10,782 (approving use of private certification labels in addition to organic); 83 Fed. Reg. 10778 (rejecting NOSB consultative role).

OTA, as an organization is severely harmed by these policy reversals. *See Batcha Dec.* at ¶¶'s 10-19  During these multiple rulemakings, USDA failed to keep open the consultative channel with the NOSB, which is a key mechanism by which OTA stays informed and fulfills its mission. SAC ¶ 24; *see also* SAC ¶ 281 (failure to consult NOSB in each proceeding)  USDA failed to provide adequate Notice in the third delay rulemaking, SAC ¶280, failure to provide the necessary technical reports that USDA ultimately relied upon to revise its cost/benefit analysis of the OLPP, SAC ¶ ¶ 's 184-84, 281 and failure to provide adequate time to prepare comments in the Withdrawal rulemaking. SAC ¶ 247.  Batcha declaration patently establish that OTA's activities in promoting trade in organic products, promoting consumer awareness of the single, consistent national standard and working with NOSB has been impaired. *Abigail All. for Better Access to Developmental Drugs v. Eschenbach,* 469 F.3d 129, 133 (D.C.Cir.2006). *Food & Water Watch, Inc. v. Vilsack,* 808 F.3d 905, 919 (D.C. Cir. 2015).

**b.   Plaintiff ASPCA has organizational standing to challenge Defendants on the postponement and withdrawal of OLPP.**

The ASPCA asserts organizational standing only. *See* SAC ¶¶ 26-37. In order to demonstrate, at this stage of the litigation, that it has standing in its own right, the ASPCA

---

[5] *A Report Summary from the Economic Research Service, Beyond Nutrition and Organic Labels—30 Years of Experience With Intervening in Food Labels*, Report No. 39 (November 2017) ("ERS Report No. 39").

alleges a personal stake in the outcome of the case. *See Havens Realty Corp.*, 455 U.S. at 378-79.

Specifically, the ASPCA asserts (1) a concrete and demonstrable injury to its activities that is (2)

fairly traceable to the alleged illegal action and (3) likely to be redressed by a favorable court

decision. *See Equal Rights Ctr.*, 633 F.3d at 1138.

       In order to determine whether an organization's injury is concrete and demonstrable, as

opposed to a mere setback to its abstract interests, the organization must show, first, that the

agency's action or omission injured the organization's interest or mission, and, second, that the

organization used its resources to counteract that harm. *See id.* at 1140*, see also PETA*, 797 F.3d

at 1094. The ASPCA can satisfy both elements.

       The ASPCA's mission, as stated by founder Henry Bergh in 1866, is "to provide

effective means for the prevention of cruelty to animals throughout the United States." *See*

https://www.aspca.org/about-us. Improving the welfare of the billions of farm animals raised

each year on American farms is central to this mission. *See* https://www.aspca.org/animal-

cruelty/farm-animal-welfare. To that end, the ASPCA has a well-established farm animal welfare

program which employs several farm animal welfare experts and is supported by other ASPCA

staff, including those in the organization's Government Relations and Legal Advocacy

departments. Exh. 9, McMillan Decl. ¶ 3.

       The farm animal welfare program helps the ASPCA achieve its mission by advocating

for a range of laws, regulations, and policies that promote greater protection for farm animals,

including bans on raising farm animals with cages, crates, and other intensive farming practices

that maximize output at the expense of animal welfare; corporate policies adopting more humane

husbandry, transportation, and slaughter practices; and regulatory and legislative requirements

that ensure food product labels convey accurate information to consumers about farm animal

welfare. SAC ¶ 29; Exh. 9, McMillan Decl. ¶ 4. The ASPCA pursues these efforts through

regulatory and legislative advocacy; corporate and institutional engagement; and consumer

education and mobilization. Exh. 9, McMillan Decl. ¶ 5. Through this work, the ASPCA aims to

improve farm animal welfare by, among other things, expanding the portion of the market

comprised of meaningful third-party animal welfare-certified meat, dairy, and egg products. Exh.

9, McMillan Decl. ¶ 6.

      Much of the ASPCA's farm animal welfare work is reflected on the ASPCA's "Shop

With Your Heart" campaign website, which is geared toward consumers, companies, and

advocates. Exh. 9, McMillan Decl. ¶ 7. That website, launched in 2016, reaches millions of

Americans to encourage them to consider making more humane food choices by providing

resources such as food label guides, lists of higher-welfare brands, guides for farmers

considering welfare certification, and ways for the public to take action to improve farm animal

welfare. Exh. 9, McMillan Decl. ¶ 8. The campaign has been reported on by national

publications including the *New York Times*, *USA Today*, and the *Los Angeles Times*. Exh. 9,

McMillan Decl. ¶ 9. The Shop With Your Heart campaign reaches 2.5 million ASPCA members

by e-mail and has 1.75 million Facebook followers, 490,000 Twitter followers, and 303,000

Instagram followers. Exh. 9, McMillan Decl. ¶ 10. Over the past year, forty-five brands and

twelve major food buyers have collaborated with the Shop With Your Heart campaign by

adopting the most rigorous and transparent farm animal welfare certification programs in the

country, thereby improving the lives of hundreds of thousands of chickens, cows, pigs, and other

farm animals. Exh. 9, McMillan Decl. ¶ 11.

      In its first year, the ASPCA's Shop With Your Heart campaign garnered the ASPCA

approximately 3,000 additional followers, supporters, and donors per month, reflecting the

growing expectations of ASPCA supporters and the American public that animal welfare organizations like the ASPCA vigorously advocate for improvements in farm animal welfare. Exh. 9, McMillan Decl. ¶ 12. The ASPCA's farm work has also helped the ASPCA reach new audiences, such as individuals concerned with personal health, public health, the environment, and fair labor standards. Exh. 9, McMillan Decl. ¶ 13. The ASPCA is a key participant in a number of cross-sector initiatives and events that have allowed it to generate materials for those new audiences and reach them through public appearances on conference panels and in other venues. Exh. 9, McMillan Decl. ¶ 14. Additionally, the farm animal welfare program continues to develop relationships with farm animal sanctuaries, helping to increase the ASPCA's ability to place farm animals from cruelty cases. Exh. 9, McMillan Decl. ¶ 15.

Defendants' postponement and eventual withdrawal of the OLPP impairs and frustrates the ASPCA's mission. Prior to the OLPP's withdrawal, the ASPCA devoted a substantial amount of its time and other resources to improving organic standards. Exh. 9, McMillan Decl. ¶ 16. It has focused on educating consumers on what the Organic label entails for animal welfare and, eventually, planned to help raise the labels' welfare standards, through the implementation of the OLPP and other efforts. Exh. 9, McMillan Decl. ¶ 17. While the OLPP rulemaking process was underway, and relying on the assumption that the process would have established regulations leading to higher welfare, the ASPCA engaged organic farmers to secure their support for OLPP, and encouraged their participation in its outreach campaigns. Exh. 9, McMillan Decl. ¶ 18. Now that OLPP has been withdrawn and the anticipated certainty in consistent and improved animal welfare regulations has been destroyed, the Organic farming community is splintering off in several directions. Exh. 9, McMillan Decl. ¶ 19. Some farms will implement higher-welfare standards, while others may not. Without OLPP in place, both types of

farms may use the same Organic certification. Exh. 9, McMillan Decl. ¶ 20. This is likely to cause increased consumer confusion, since the Organic food label will not carry a consistent meaning as it relates to animal welfare standards. Exh. 9, McMillan Decl. ¶ 21.

Relatedly, the OLPP's withdrawal has now made it difficult for the ASPCA to clarify the Organic label for consumers, because the ASPCA had previously publicized the OLPP rule as promising significant improvements to the Organic label. Exh. 9, McMillan Decl. ¶ 22. The ASPCA's Shop With Your Heart campaign is aimed at helping consumers understand the complex food labeling marketplace and increasing the availability of meaningful food-labeling certifications. Exh. 9, McMillan Decl. ¶ 23. The repeated postponement, and eventual withdrawal, of the OLPP has undermined this work and likely eroded consumer trust in this campaign. Exh. 9, McMillan Decl. ¶ 24.

In sum, by now refusing to promulgate the OLPP as planned, and thus, undercutting the relationships the ASPCA has built with consumers, farmers, and the public, Defendants have impaired the ASPCA's ability to accomplish its mission with respect to farm animal welfare.

Further, as alleged in the Second Amended Complaint, the USDA has eliminated the ASPCA's ability to contribute to the government's development of organic standards. First, USDA failed to provide notice and comment opportunities on the first two postponements of the OLPP. *See* SAC ¶¶ 160-174. This precluded the ASPCA from providing input on USDA's decisions as it had been able to do in the past. *Id.* at ¶¶ 30-32. USDA also failed to consult NOSB with respect to its recent decisions on OLPP, including the rule's withdrawal. *Id.* at ¶¶ 169, 171, 179, 204. As noted in the Second Amended Complaint, the ASPCA has communicated with NOSB on many occasions in the past about OLPP, because USDA must consult with NOSB as part of the rulemaking process. *See* SAC at ¶ 30. USDA's recent refusal to include NOSB in its

decision-making process (including on USDA's decision to withdraw the OLPP rule) limited the

ASPCA's ability to obtain critical information about the status of the agency's rulemaking,

which the ASPCA needed to develop appropriate educational and other programmatic activities.

Exh. 9, McMillan Decl. ¶ 25. By curtailing the ASPCA's mechanisms for communicating with

USDA about OLPP and any potential future organics standards, Defendants have significantly

frustrated the ASPCA's ability to achieve its mission with respect to animals on organic farms.

     The ASPCA's standing allegations in this case are similar to those found to be sufficient

to establish that People for the Ethical Treatment of Animals (PETA) had standing to bring suit

against USDA for the agency's failure to apply the standards set out in the Animal Welfare Act

to birds. *See PETA* 797 F.3d at 1087. In *PETA*, the Court identified that organization's mission

as the prevention of cruelty and inhumane treatment of animals and agreed that "one of the

primary ways in which PETA accomplishes its mission is 'educating the public' by providing

'information about the conditions of animals held by particular exhibitors.'" *Id.* (internal

citations omitted). It found that USDA's refusal to apply the Animal Welfare Act to birds

impaired PETA's mission by precluding PETA from gathering information about exhibitors to

submit to the USDA through its complaint process, and depriving PETA of key information it

relied on to educate the public. *Id.* ("We agree that PETA has, at the dismissal stage, adequately

shown that the USDA's inaction injured its interests. . ."). Here, as in the *PETA* lawsuit, an

animal welfare organization's mission has been thwarted by USDA's actions. USDA's repeated

delay, and eventual withdrawal, of the OLPP has impaired the ASPCA's ability to adequately

educate consumers about the realities of the organic industry. It has also opened the door for

numerous inconsistent animal welfare practices on organic farms, which will make it far more

difficult for the ASPCA to educate consumers about which organic products have the high-welfare standards consumers expect from the Organic label.

In addition, the ASPCA has devoted critical resources to counteracting Defendants' unlawful conduct. For example, since the OLPP was first postponed, the ASPCA has diverted resources toward extensive communication with the public, journalists, and partner organizations to alert them to USDA's actions. Exh. 9, McMillan Decl. ¶ 26. This includes press releases; researching and releasing reports on the economic and ethical imperative for these rules; conducting extensive media interviews; coordinating with farmers, companies, and other strategically-aligned groups; issuing multiple rounds of advocacy emails; and launching multi-platform social media campaigns, all urging public comment to USDA. *See* SAC ¶ 36; Exh. 9, McMillan Decl. ¶ 27. None of these activities were taken for the purpose of litigation or in anticipation of litigation. The ASPCA would have undertaken these activities to counteract USDA's conduct regardless of whether it joined this lawsuit or not. Exh. 9, McMillan Decl. ¶ 28. Thus, the ASPCA's ongoing expenditure of resources to counteract USDA's challenged actions suffice for an organizational standing injury. *See PETA*, 797 F.3d at 1095 ("Accordingly, the USDA's challenged non-action plainly impairs PETA's activities in a non-speculative manner by 'requir[ing]' PETA to 'divert and redirect its limited resources to counteract and offset Defendant's unlawful conduct and omissions.'"); *see also Equal Rights Ctr.*, 633 F.3d at 1140 ("While the diversion of resources to litigation or to investigation in anticipation of litigation does not constitute an injury in fact sufficient to support standing, the ERC's alleged diversion of resources to programs designed to counteract the injury to its interest in promoting fair housing could constitute such an injury.").

Several recent decisions from this Court relate to the standing inquiry in this case. For example, in *National Fair Housing Alliance v. Travelers Indemnity Co.*, the Court found standing where the plaintiff diverted its resources to provide additional training for staff and develop tracking and intake procedures to prepare for a potential increased volume of calls by landlords and tenants regarding insurance-related housing discrimination; created new educational materials and posted them on its website; purchased a public-service advertisement in a newspaper targeted toward the population to be harmed by the defendant's policy; and paid for an email blast to the newspapers' readers. 261 F. Supp. 3d 20, 26-27 (D.D.C. 2017) (finding NFHA had "certainly pleaded sufficient facts to show that it suffered a concrete injury-in-fact by diverting scarce resources to 'counteract the defendant's racially discriminatory' practices").

In *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, the Court found the plaintiff suffered an injury because it had "a long-standing mission to educate the public regarding privacy rights, and engages in this process by obtaining information from the government." 266 F. Supp. 3d 297, 314 (D.D.C. 2017). The Court also found that the plaintiff's programmatic activities—educating the public regarding privacy matters—had been impaired by Defendants' alleged failure to comply with the relevant statute – an injury that required the plaintiff to expend resources to seek records from federal entities concerning the collection of voter data. *Id.* ("Accordingly, Plaintiff has organizational standing under the two-part test sanctioned by the D.C. Circuit in *PETA*.").

Because the ASPCA's injuries are concrete and specific to the work it is engaged in, the ASPCA has sufficiently alleged a cognizable injury to support standing. Further, since Defendants' actions have injured the ASPCA, and the ASPCA has expended resources to counteract these injuries, it has shown a concrete and particularized injury necessary to support

standing. *See, e.g.*, *PETA*, 797 F.3d at 1095 ("[T]he USDA's allegedly unlawful conduct *does* hamper and directly conflicts with PETA's stated mission of preventing 'cruelty and inhumane treatment of animals' through, *inter alia*, 'public education' and 'cruelty investigations.'"). As in *PETA*, the ASPCA has sufficiently alleged that its injury is far more than just a setback to its abstract interests. *See Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986).

The ASPCA also meets the causation and redressability prongs of the standing analysis. In terms of causation, it is clear that, but for USDA's decision to postpone, and ultimately withdraw, the OLPP, the ASPCA would not have had to divert its resources in the manner described above. Further, the remedy sought – immediate implementation of the OLPP – would redress the ASPCA's injuries. The ASPCA could rededicate resources to its other legislative, regulatory, corporate, or consumer education initiatives that help fulfill its mission. Exh. 9, McMillan Decl. ¶ 29. For example, the ASPCA could focus its work on clarifying other types of food labeling claims for the public, as well as improving the underlying animal welfare standards of those labels. Exh. 9, McMillan Decl. ¶ 30. The ASPCA could also focus more on growing the market for, and continuing to raise the standards of, animal welfare certification programs (such as Certified Humane, Global Animal Partnership and Animal Welfare Approved), which is a cornerstone of the ASPCA's farm animal welfare strategy. Exh. 9, McMillan Decl. ¶ 31. To date, many of the ASPCA's resources have been dedicated to just one label – USDA Organic. Exh. 9, McMillan Decl. ¶ 32. Therefore, immediate implementation of the OLPP rule would allow the ASPCA to focus on other campaigns, as well as refine its work with organic farmers and consumers and continue to advocate for higher organic welfare standards following implementation of OLPP. Exh. 9, McMillan Decl. ¶ 33. Therefore, the relief sought would

redress the injuries caused by USDA's failure to implement OLPP. *See PETA*, 797 F.3d at 1093 n.3 (finding causation and redressability where "the injuries complained of – USDA's refusal to take enforcement action in response to PETA's complaints and USDA's failure to compile the information PETA wants to use in its educational materials – are caused by the agency and the remedies sought – and order compelling USDA to enforce the AWA with respect to birds . . . – would redress those injuries." (internal citations omitted)).

      c.    **Plaintiff AWI has organizational standing to challenge Defendants on the postponement and withdrawal of OLPP.**

Defendants assert AWI lacks organizational standing because AWI fails to allege more than "simply a setback" to its "abstract social interests." Motion at ¶ 21. To establish standing, AWI can demonstrate that it, as an organization, has an actual or threatened injury that is fairly traceable to the illegal action, which is likely to be redressed by a favorable court decision. *See, e.g., Lujan*, 504 U.S. at 560–61; *Equal Rights Ctr.*, 633 F.3d at 1136. AWI further shows that, through the doctrine of associational standing, at least one of its members meets the standing requirements. *Hunt*, 432 U.S. at 343.

To meet the burden of injury, the Supreme Court has found that a concrete and demonstrable injury to an organization's activities—with consequent drain on the organization's resources—constitutes *far more than simply a setback* to an organization's abstract social interests. *See Havens Realty Corp.*, 445 U.S. at 379; *see also Equal Rights Ctr.*, 633 F.3d at 1138. USDA's failure to implement the OLPP rule, which would have created consistent, improved animal welfare standards under the National Organic Program (NOP), as required by the statute, 7 U.S.C. § 6501(b), has "perceptibly impaired" AWI's interest, made its "overall task more difficult[,]" *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.,* 28 F.3d 1268, 1276 (D.C. Cir. 1994), and has forced AWI to expend substantial resources "in response

to, and to counteract, the effects of defendants' alleged [illegal action]" *Equal Rights Center*, 633 F.3d at 1140. This "increase [in] the resources [AWI] must devote to programs" in response to a defendant's illegal action is sufficient to demonstrate an injury in fact. *Id.* at 1138, *citing Havens Realty*, 455 U.S. at 379. AWI can meet this factor.

AWI was founded in 1951 to alleviate the suffering that humans cause to animals. To that end, AWI focuses a substantial portion of its efforts on improving animal welfare at cruel animal factories, which raise and slaughter pigs, cows, and chickens for human consumption. *See* https://awionline.org/content/who-we-are. AWI employs farm animal and legislative affairs staff who focus on campaigns to improve animal welfare on farms, during transport, during slaughter, and to promote consumer awareness of the treatment of animals produced for food by encouraging informative labeling of animal products. Exh. 10, Jones Decl. ¶ 5. AWI also engages in policy efforts, legislative advocacy, research, and education of the public and our members in as part of these campaigns. Exh. 10, Jones Decl. ¶ 5; SAC ¶ 40.

The USDA Organic label is especially consequential for AWI, because OFPA and its associated regulations directly affect all four of AWI's farm animal campaign areas—indicating that the implementation of the OLPP rule, which governs the standards with which "organic" producers must comply, is central to AWI's mission. AWI's four major campaign areas for farm animals include: on farm, transport, slaughter, and labeling, each of which are affected by the OLPP rule. AWI's on-farm campaigns cover advocating for improved living conditions and health care practices, including access to the outdoors and the elimination of painful physical alterations. OLPP expressly required outdoor access for all animals under the program and limited the use of painful physical alterations. 82 Fed. Reg. 7091–92 (§§ 205.238(a)(5); 205.239; 205.241). AWI's transport campaign advocates for less travel time, fewer instances of

offloading, and for environmental improvements to decrease suffering and discomfort. OLPP contained provisions improving the treatment of animals during travel by regulating environmental conditions and travel time. 82 Fed. Reg. 7092 (§ 205.242(a)). AWI's campaign regarding the slaughter of animals aims to promote more humane methods of slaughter, and for more oversight. OLPP included provisions relating to increased oversight of humane handling at slaughter. 82 Fed. Reg. at 7092 (§ 205.242(b)). AWI's last major campaign area is labeling transparency. AWI does substantial work to ensure that consumers have access to accurate information in food labels, notably including the economically important USDA "organic" label, in order to allow consumers to make educated, ethical choices about the food they consume. *See e.g.* https://awionline.org/content/consumers-guide-food-labels-and-animal-welfare. The essence of the NOP is food label consistency, as indicated by the purpose of the act. 7 U.S.C. § 6501(2). To that end, the OLPP was designed to improve consumer confidence in the USDA "organic" label by ensuring that the label accurately reflects a consistent standard of animal care.  Because the OLPP's withdrawal directly impairs all four AWI campaign areas by allowing inhumane treatment of animals on farms and during transport and slaughter, and by eroding, the unlawful withdrawal of the OLPP rule directly and fundamentally harms AWI's ability to carry out its mission.

To accomplish AWI's goals of reducing suffering of farm animals raised under the organic program, AWI advocates for improved raising conditions, consistent standards that will improve consumer confidence and increase the welfare of animals raised under "organic" programs, and transparent and lawful administrative actions. Exh. 10, Jones Decl. ¶¶ 6–7; SAC ¶ 39–41. AWI employs three full-time farm animal staff members and government affairs staff that work on legislative matters relating to farm animal welfare. Exh. 10, Jones Decl. ¶ 5. Once

OLPP was finalized, AWI planned to limit expenditures and staff time relating to organic matters to only advocating for improved poultry growth-rate standards. Exh. 10, Jones Decl. ¶ 8. When the USDA delayed and withdrew OLPP, AWI staff were forced to redirect efforts and financial resources away from planned advocacy, policy, legislative, research, litigation, and education projects on other matters (such as ritual slaughter of livestock and policy efforts to improve animal welfare at slaughter) toward addressing the USDA's actions. Exh. 10, Jones Decl. ¶ 8. Consolidate these two sentences: Due to the OLPP's withdrawal, AWI has been unable to continue work on several other projects, including reports on ritual livestock slaughter and livestock transport.

When USDA delayed the rule, AWI expended substantial staff time and resources to mitigating the harm caused by that unlawful delay. AWI alerted its members about the delay, drafted substantive comments in response to the USDA's unlawful comment period, and encouraged its members and the public to participate in the comment period. Exh. 10, Jones Decl. ¶¶ 9–10; SAC ¶ 40. AWI also partnered with ASPCA and Farm Forward to research, write, and publish a report about the effect of the rule and the delay on animal welfare and consumers. Exh. 10, Jones Decl. ¶ 9; SAC ¶ 40.

When USDA withdrew OLPP, AWI expended significant staff resources to publish a report, *The Critical Relationship Between Farm Animal Health and Welfare*, to educate its members in response to USDA's argument that OFPA permitted it to only regulate animal health care, not animal welfare. The report demonstrates that not only has the USDA expressly found the two are inextricably linked, but that often changes are made to animal husbandry practices

based upon the health impact on animals.[6] *See*

*https://awionline.org/sites/default/files/uploads/documents/FA-AWI-Animal-Health-Welfare-Report-04022018.pdf*. AWI expended considerable staff resources preparing this report, and even hired a consultant to assist in its completion. Exh. 10, Jones Decl. ¶ 11. AWI also drafted a statement to its members and to the public about OLPP's withdrawal, asked for an extension to the unconventionally short comment period, pulled together extensive comments on extremely short notice, and rallied its members to submit comments into the docket. Exh. 10, Jones Decl. ¶ 7; SAC ¶ 40.

All told, AWI has expended in excess of 1,000 staff and consultant hours attempting to mitigate the harm caused by the USDA's unlawful delay and withdrawal of OLPP and to respond to USDA's actions on behalf of AWI and its members. Exh. 10, Jones Decl. ¶ 12. AWI also must now also expend resources it expected to spend on other farm animal campaigns educating its members about how the organic program will not have the consistent standards that would have been implemented under OLPP, which is directly traceable to USDA's failure to comply with its own statute, OFPA. Exh. 10, Jones Decl. ¶ 13; SAC ¶ 43. Since OLPP will not go into effect, and the NOP will not guarantee consistent standards across the board, AWI will have to expend more resources counseling its members about which products meet minimum animal welfare standards. Exh. 10, Jones Decl. ¶ 13. None of these expenditures were taken in anticipation of litigation, and AWI would have expended these resources regardless of its participation in the present case. Exh. 10, Jones Decl. ¶ 14. Indeed, AWI had already expended

---

[6] *See https://awionline.org/sites/default/files/uploads/documents/FA-AWI-Animal-Health-Welfare-Report-04022018.pdf*.

most of these resources before the filing of the motion to amend the complaint and add AWI as a party.

This court has found sufficient injury in fact in similar cases. For example, in *PETA*, this court sufficient injury when a plaintiff alleged its educational interests were affected by the USDA's failure to enforce the Animal Welfare Act ("AWA"). 797 F.3d at 1094. The plaintiff was injured because the defendant's actions deprived the plaintiff of information required to continue its advocacy by failing to enforce the AWA for birds. *Id.* To obtain this information, the plaintiff had to expend additional resources. *Id.* The court also found that the defendant's actions directly hampered and prevented the plaintiff from accomplishing its mission of preventing cruelty and inhumane treatment of animals through public education. *Id.* at 1095.

The court's finding of sufficient injury in fact to establish Article III standing is indistinguishable from the facts of this case. Just as USDA's actions deprived PETA of information by failing to provide information that would have been made available through lawful implementation of the AWA, *id.*, in this case, USDA's delay and withdrawal of the OLPP rule injures AWI by depriving it of clear standards necessary to determine definitively whether organic livestock and poultry products produced under the organic program meet the standards of care its members seek. Because of this lack of clarity, AWI is forced to expend additional resources doing research and educating its members to counteract that information gap. *See also Fair Emp't Council*, 28 F.3d at 1276 (finding the defendant's actions that "might increase the number of people in need of counseling" and that "may have reduced the effectiveness of any given level of [the organization's] outreach efforts" demonstrate sufficient injury for organizational standing); Exh. 10, Jones Decl. ¶ 13.

A favorable decision by the court will redress the injury caused by defendants. But for USDA's decision to delay, withdraw, and provide inadequate procedure, AWI would not have been injured, and would not have needed to divert substantial resources toward mitigating that injury. *PETA*, 797 F.3d at 1095–96. The remedy sought by Plaintiffs redresses this injury by implementing standards that ensure consistency from one organic product to the next, and in turn removes the educational burden from AWI. If a favorable decision were granted by this court, AWI could use its resources toward the other educational and interest activities it had planned prior to the rule's delay and withdrawal. Exh. 10, Jones Decl. ¶ 13.

## 2. Plaintiffs ASPCA and AWI are Within the Zone of Interests of the OFPA.

Defendants contend that AWI and ASPCA's interests do not fall within the zone of interests of the OFPA because the Act's objectives focus on marketing organic products, assuring consumers that organic products meet consistent standards, and facilitating interstate commerce in organic food. *See* Motion at 26. But the zone of interests test is not the demanding standard Defendants would have the Court believe: It merely requires a court to assess "whether a would-be challenger to agency action is pursuing an interest 'arguably within the zone of interests' Congress intended either to regulate or protect. *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 921–22 (D.C. Cir. 1989) (hereinafter, "HWTC I"). This should be determined by reference to "the particular provision of the law upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997). The doctrine is only meant to exclude plaintiffs who are more likely to "frustrate rather than further the statutory objective." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 (1987).

The zone of interests test therefore requires challengers to agency actions to fall into one of two categories: "intended beneficiaries" (*i.e.*, regulated parties) or "suitable challengers." *Id. ; Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 (D.C. Cir. 1988) (hereinafter,

"*HWTC II*"). Suitable challengers are those whose interests coincide with the statutory purpose, *id.*, or those who can "police interests that the statute protects." *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 444 (D.C. Cir. 1998). AWI and ASPCA are suitable challengers.

Non-beneficiaries are required to show "less than a . . . congressional intent to benefit, but more than a 'marginal' rela[tionship] to the statutory purpose." *HWTC II*, 861 F.2d at 283, regardless of whether it was the "direct or express object of Congressional beneficence" *HWTC I*, 885 F.2d at 923. ASPCA and AWI demonstrate that their interests "coincide . . . with the interests of those whom Congress intended to protect" through their interest in ensuring consistent, meaningful labeling of organic food. *Id.* at 924.

As they relate to the OFPA, ASPCA and AWI's missions include reducing suffering of farm animals and helping farmers and other companies implement more humane raising standards. The organizations accomplish these goals through public education, research, legislation, policy efforts and litigation. Exh. 10, Jones Decl. ¶ 4; Exh. 9, McMillan Decl. ¶ 4.

AWI accomplishes its mission by educating the public and researching the effects on animals of conditions of animals raised in different types of husbandry systems and advocating for consistent standards to be applied across these systems. Exh. 10, Jones Decl. ¶ 6. Because consistent standards are so problematic under the organic system, and because of the large impact that has on animal welfare, AWI has focused on organic standards as part of one of its farm animal program objectives. *Id.* This program area coincides with the interests Congress intended to protect with OFPA. *HWTC*, 885 F.2d at 923.

ASPCA accomplishes its mission by expanding the portion of the market comprised of meaningful third-party animal welfare-certified meat, dairy, and egg products; encouraging consumers to consider making more humane food choices by providing resources such as food

label guides, lists of higher-welfare brands, guides for farmers considering welfare certification, and ways for the public to take action to improve farm animal welfare; educating consumers on what the Organic label entails for animal welfare and, eventually, planned to help raise the labels' welfare standards, through the implementation of the OLPP and other efforts. Exh. 9, McMillan Decl. ¶¶ 4-18.

AWI and ASPCA's interests are directly linked to the purpose of OFPA, which Congress enacted to "assure consumers" that organic products "meet a consistent standard." 7 U.S.C. § 6501(2). OFPA seeks to protect consumers who desire assurances about consistency in organic products. ASPCA's and AWI's members are exactly the types of consumers Congress sought to protect. *See* SAC ¶¶ 33, 43. AWI and the ASPCA have an interest in protecting the integrity of organic certification on behalf of their members' interests in reducing the suffering of animals, improving the lives of the billions of animals on American farms, and helping farmers and other companies implement more humane practices. The core of these issues in animal agriculture are addressed by consistent application of standards, which the withdrawn OLPP rule would have contributed to.

While not directly addressed by Defendants in their zone-of-interests argument, animal well-being, a stated interest of AWI, ASPCA, and their members, is also critical to the implementation of the organic certification program. 7 U.S.C. § 6509 ("Animal Production Practices and Materials"). Defendants acknowledge as much. *See* Motion at 5–6 ("OFPA . . . addresses production practices for organic livestock" and "[the Access to Pasture Rule] addressed additional matters . . . access to pasture. . . . and clarified that the outdoor access and species-appropriate access to shade, shelter, exercise, fresh air, and direct sunlight required by the NOP rule must be provided for all organic livestock, including poultry, on a year round

basis"). Contrary to Defendants' assertion that OFPA only permits it to regulate animal health

care, not animal welfare, animal welfare and animal health care are inextricably linked—as

USDA itself has routinely found in the past. 75 Fed. Reg. 7153 (Access to Pasture Rulemaking);

AWI Report, *The Critical Relationship Between Farm Animal Health and Welfare*,

https://awionline.org/sites/default/files/uploads/documents/FA-AWI-Animal-Health-Welfare-

Report-04022018.pdf. Therefore, ASPCA and AWI's stated interest in animal well-being also

puts them within the zone of interests to have standing in this case.

###### 3. Plaintiffs OTA and AWI Have Demonstrated Associational Standing on Behalf of Their Members.

###### a. Plaintiff OTA has associational standing to challenge Defendants' actions on behalf of its members.

An association has standing to bring suit on behalf of its members when: (1) its members
would otherwise have standing to sue in their own right; (2) the interests it seeks to
protect are germane to the organization's purpose; and (3) neither the claim asserted nor
the relief requested requires the participation of individual members in the lawsuit.

*Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (internal quotation

marks removed) Each factor is addressed below.

The SAC alleged that USDA's delay and withdrawal actions with respect to the OLPP

caused harm by "failing to ensure fair competition in the marketplace between organic egg

producers and handlers and organic meat producers and handlers; failing to eliminate conflicting

interpretations of the organic regulations that certifying agents must enforce; damaging and

diminishing consumer trust in the USDA organic seal; and failing to keep open the consultative

channel with the NOSB, which is a key mechanism by which OTA members participate in the

development of organic standards and policies." SAC ¶ 24; *see also* SAC ¶ 281 (failure to

consult NOSB in each proceeding)  This included a failure to provide adequate Notice in the

third delay rulemaking, SAC 280, failure to provide the necessary technical reports that USDA

ultimately relied upon, SAC ¶ ¶ 's 184-84, 281 and failure to provide adequate time to prepare

comments in the Withdrawal rulemaking. SAC ¶ 247.

An individual has standing when, (1) she has suffered an "injury in fact" that is concrete

and particularized, and actual or imminent rather than conjectural or hypothetical; (2) the injury

is fairly traceable to the challenged action; and (3) it is likely, as opposed to merely speculative,

that the injury will be redressed by a favorable decision. *Ctr. for Sustainable Econ. v. Jewell*, 779

F.3d 588, 596 (D.C. Cir. 2015) citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112

S.Ct. 2130, 119 L.Ed.2d 351 (1992).

> OTA members include organic product consumers, farmers and livestock growers,
> ingredient suppliers, processors, manufacturers, distributors, retailers, accredited certifying
> agents and those in international trade. OTA's members grow, make, distribute, and certify
> organic products including livestock products worldwide."  SAC at 21.

The doctrine of competitor standing addresses the first requirement by recognizing that

economic actors "suffer [an] injury in fact when agencies lift regulatory restrictions on

their competitors or otherwise allow increased competition" against them. *Sherley v. Sebelius*,

610 F.3d 69, 72 (D.C. Cir. 2010) quoting *La. Energy & Power Auth. v. FERC,* 141 F.3d 364, 367

(D.C.Cir.1998); *accord New World Radio, Inc. v. FCC,* 294 F.3d 164, 172 (D.C.Cir.2002)

("basic law of economics" that increased competition leads to actual injury).

At the time of publication of the OLPP in January 2017, USDA declared the OLPP

necessary, *inter alia,* to "ensure fair competition among producers by facilitating equitable

certification and enforcement decisions." 82 Fed. Reg. at 7083; *see also* SAC at ¶178 (citing

OLPP description of one of the unfair practices corrected by the OLPP—the use of "porches" in

poultry production to meet "outdoor access" requirements.)  Upon publication in the Federal

Register the new livestock production rules became binding on all certified organic operations.[7] *See* SAC at ¶298 (citing *Clean Air Council v. Pruitt,* 862 F.3d. 1, 9 (D.C. Cir. 2017) (agency is "bound by the rule until that rule is amended or revoked.")  Upon publication of the Withdrawal Rule, the competition distorting practice of using "porches" was restored thus USDA "lifted regulatory restrictions" on certified operations to the detriment of OTA members.

Plaintiff OTA has challenged each administrative delay and the final withdrawal on competition grounds: "USDA's unlawful delay rules and Withdrawal Rule harms OTA members by… failing to ensure fair competition in the marketplace between organic egg producers and handlers and organic meat producers and handlers."  SAC at ¶24  OTA member declarations identify the harm to competition. *See e.g. Declaration of George Siemon,* ECF No. 34, Exhibit 14 at ¶ 2(certified organic egg producer); ¶ 21 (OLPP "is necessary to ensure fair competition in the marketplace"); ECF No. 34, Exhibit 11--*Declaration of Jesse LaFlamme*, at ¶ 2 (owner and CEO of largest certified organic egg producer in the U.S.); at ¶ 6 (without OLPP "inconsistent practices" prevail); ECF No. 34, Exhibit 14--*Declaration of Gina Asoudegan*, ¶ 2(leading U.S. seller of certified organic meat products);  ¶ 8 (producers that exploit organic inconsistencies "distort the marketplace for organic livestock products" and "our company is harmed.") *see* ECF No. 34, Exhibit 16--*Declaration of John Lee*, at ¶10 (egg sale profitability drop in 2017 attributed to "rapidly expanding supply arising from the use of production systems that were set to be disallowed under the OLPP."); *see also* April 28, 2017 Letter to Sec. Perdue (from three

---

[7] The SAC expressly challenged the lawfulness of each of the delay rules, SAC ¶278-286, and the lawfulness of the Withdrawal Rule. SAC ¶292-294. Moreover, the SAC alleges they form a single course of interlocking administrative actions that are most properly challenged together. SAC at ¶ 1 USDA appears to agree by referring to its withdrawal action as a reconsideration. 83 Fed. Reg. at 80777 ("AMS has broad discretion to reconsider a regulation at any time.") At this stage of the pleadings the allegations that the delay rules violated the APA and OFPA are accepted as true.

hundred and thirty-four certified organic livestock and poultry producers with estimated revenue

of $1.95 billion) *Available at* https://www.regulations.gov/document?D=AMS-NOP-17-0031-

0006.

Harm to Consumer Trust and Reliance on the USDA's Organic Seal as Proof of Highest
Standards[8]

> At the time of publication of the OLPP USDA said,

> One of the key objectives in implementing this final rule is to assure consumers that the
> practices used to produce organic products meet a consistent standard, including outdoor
> access for poultry. This objective is guided by the NOSB recommendations and public
> and expert comment received during those deliberations that indicated a risk to the
> integrity and value of the organic seal from the gap between consumer expectation and
> current industry practice.  82 Fed. Reg. at 7068

> This final rule will resolve the current ambiguity about outdoor access for poultry and
> address the wide disparities in production practices among the organic poultry sector.
> Greater clarity about the significance of the USDA organic seal in the marketplace will
> help to maintain consumer confidence in the organic label, which drives the $43 billion in
> sales of organic products, and support a fair, viable market for producers who chose to
> pursue organic certification.[9]

82 Fed. Reg. at 7082-83; *see also id.* at 7082 ("AMS is conducting this rulemaking to maintain
consumer confidence in the USDA organic seal.")

> OTA and its members recognize that use of the USDA's Organic Seal constitutes a kind
> of shared brand among all certified operations and businesses.  This unique common
> equity places greater than usual emphasis on the need for consensus standard setting
> under the federal organic program and on uniform compliance and cohesive enforcement.
> The USDA seal is commonly and uniformly used on the packaging of every certified
> organic product.

Exhibit X—*Declaration of Laura Batcha* (Exec. Director OTA) at ¶ 8.  OTA members that are

regulated under the OFPA and are subject to this regulation include egg and livestock producers,

certified organic retailers and accredited certifying agents. *See e.g. Declaration of George*

---

[8] Congress authorized certified organic operations to affix the USDA's seal to their products to
demonstrate compliance with federal standards.  7 U.S.C. §6505(a)(2).  It appears on nearly
every certified organic product and constitutes proof of the "shared brand." *See* Exhibit X—
*Declaration of Laura Batcha* (Exec. Director OTA) at ¶ 8.
[9]

*Siemon,* ECF No. 34, Exhibit 14 at ¶ 2(certified organic egg producer); ¶ 27 ([C]onsumers have become increasingly aware that the pre-OLPP requirements of "outdoor access" are not being consistently applied thus causing reputational harm to farmers that are willing to comply with the new requirements and lowering consumer trust and diluting the value of the USDA's organic seal."); ¶ 28 ("If consumers understand that some organic livestock products meet higher welfare standards than others the USDA organic seal is concretely damaged by that inconsistency because consumers cannot know which organic products meet the higher requirements and which don't."); ECF No. 34, Exhibit 11--*Declaration of Jesse LaFlamme*, at ¶ 2 (owner and CEO of largest certified organic egg producer in the U.S.); at ¶ 9 (failure to implement OLPP "will irremediably damage to consumer trust in the USDA's organic seal because it will fall behind consumer's expectation for egg production and thus our farmers will suffer severe financial setbacks."); ECF No. 34, Exhibit 14--*Declaration of Gina Asoudegan*, ¶ 2 (Applegate is leading U.S. seller of certified organic meat products);  ¶ 13 ("[T]he decision to propose [OLPP] withdrawal, further undermines the trust of consumers in the USDA's organic seal."); ECF No. 34, Exhibit 15--*Declaration of Tom Chapman*, NOSB Chairman, ¶ 32 (failure to implement OLPP will "harm consumer trust in the USA Organic seal"); ECF No. 34, Exhibit 13, *Declaration of Kyla Smith,* Chair, Accredited Certifiers Association, ¶ 19 (withdrawal of OLPP "could lead to profound disruption to the marketplace for certified organic products by irretrievably damaging consumer trust in the USDA organic seal.")

Defendants complain that "OTA fails to articulate how such confusion is caused by withdrawal of the OLPP Rule or redressable by its implementation."  MTD at 28-29.

> Some organic poultry operations provide large, open-air outdoor areas, while other operations provide minimal outdoor space or uses screened and covered enclosures commonly called ''porches'' to meet outdoor access requirements. This variability perpetuates an uneven playing field among producers and sows consumer *confusion* about the meaning of the USDA organic label.  Greater clarity about the significance of

the USDA organic seal in the marketplace will help to maintain consumer *confidence in the organic label*, which drives the $43 billion in sales of organic products, and support a fair, viable market for producers who chose to pursue organic certification.

82 Fed. Reg. at 7082  The OLPP was adopted to eliminate the consumer confusion arising from the use of "porches" instead of outdoor access to soil, direct sunlight and fresh air and ensure that there was a single national standard for "outdoor access" as required by Section 6501 of the OFPA. The withdrawal of the OLPP frustrates that purpose.  OTA members are harmed by the failure to retain the single national standard required by Section 6501.  Moreover, as the declarations establish, producers are competitively harmed by the cheaper and lower welfare "porch" systems and retailers are hurt by loss of consumers.  *See e.g.* ECF No. 34, Exhibit 12--*Declaration of Robynn Schrader*, (CEO of National Co+op Grocers) ¶ 6 ("Consumer confidence in the USDA Certified Organic Seal is foundational to our business."); *see also* ¶ 7-9 (describing consumer expectations); ¶ 11 (withdrawal of OLPP "harms and will continue to harm NCG" by "irretrievably damaging consumer trust in the USDA organic seal.")  OTA members are harmed by the period of delay and the failure to timely implement and ultimate withdrawal of the OLPP.

Next defendants contend that sales data from 2016 showing growth in organic sales establishes there has been no harm from delay and withdrawal of OLPP.[10]  MTD at 29.  This

---

[10] Defendants argue that consumer surveys are not reliable. MTD 29-30.  This is a curious argument in light of the fact that the Withdrawal Rule bases much of its cost-benefit analysis based on "willingness to pay" data in an academic paper that involved a single consumer survey, Heng, Y., Peterson, H., Li, X. "Consumer Attitudes toward Farm-Animal Welfare: The Case of Laying Hens (2013).  The authors stated goal in the study seems far afield from the issues here: "This study evaluates how environmental concerns may influence consumers' valuation of layer management practices."  Heng, at pg. 420.  Moreover, it presents a question for the merits stage of this case—should a study based on two cohorts of 449 and 475 respondents respectively, be treated as a better predictor of consumer behavior than the hundreds of thousands of commenters on the rule that urged adoption of the OLPP?

overlooks several important points.  First, the use of "porches" to meet "outdoor access" requirements was not widely known by consumers because the organic seal appeared on poultry products from both systems.  Second, when consumers did begin learning about the situation in 2016 they heard that USDA was conducting a rulemaking to strengthen animal welfare provisions by publication of the proposed OLPP in April.  Third, when consumers learned that the OLPP was delayed and likely to be scuttled, the worm turned.  *See* ECF No. 34, Exhibit 16-- *Declaration of John Lee*, at ¶ 3 ("The best available organic market information for the year ending December 31, 2017 demonstrates that the organic dairy sector has stopped growing, and there is an actual downturn.); ¶ 6 ("The sharpest drop in the growth rate in both volume of products and dollars in sales occurred in January 2017 and coincided with the administration's announcement that it would delay the Organic Livestock Production Practices ("OLPP") rule."); ¶ 9 ("shell egg market dollar sales growth steadily declined in 2017 but has not turned negative yet."); ¶10 (egg sale profitability drop in 2017 attributed to "rapidly expanding supply arising from the use of production systems that were set to be disallowed under the OLPP.").

The declaration of Eric Pierce from the V.P. of Business Insights at the Nutrition Business Journal ("NBJ"), attached as Exhibit X, summarizes the data that has been gathered for the OTA annual report, which will be published before the end of May.  The NBJ "has worked with the Organic Trade Association since 2007 to conduct its annual Organic Industry Survey." *Id.* at ¶ 4.

> **The initial assessments of the 2017 data are just now available.**
> **The growth in the overall organic marketplace in 2017, based on analysis of 2017 data, is approximately 6.4%.**
> **The annual growth in the organic dairy and egg category in 2017 is 0.9%  The dairy and egg category for 2017 has the lowest sales growth rate of any category and the lowest growth rate for the category since the recession declines observed in 2009.**

**The dairy and egg category has added the fewest new dollars of any organic food category in 2017, despite being the third largest category of sales in terms of dollar values.**
**The 2017 growth rate for organic overall declined by approximately 28% and the decline for dairy and eggs is approximately 86% from 2016 levels.**
**The downward pressure on the dairy and egg category is significantly greater than other categories, and the steeper decline correlates to the period of regulatory inaction on the Organic Livestock Production Practices rule.**

Declarations of Five Former NOSB Chairs Alleging all Rulemakings Came from NOSB Recommendations During Tenure—Consumer Trust in USDA's Organic Seal[11]

1. Declaration of Robert Anderson (former NOSB Chairman) (every NOP rulemaking was based on NOSB recommendation during tenure)(key role of board is protecting consumer trust in standards)

2. Declaration of Michael Sligh (former NOSB Chairman) (every NOP rulemaking was based on NOSB recommendation during tenure) )(key role of board is protecting consumer trust in standards)

3. Declaration of Mac Stone (former NOSB Chairman) (every NOP rulemaking was based on NOSB recommendation during tenure) )(key role of board is protecting consumer trust in standards)

4. Declaration of Tracy Miedema (former NOSB Chairman) (every NOP rulemaking was based on NOSB recommendation during tenure)

3. Declaration of Jeffrey Moyer (former NOSB Chairman) (every NOP rulemaking was based on NOSB recommendation during tenure) (key role of board is protecting consumer trust in standards)

Organizational Germaneness

The germaneness requirement mandates "pertinence between litigation subject and organizational purpose." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) quoting *Humane Soc. of the United States v. Hodel,* 840 F.2d 45, 58 (D.C.Cir.1988) "[T]he threshold for the "germaneness" requirement is quite low." *Washington Legal Found. v. Leavitt,*

---

[11] Congress authorized certified organic operations to affix the USDA's seal to their products to demonstrate compliance with federal standards.  7 U.S.C. §6505(a)(2).  It appears on nearly every certified organic product and constitutes proof of the "shared brand." *See* Exhibit X— *Declaration of Laura Batcha* (Exec. Director OTA) at ¶ 8.

477 F. Supp. 2d 202, 212 (D.D.C. 2007) citing *Competitive Enter. Inst. v. NHTSA,* 901 F.2d 107, 111 (D.C.Cir.1990); *accord Humane Society v. Hodel,* 840 F.2d 45, 56 (D.C.Cir.1988) ("Germaneness ... require[s] only than an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together.") OTA is a "business association for organic agriculture and products…and is the leading voice for the organic trade in the United States …"  SAC ¶ 21. OTA's "mission is to promote, develop and protect organic standards, ensure the due process rights of its members…" *See Declaration of Laura Batcha,* OTA Exec. Director, ECF No. 34, Attachment 15 at ¶ 11 *Sec. Indus. & Fin. Markets Ass'n v. United States Commodity Futures Trading Comm'n,* 67 F. Supp. 3d 373, 401 (D.D.C. 2014)  The challenge to the USDA's actions here are pertinent to OTA's purpose.

<u>Individual Litigants are Unnecessary</u>

Member participation is not required where a "suit raises a pure question of law" and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization.  *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,* 477 U.S. 274, 287–88, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986); *see also Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).  Here OTA seeks declaratory and injunctive relief. Declaratory and injunctive relief  does not require the participation of any individual member. *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 53 (D.C. Cir. 1988).

  **b.** **Plaintiff AWI has associational standing to challenge Defendants' actions on behalf of its members.**

Plaintiff AWI also has associational standing to bring this case against USDA on behalf of its members, as articulated in *Hunt*, 432 U.S. at 343.  That principle controls today.

AWI's members are suffering an immediate injury as a result of the challenged action, and that injury would form the basis of a justiciable case had AWI's members brought suit themselves. *Id.* AWI's members rely on AWI to notify and educate them about injury to their interests in animal welfare. Exh. 11, Fowler Decl. ¶ 5; Exh. 12, Hopkins Decl. ¶ 2. AWI's members have been injured by the delay of the rule and the withdrawal in several ways. Many of AWI's members have a strong desire to know that the meat they consume is raised humanely, and they consume organic livestock and poultry products in the hopes that "organic" meat has been humanely raised. Exh. 11, Fowler Decl. ¶ 6; Exh. 12, Hopkins Decl. ¶ 7. However, AWI's members have difficulty choosing whether to purchase organic products at all because the standards are not evenly applied – a confusion and market failure that the OLPP rule would have corrected. Exh. 11, Fowler Decl. ¶ 6; Exh. 12, Hopkins Decl. ¶ 8.[12]

AWI's members also believed that OLPP would improve standards for the care of animals raised for human consumption so that they could reliably buy "organic" meat and/or products and know that they had been humanely produced. AWI's members will avoid the USDA Organic label altogether as a result of the withdrawal of OLPP. Exh. 10, Jones Decl. ¶ 8 ("I am unlikely to purchase organic animal products because I cannot trust that the label

---

[12] This harm from OLPP's withdrawal is not only imminent, it is occurring now. As matters currently stand, AWI's members face precisely the type of confusion USDA sought to correct when it drafted OLPP—the inability to tell whether "organic" animal products have been humanely produced in a consistent manner. Because that harm is *actually* occurring now, this case is distinct from those in which plaintiffs have relied on an increased risk of harm from a regulation that only partially addresses their concerns. *E.g. Food & Water Watch*, 808 F.3d at 914. Here, the government has not only *withdrawn* a rule, rather than issuing a regulation that partially addresses Plaintiffs' concern, but has indicated that it believes it *cannot* issue any such regulation under its statutory authority in OFPA. Accordingly, this is not a case involving in *increased risk of harm*, but is instead a case in which AWI's members' avoidance of the "organic" label constitutes an actual, concrete injury that is presently occurring and is sufficient to establish standing.

represents consistent and accurate information."); ¶ 6 ("To continue to buy these products, I need the labels to mean something, especially because organic products are usually higher priced than non-organic products."). Thus, many AWI members expected that OLPP would improve their confidence in the organic label because the consistency from product to product would be ensured. Exh. 11, Fowler Decl. ¶ 6; Exh. 12, Hopkins Decl. ¶ 7. AWI's members now feel less confident about choosing organic products, Exh. 11, Fowler Decl. ¶ 6; Exh. 12, Hopkins Decl. ¶ 7-8, and will be prevented from purchasing "organic" dairy because there is no way for them to know whether "organic" cows were raised according to the consistent standard of care they expect. *Id.* Further, because AWI's members reasonably fear that if they purchase "organic" without the guarantee of humane treatment that OLPP would have provided, they face the risk of inadvertently purchasing foods that are not consistent with their ethical practices. This constitutes a concrete injury sufficient for Article III standing. *Friends of the Earth Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 184–85 (2000) (finding that curtailing an activity based on a reasonable fear constitutes injury sufficient for standing).

  Additionally, AWI's members are suffering an informational injury sufficient to establish standing. *Federal Election Commission v. Akins*, 524 U.S. 11, 19 (1998). Congress enacted OFPA in part to correct consumer confusion by providing accurate, consistent standards for "organic" products, thus entitling consumers to accurate, consistent information as conveyed by the USDA Organic label. By depriving that label of any consistent, accurate meaning, the USDA's withdrawal of OLPP deprives consumers of the information that Congress intended consumers to be able to rely on, thus causing an informational injury. *Id.*

  Finally, Defendants' suggestion that AWI's members purchase other animal products with more rigorous labeling standards inflicts even *more* harm. As the government concedes,

compliance with more rigorous standards can increase production costs. Motion at 38; Market

Watch, *What You Really Get for the High Price of 'Humanely Raised' Meat*,

https://www.marketwatch.com/story/what-you-really-get-for-the-high-price-of-humanely-raised-

meat-2015-11-19.  Thus, Defendants' suggestion that AWI members can simply buy other, more

expensive meat actually illustrates economic harm sufficient to show standing; as a result of the

withdrawal of the OLPP rule, consumers who could have bought USDA "organic" meat knowing

that the label indicated that animals had been ensured a certain level of care must now instead

spend more money to ensure that the food they consume was raised with that same level of care.

AWI's members are also injured by USDA's delay and withdrawal OLPP without

following adequate procedures and were injured by the failure to consult with NOSB, which

would have shielded their interests from political whims. Because of the rule's delay and

withdrawal, AWI's members were forced to spend time commenting multiple times to USDA to

make their concerns known regarding the implementation of OLPP.

A favorable decision by the court will redress the injury caused by Defendants. But for

USDA's decision to delay, withdraw, and provide inadequate procedure, AWI's members would

not have experienced their injury. *Lujan*, 504 U.S. at 560–61.

As alleged in its organizational standing argument, the interest AWI seeks to protect is

germane to its purpose of improving the lives of animals raised for human consumption. *See*

*Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 56, 59 (D.C. Cir. 1988) (this "modest . . .

standard" requires "only that an organization's litigation interest be pertinent to . . . grounds that

bring its membership together"). Participation of AWI's individual members would only add

unnecessary complexity to this case and not promote the timely resolution of this case.

Additionally, the relief requested by AWI is "clearly not of a type that requires participation of

any individual member[.]" *Id.* at 53 (finding declaratory and injunctive relief do not require individual member participation in associational standing cases). For these reasons, AWI has associational standing on behalf of its members.

## B.  NONE OF THE CLAIMS IN THE SECOND AMENDED COMPLAINT ARE MOOT.

Plaintiffs request this Court "vacate and set aside the First, Second and Third Delay Rules *ab initio* and vacate and set aside the Withdrawal Rule challenged in this Complaint." SAC ¶ 307 The APA, of course, empowers and requires this court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Defendants contend Count One of the SAC is moot. Mootness is inapplicable because it is well settled in this circuit that, "[e]ven though the specific action that the plaintiff challenges has ceased, a claim for declaratory relief will not be moot" if "the specific claim fits the exception for cases that are capable of repetition, yet evading review." *Grant v. Vilsack*, 892 F. Supp. 2d 252, 257 (D.D.C. 2012) *citing Del Monte Fresh Produce Co. v. United States,* 570 F.3d 316, 321 (D.C. Cir. 2009) (internal quotation marks omitted).

The exception requires plaintiffs demonstrate that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Del Monte*, 570 F.3d at 321 (internal citations and quotation marks omitted). With regard to the evading review prong, the D.C. Circuit generally recognizes a two-year minimum period for challenging agency actions. *Id.* at 322. Here, the challenged delays in February and May were 60 and 180 days respectively, each within the required limit. The third delay rule of 180 days is likewise within the limit.

With regard to repetition, the focus is not "whether the precise historical facts that spawned the plaintiff's claims are likely to recur" but "whether the legal wrong complained of by the plaintiff is reasonably likely to recur." *Del Monte*, 570 F.3d at 324. In fact, the *Del Monte* court expressly noted that no "precedent requires that the very same facts must recur for the capable of repetition exception to apply." *Id*. at 325; *see also* Campbell v. Clinton, 203 F.3d 19, 34 (D.C. Cir. 2000) (finding "Circuit precedent requires us to determine whether the activity challenged is 'inherently' of a sort that evades review").

The Plaintiffs alleged:

> USDA's publication of each of the three delay rules violated the OFPA because the USDA failed to complete the pre-rulemaking consultation with the NOSB prior to each amendment to the effective date of the OLPP, failed to disclose or provide an opportunity to the NOSB to address the substantive concerns that had apparently arisen since publication of the OLPP, and failed to consult the NOSB regarding the "implementation" of the livestock standards. & U.S.C. §§ 6503(c); 6509(d)(2); 6509(g); 6518(a); 6518(k)(1).

SAC ¶ 281. Defendants argue that the mootness doctrine applies to all three delay rules because, "[A]ll of the rules were superseded by each other and/or are by the recently-published Withdrawal Rule. In that process, plaintiffs received precisely the relief they purport to seek in count one: notice of, and opportunity to comment on, the issue underlying the postponement and withdrawal."[13] Motion at 33. This argument fails for several reasons.

---

[13] Defendants seem to be arguing that USDA voluntarily terminated the serial delays by a withdrawal rulemaking. If this is correct, it implicates a different mootness doctrine. In cases in which the defendant voluntarily ceases the complained-of activity before the matter is litigated, a different standard applies. "In such cases the *defendant* must show that there is no reasonable expectation that the alleged violation will recur and that interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C. Cir. 1985) It is obvious that the short-term delays were intentional. It is also arguable if not obvious that the USDA was on the path of withdrawal from the outset. *See e.g.* SAC ¶¶ 183-188. "It is well settled that a defendant's voluntary cessation of a challenged practice

First, Defendants misstate the legal test in the D.C. Circuit, which is stated in *Conyers v.*

*Reagan*, 765 F.2d 1124, 1128 (D.C. Cir. 1985):

> The question, however, is not whether the particular activity complained of ended before there was an opportunity to fully litigate the dispute. Rather, the proper inquiry is whether "the [challenged] activity is *'by its very nature' short in duration,* 'so that it could not, or probably would not, be able to be adjudicated while fully "live." ' " *Finberg v. Sullivan,* 634 F.2d 50, 55 (3d Cir.1980) (quoting *Dow Chemical Co. v. EPA,* 605 F.2d 673, 678 n. 12 (3d Cir.1979)) (emphasis in original).

 Brief and fixed periods of delay that expire and are renewed, like those in this case, are precisely

the type of activity the D.C. Circuit refers to as an activity that "inherently" evades review.

Accepting Defendants' characterization would mean a court has no authority to step in and halt

abuse since the fact of the activity's termination would function as a shield to judicial scrutiny.

Such an outcome cannot be countenanced.

Second, "[w]e agree that "(p)ermitting the submission of views after the effective date (of

a regulation) is no substitute for the right of interested persons to make their views known to the

agency in time to influence the rule making process in a meaningful way." *Am. Fed'n of Gov't*

*Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981). If, as defendants contend, the

grounds for the three delay rules were finally disclosed in the Withdrawal Rule, the delay

proceedings were hardly ones that could have been impacted by party comment or saved thereby.

*See Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 28 F.3d 1288, 1291 (D.C.

Cir. 1994) citing *National Tour Brokers Ass'n v. United States,* 591 F.2d 896, 902 (D.C. Cir.

1978) (stressing "[T]he importance of the Administrative Procedure Act's "requirement that the

parties be able to comment on the rule while it is still in the formative or 'proposed' stage . . . [to

ensure] that the agency maintains a flexible and open-minded attitude."). It is worth noting that

---

does not deprive a federal court of its power to determine the legality of the practice. *Friends of the Earth,* 528 U.S. at 189 (internal quotation marks omitted).

USDA took nearly a year to figure out the problems with the cost/benefit analysis but provided only thirty days for comment, and that was over the annual holiday season. *See* 82 Fed. Reg. 59,988-992 (Dec. 18, 2018) ("*National Organic Program (NOP); Organic Livestock Production Practices—Withdrawal*").

Moreover, in the withdrawal proceeding Defendants persisted in refusing to discharge pre-rulemaking duties imposed by the OFPA. *See* SAC ¶ 293(d); *id.* at ¶ 281 (citing relevant statutory sections). In fact, Defendants announced a new policy under which even rulemakings conducted under statutory provisions expressly calling for consultation with the NOSB, such as livestock-related standards, are ignored: "OFPA does not require AMS to consult with the NOSB prior to undertaking a rulemaking to withdraw the OLPP final rule." 83 Fed. Reg. 10,778 at n. 6. USDA also said that "nothing in OFPA requires AMS to consult the NOSB at every phase of the rule making process or makes the NOSB's recommendations binding on the Secretary, nor could it." 83 Fed. Reg. 10778.

The approach taken today differs substantially from that announced in the final rule that created the National Organic Program in 2000:

> The national standards implemented by this final rule can be amended as needed to establish more restrictive national standards. Anyone may request that a provision of these regulations be amended by submitting a request to the NOP Program Manager or the Chairperson of the NOSB. Requests for amendments submitted to the NOP Program Manager will be forwarded to the NOSB for its consideration. The NOSB will consider the requested amendments and make its recommendations to the Administrator. When appropriate, the NOP will conduct rulemaking on the recommended amendment. Such rulemaking will include an opportunity for public comment."

65 Fed. Reg. at 80,608.

Accordingly, one of the "legal wrongs" Plaintiffs contend is capable of repetition is USDA's refusal to undertake consultation and consideration of a recommendation from the NOSB on the subject matter of the rulemaking before the rulemaking is initiated, or to properly

consider public comment as required by the APA. This legal wrong will come up every time Defendants wish to conduct a rulemaking regarding organic standards.[14] The NOSB is not going away. See e.g. 7 U.S.C . § 6518(a) (non-discretionary duty to "establish a National Organic Standards Board…to advise…the Secretary on…implementation of this chapter."); *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Canada, AFL-CIO*, 721 F.3d 678, 688 (D.C. Cir. 2013) (stating "[t]he 'wrong' that is, or is not, 'capable of repetition' must be defined in terms of the precise controversy it spawns," to wit, "in terms of the legal questions it presents for decision."). Plaintiffs, particularly OTA, can predict their own participation in any organic policy rulemaking with equal certitude. SAC ¶¶'s 24-25; 44.

Finally, Defendants wrongly contend the First Delay Rule was authorized by the *Priebus Memorandum*. *See* SAC ¶¶ 161-164. "The advent of a new Administration cannot justify the Government's complete and continued disregard of the APA's rulemaking requirements." *Pub. Citizen v. Dep't of Health & Human Servs*., 671 F.2d 518, 520 (D.C. Cir. 1981). Significantly, contrary to the use to which Defendants would put the *Priebus Memorandum* here, it *did not* authorize the departure from the APA's or the OFPA's required procedures. SAC ¶ 163 The *Priebus Memorandum* plainly states agencies are directed to postpone any published but not yet effective rule only "*as permitted by law*." *Priebus Memo,* at ¶3 (emphasis added).

The D.C. Circuit's approach to amendment of "effective dates" in published rules was well settled at that time—amendment without notice and comment was unlawful. *See Environmental Def. Fund v. EPA,* 716 F.2d 915, 920 (D.C. Cir. 1983) (citing *Environmental*

---

[14] Defendants concede "plaintiffs can pursue their NOSB consultation theory" in connection with Count Three's challenge to the Withdrawal Rule. MTD at 34

*Defense Fund v. Gorsuch,* 713 F.2d 802, 816 (D.C. Cir. 1983)); *see also Pub. Citizen,* 733 F.2d at 98 (holding that agency's suspension of rule was "a paradigm of a revocation," constituting "a 180 degree reversal of [the agency's] former views as to the proper course"); *see also Clean Air Council v. Pruitt,* 862 F.3d. 1, 9 (D.C. Cir. 2017). In addition, Plaintiffs contend the agency failed to observe the scope-limiting language in the *Priebus Memorandum* for assessing whether a regulation should be excluded from its purview, thus precluding Defendants' reliance on it at this stage of the case. The challenge to the First Delay Rule is not moot. Moreover, Defendants claim no independent legal authority for the Second Delay Rule. It thus fails as an unlawful amendment to the OLPP under the same D.C. Circuit authorities cited above.[15] *See e.g. Sierra Club v. EPA*, 873 F.3d 946, 952 (D.C. Cir. 2017) ("We agree, of course, that an amendment to a legislative rule must itself be legislative.") (internal citations omitted).

In other words, the question is not, as Defendants posit (Motion at 33), whether Plaintiffs eventually received a chance to comment on the delay/withdrawal grounds, but whether the use of serial, fixed periods of short delay that fall back for support on 5 U.S.C. 553(b)(B)'s exception from notice and comment, constitutes unlawful exclusion of the NOSB from the rulemaking process that is likely to recur, and whether this or a future administration may attempt to halt duly published rules without following the notice and comment requirements of the APA.

---

[15] Defendants claimed the First and Second Delay Rules were each exempt from the APA's notice and comment requirements because it was "impracticable, unnecessary, or contrary to the public interest" pursuant to 5 U.S.C. 553(b)(B). 82 Fed. Reg. at 9967 (first delay); 82 Fed. Reg. at 21677 (second delay). In light of the fact that the delay never ended and is now permanent, the record contradicts Defendants' reliance on this rarely necessary and uniformly disfavored exemption. *See Mid–Tex Elec. Coop. v. Fed. Energy Regulatory Comm'n,* 822 F.2d 1123, 1132 (D.C. Cir. 1987) ("This court has cautioned that the § 553(b)(3)(B) exception should be narrowly construed and reluctantly countenanced."). In any event, Plaintiffs challenged these findings. SAC ¶166 (first delay); SAC ¶173 (second delay).

Plaintiffs and their members will very likely, if not certainly, be in position to comment on agency rulemaking and NOSB consultation developments in the future, and the unlawful actions here should not be countenanced for future administrators by a premature determination of mootness at the pleading stage in this case.[16]

## C.  COUNTS ONE AND THREE SURVIVE A FED. R. CIV. P. 12(B)(6) CHALLENGE.

### 1.  Count One States a Claim Upon Which Relief May Be Granted.

The Court should deny Defendants' Rule 12(b)(6) challenge to Count One because under the applicable standard, the claim asserts plausible bases for relief under the APA and OFPA. Count One sufficiently alleges that USDA's publication of three final rules amending the OLPP's effective date are unlawful because USDA failed to publish a notice of proposed rulemaking, failed to provide opportunity for comment, and failed to provide adequate justification for the First and Second Delay Rules. *See* SAC ¶ ¶ 178-188 (summarizing notice and rule); SAC ¶¶ 280-293.

Plaintiffs alleged:

In violation of the APA and OFPA, the USDA published three final rules[17] *seriatim* that each unlawfully amended the effective date and temporarily revoked the OLPP. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (stating that an "order delaying the rule's effective date ... [is] tantamount to amending or revoking a rule.").

SAC ¶ 278.
Further,

---

[16] References to the declarations submitted in this case in the standing section of this brief, setting forth harm to Plaintiffs' organizations and members arising from the delay and withdrawal, are equally applicable here but are not repeated.

[17] 82 Fed. Reg. at 9967 (February 9, 2017) (first delay); 82 Fed. Reg. at 21677 (May 10, 2017) (second delay); 82 Fed. Reg. 52643 (Nov. 14, 2017) (third delay).

> USDA published the Third Delay Rule following publication of a notice of proposed rule
> that was deficient under the APA because it failed to disclose (1) the legal authority upon
> which it intended to rely to amend the OLPP in violation of 5 U.S.C. § 553(b)(2); (2) that
> USDA intended to conduct a *de facto* reconsideration of the entire OLPP, and ultimately
> rescind it, based on (a) a lack of statutory authority under the OFPA and (b) technical
> errors in calculating the cost-benefit analysis in the OLPP; and (3) it failed to provide the
> technical reports and documents it ultimately relied upon to issue the Third Delay Rule
> and to later rescind.

SAC at ¶ 287.

Defendants advance two arguments in support of their Motion, both squarely in conflict

with the law of this Circuit. The first attempts to circumvent well-settled case law that "effective

dates" that appear in published rules are substantive, in the same manner as any other provision

in the rules. *Clean Air Council*, 862 F.3d at 9 (stating "an agency issuing a legislative rule is

itself bound by the rule until that rule is amended or revoked" and "may not alter [such a rule]

without notice and comment.") (internal citations omitted). To get around this, Defendants point

to the portion of the *Clean Air Council* ruling where the court finds that determining "finality" of

agency action for purposes of review requires that "two conditions must be satisfied for agency

action to be "final":

> First, the action must mark the "consummation" of the agency's decision making
> process, it must not be of a merely tentative or interlocutory nature. And second, the
> action must be one by which "rights or obligations have been determined," or from which
> "legal consequences will flow."

*Id.*, citing *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997) (internal citations omitted). From this,

Defendants conclude that notice and comment rulemaking may be dispensed with so long as the

agency action impacts "rights or obligations." Motion at 37. This is a facially erroneous reading

of both cases. The issue under discussion is "finality" for purposes of review, not determining

whether an exception to the APA's notice and comment rulemaking requirements is authorized.

This crabbed reading of *Clean Air Council* conflicts with other relevant authority. First,

it is well settled in the D.C. Circuit that "[t]he only exceptions for the absence of public procedures are found within section 553(b) itself." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 n. 4 (D.C. Cir. 1981). Second, when applying Section 553, "[i]f a rule ranks as a substantive regulation, the limited nature of the rule cannot in itself justify a failure to follow notice and comment procedures." *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 582 (D.C. Cir. 1981). This Court need only look at the dissent in *Clean Air Council* to see that the dispute was over "finality" not "notice and comment" procedures. In fact, the dissent cited the very section of the case Defendants point this Court to and said: "Turning to the second element of "final agency action," the Court establishes nothing by asserting the stay creates obvious consequences for the regulated parties." *Clean Air Council*, 862 F.3d at 17. There is no "palpable effects" exception to the APA notice and comment requirements and the *Clean Air Council* holding regarding "effective dates" being substantive parts of published rules is binding. Defendants' argument must be rejected.

Defendants next allege that this Court must dismiss as moot the Plaintiffs' challenge to the First and Second Delay Rules because the Third Delay Rule provided a notice and comment opportunity that cured the two prior failures. *See* Motion at 37. This argument has been addressed elsewhere in this brief as well and likewise runs headlong into well-settled authority:

> We agree that "(p)ermitting the submission of views after the effective date (of a regulation) is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way.

*Am. Fed'n of Gov't Emp., AFL-CIO*, 655 F.2d at 1158. Since Defendants now suggest all three delay rules were based on the same grounds, grounds more fully set forth in the Withdrawal Rule proceeding, it is perplexing why USDA did not simply comply with the requirements of the APA

from the beginning. In any event, notice and an opportunity to comment after the decision has

been made, even if on the same grounds, is unavailing.

With regard to Defendants' contention that the Proposed Third Delay Rule fairly

disclosed the substance of the rulemaking, it is important to start with the position taken by

USDA only four months earlier:

> Several comments argued that USDA does not have sufficient regulatory authority under
> OFPA to publish final rules for livestock living conditions and animal welfare as
> described in the proposed rule. They argued that the livestock section of OFPA only
> provides authority to prepare regulations regarding feeds and animal health care issues.
> (Response) AMS affirms that USDA has the authority to conduct this rulemaking; this
> action falls within our purview to implement the Organic Foods Production Act. AMS is
> issuing these regulations to strengthen the USDA organic livestock production
> regulations with clear provisions to fulfill one purpose of OFPA: to assure consumers that
> organically-produced products meet a consistent and uniform standard (7 U.S.C. 6501).

82 Fed. Reg. at 7043. Then, on May 10, 2017 the agency published the Proposed Third Delay

Rule with four procedural options:

> 1. Let the Organic Livestock Rule become effective on November 14, 2017;
> 2. Suspend the Organic Livestock Rule indefinitely;
> 3. Further delay the effective date of the Organic Livestock Rule;
> 4. Withdraw the Organic Livestock Rule.

82 Fed. Reg. at 21742 (May 10, 2017). No further guidance as to the goal of the rulemaking

was offered except a single sentence: "USDA is asking the public to comment on the possible

actions USDA should take in regards to the disposition of the FR." *Id.*

The Proposed Third Delay Rule posited no substantive inquiry; identified no deficiency

in the existing administrative record made over approximately ten years; identified no

outstanding issue of law, fact or policy; and did not mention the NOSB's role or its view on the

proposed rule. *Id.* Although the final rule said, "[T]here are significant policy and legal issues

addressed within the FR that warrant further review by USDA. . ." there was no description of

the issues and no request for comment thereon and disclosure in the final rule can't save the

defective notice. *Id.* The sole legal authority cited was the *Priebus Memorandum.* SAC ¶ 176.

> The D.C. Circuit recently held:
>
> A final rule is the "logical outgrowth" of a proposed rule if "interested parties should
> have anticipated that the change was possible, and thus reasonably should have filed their
> comments on the subject during the notice-and-comment period." *CSX Transportation,*
> *Inc. v. Surface Transportation Board*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (citation and
> internal quotation marks omitted). A final rule "fails the logical outgrowth test" if
> "interested parties would have had to divine the agency's unspoken thoughts, because the
> final rule was surprisingly distant from the proposed rule." Id. (citations and alterations
> omitted).

*Clean Air Council*, 862 F.3d at 10.

As noted above, the statutory authority question had been raised and rejected by the

agency in the OLPP rulemaking. 82 Fed. Reg. at 7043. There was no reason to believe it was

being revisited *sub silento*. Defendants' Motion claims that reference to "legal and policy issues"

was sufficient notice under the APA. Motion at 37-38. Under APA notice and comment

requirements, "[a]mong the information that must be revealed for public evaluation are the

'technical studies and data' upon which the agency relies [in its rulemaking]." *Chamber of*

*Commerce v. SEC* (Chamber of Commerce II), 443 F.3d 890, 899 (D.C.Cir.2006) (citation

omitted); *see also Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 236 (D.C. Cir. 2008)

The failure to provide the technical information necessary to develop meaningful comments that

could possibly avoid another delay ruling or withdrawal violated the APA. There was no way for

Plaintiffs' members to know in May 2017 that USDA intended to announce a complete

reconsideration of its own legal and factual position from the preceding November, also reflected

in statements made by USDA in January 2017.

The Proposed Third Delay Rule did not mention technical errors in calculating cost-

benefit analyses in OLPP and there was no reason to suspect that USDA's determination made in

the OLPP was incorrect—after all the agency accepted it and had published the rule just four months earlier.[18] The technical reports necessary to assess whether a cost/benefit error had been made in OLPP were not referenced in the rulemaking materials released in May, and thus could not be evaluated and commented upon. The documents that USDA was apparently analyzing were posted to the regulations.gov website on December 18, 2017. *See* https://www.regulations.gov/docket?D=AMSNOP-15-0012 ("Supporting Documents Folder" (OLPP-PRIA) and ("Benefit+Cost Workbook for OLP Notice")); *see also Am. Radio Relay League, Inc.*, 524 F.3d at 237 ("It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment."). The absence of the necessary technical reports foreclosed meaningful commentary. *See* Exh. 18 to ECF No. 34 (Batcha Decl. ¶¶ 14-19).

Last, the declarations attached to the SAC and reviewed in Section A of this brief demonstrate Defendants' assertion of the kind of ongoing impact of the USDA's delay in 2017. *See e.g.*, Exh. 12 to ECF No. 34 (Schrader Decl ¶¶ 4-6):

> Since the time of my initial declaration in this case the USDA has failed to allow the *Organic Livestock and Poultry Practices* final rule to become effective. The continued delay of the OLPP is causing consumer confusion in NCG co-op stores about the meaning of organic livestock standards and the USDA organic seal. In particular many consumers are hearing that organic chickens, both broilers and egg layers, do not have true outdoor access where the birds may express natural behavior such as ground-pecking and dust bathing and only go out of the chicken house into concrete floored, covered areas.  This conflicts with their understanding that "outdoor access" is required under the federal organic program, and is contributing to consumer confusion and degrading confidence in the USDA Certified Organic label.

---

[18] The vast majority of the comments on the Proposed Third Delay Rule favored implementation of OLPP, as alleged by Plaintiffs. *See* SAC ¶ 181 ("45,000 comments supported Option 1 [implementation]."). A final outcome, further delay, which was supported by a total of one commenter, *id.*, does not meet the logical outgrowth test.

*See also* Exh. 16 to ECF No. 34 (Lee Decl. ¶ 3) ("The best available organic market information for the year ending December 31, 2017 demonstrates that the organic dairy sector has stopped growing, and there is an actual downturn.); ¶ 6 ("The sharpest drop in the growth rate in both volume of products and dollars in sales occurred in January 2017 and coincided with the administration's announcement that it would delay the Organic Livestock Production Practices ("OLPP") rule.").  The harm to certified organic operations from the delay began almost immediately and continues to grow to this day.

USDA's First, Second, and Third Delay Rules are arbitrary, capricious, an abuse of discretion, are otherwise not in accordance with the law, and exceed USDA's statutory authority under OFPA. Plaintiffs are entitled to relief under the APA. 5 U.S.C. § 706(2)(A); § 706(2)(C). For the foregoing reasons, Defendants' request to dismiss Count 1 should be denied.

**2.   Count Three States a Claim Upon Which Relief May Be Granted.**

All the legislative history, statutory language, agency and board practices and roles that have evolved over the last nearly thirty years play a role in shaping the collaborative dynamic that makes the NOP the most unique regulatory program in the world. Plaintiffs previously set forth the background of the OFPA and its legislative history in great detail. *See* SAC ¶¶ 52-73.

Amongst those allegations, Plaintiffs note that OFPA was enacted in 1990 to correct a market failure arising from a patchwork of state and private organic production and processing standards that resulted in inconsistent organic products, consumer confusion, and fragmented markets for organic producers, processors and products. SAC ¶ 56; 65 Fed. Reg. at 80663-64. Congress sought to "facilitate interstate commerce" by "establishing national standards governing the production and marketing of certain agricultural products. . ." in order to "assure consumers that organically produced products meet a consistent standard." SAC ¶ 53; 7 U.S.C. §

6501. At that time, there were private certifying agencies operating throughout the country. 65 Fed. Reg. 80675 (list of private certifiers). Congress preserved a role for these organic pioneers by creating the federal accreditation program for certifying agents. 7 U.S.C. § 6514. This created a hybrid scheme where the inspectors and certifying bodies were *not* employees of USDA but were accredited by USDA. Congress directed the USDA to develop and implement the new "national standards," SAC ¶ 54; 7 U.S.C.§ 6503, taking an "opt-in" approach to regulating organic products by creating these standards solely for those persons who *voluntarily* choose to produce and market products bearing an "organic" marketing claim. SAC ¶ 53; 7 U.S.C. § 6504.

To guide USDA in this undertaking, Congress created an expert citizen-advisory board, the NOSB. SAC ¶ 55; 7 U.S.C. § 6518. The NOSB is composed of fifteen members appointed according to statutory criteria; the expertise necessary for each seat is set forth in the statute. SAC ¶ 56; 7 U.S.C. § 6518(b). The OFPA requires the Secretary to seat four certified farmers, two certified handlers, one organic retailer, one accredited certifying agent, three members with environmental and resource conservation expertise, three members that represent, or are, public or consumer interest groups, and one member with expertise in toxicology, ecology or biochemistry. SAC ¶ 57; 7 U.S.C. § 6518(b). In addition to setting criteria for the holder of each board seat, the statutory criteria also disclose the distinct perspectives Congress expressly intended the Secretary to meaningfully consult when considering new organic standards, or amending existing ones. SAC ¶ 58; 7 U.S.C. § 6518. Unlike many advisory boards, the NOSB is not weighted towards those directly regulated by the National Organic Program. *Id.* Instead, the additional perspectives include consumer interests. *Id.*

The role of consumer expectations in shaping emerging organic norms has been increasingly recognized. *See e.g.*, 82 Fed. Reg. at 7043, 7066 (recognizing consumer

expectations in deliberations of NOSB). The basic programmatic structure preserved as much as possible the existing, voluntary, self-directed standards setting and private certification scheme that created the industry in the 1970s and 1980s. This disruptive force landed at USDA in 1992.

The OFPA imposes unique pre-rulemaking duties on the USDA that are in addition to the requirements of the APA. The statutory duties require the Secretary to consult with the NOSB and obtain its recommendation for standards "for the care" of livestock. 7 U.S.C. § 6503(a) and (c); § 6509(d)(2); SAC ¶ 300. Since the creation of the NOSB and the inception of the NOP, USDA has observed a well-settled practice of publishing proposed and final organic livestock standards solely upon the receipt and consideration of a recommendation from the NOSB following significant public input. SAC ¶ 301. In contrast to this, the USDA failed to consult with the NOSB on each of the three delay rules, temporarily revoking the OLPP, and failed to consult on the proposed and final Withdrawal Rule. Each final rule that resulted in amendment to the OLPP, up to and including the Withdrawal, were published in excess of USDA's "statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). SAC ¶ 302.

USDA's consultation obligations are also explicitly set forth in the OFPA:

> Consultation. In developing the program under subsection (a), and the National List under section 6517 of this title, the Secretary shall consult with the National Organic Standards Board established under section 6518 of this title.

7 U.S.C. § 6503(c) (emphasis added). Subsection (a) refers to the "organic certification program for producers and handlers of agricultural products that have been produced using organic methods." 7 U.S.C. § 6503(a). Furthermore, under the section entitled National Organic Standards Board, the OFPA states:

> In General. The Secretary shall establish a National Organic Standards Board. . . to assist in the development of standards for substances to be used in organic production and to advise the Secretary on any other aspects of the implementation of this chapter.

7 U.S.C. § 6518(a) (emphasis added); SAC ¶ 60. And, under the subsection entitled

Responsibilities of the Board:

> **In General.** The Board shall provide recommendations to the **Secretary** regarding
> the implementation of this chapter.

7 U.S.C. § 6518(k)(1); SAC ¶ 59.

The "chapter" referenced in these provisions refers to the OFPA as a whole, not, as

Defendants would have this Court believe, certain cherry-picked subsections of the statute.

Therefore, the OFPA itself instructs that NOSB was formed to advise USDA on any aspects

related to implementation of the OFPA, which by rather straightforward implication includes

decisions on preparing, adopting, postponing and withdrawing rules.

Further, as 7 U.S.C. § 6503(c) points out, USDA is required to consult with NOSB in

developing the organic certification program. Certainly, a vital component to the development of

the program is how and when the rules are released, and whether the rules are implemented at

all. Putting the two subsections together, NOSB must advise USDA on any aspects related to

implementation of the OFPA, and USDA must consult with NOSB to develop the program.

Therefore, it follows that, under the plain language of OFPA, USDA had a duty to consult with

NOSB prior to proposing and finalizing the Delay and Withdrawal Rules, since they are integral

steps in the development and implementation of the organic program.

Defendants' argument that Plaintiffs are asking this Court to "engraft new consultation

requirements on the USDA that Congress clearly did not require in the OFPA" is also a non-

starter. Motion at 39. As shown above, the consultation requirements are clear-cut: USDA must

consult with NOSB with respect to developing the NOP, and NOSB must advise USDA as to

matters involving the implementation of OFPA. Plaintiffs are not asking the Court to add any

other requirements onto USDA's existing obligations, which are spelled out under the plain language of the statute.  The Supreme Court has often stated "that when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command." *D.C. Ass'n of Chartered Pub. Sch. v. D.C.*, 134 F. Supp. 3d 525, 535 (D.D.C. 2015)(citation omitted).

The consultation requirement, as well as the unique nature of the public/private partnership, is further demonstrated by statute's legislative history.  The Senate's Organic Report, published at the time the statute was passed states: "The Committee regards this Board as an essential advisor to the Secretary on all issues concerning this bill and anticipates that many of the key decisions concerning standards will result from recommendations by this Board." Senate Committee on Agriculture, Forestry and Nutrition, *Report of the Committee on Agriculture, Forestry and Nutrition to Accompany S. 2830 Together With Additional and Minority Views, 101st Congress*, S. REP. No. 101-357, at 289 (1990) ("Senate Organic Report"); SAC ¶ 62. The USDA's *NOSB Policy Manual* reflects the reciprocal nature of the relationship and the consultation requirement: "The unique nature of the NOSB and its relationship with NOP, as established through OFPA, requires that the volunteer Board, which regularly receives stakeholder input through public comment, must work collaboratively with the NOP. Similarly, the NOP, as required through OFPA, must consult and collaborate with the NOSB." *NOSB Policy Manual*, at 9, available at https://www.ams.usda.gov/sites/default/files/media/NOSB-PolicyManual.pdf; SAC ¶ 63. This legislative history, along with USDA's own prior interpretation of the statute, are unambiguous.

Defendants also conflate USDA's duty to *consult* with NOSB with USDA being required to accept all of NOSB's recommendations. Motion at 38. Defendants are correct that USDA need

not accept all of NOSB's recommendations, and in fact, as Defendants point out, USDA departed from those recommendations on several occasions. *Id.* However, USDA's ability to accept or reject NOSB's recommendations has no relevance to whether USDA must *consult* with NOSB. As the statutory provisions above show, it must. And, in the case of the Delay Rules and the Withdrawal Rules, USDA did not do so. *See* Exh. 15 to ECF No. 34, (Chapman Decl. ¶ 27). Whether or not USDA would have taken NOSB's advice on delaying or withdrawing OLPP, the fact remains that USDA failed to consult NOSB at all, even though such consultation is required by statute.

Finally, Defendants' assertion that the NOSB has no expertise on the issues underlying the Delay and Withdrawal Rules fares no better. While the NOSB might not have specific expertise on the nuances of administrative law, Congress drew the lines of responsibility and defendants may not erase them.  More importantly, the NOSB is the voice of diverse American agriculture at USDA and consumers expect it will be involved in major decisions affecting organic interests.  *See* Exh. 15 to ECF No. 34, (Chapman Decl. ¶ 29) ("The failure to consult the NOSB diminishes the trust among consumers and the organic community and undermines the collaborative wisdom on a topic." *See also Exh. 15 to* ECF No. 34 (Siemon Decl. ¶ 2); ¶ 21("The failure to consult the NOSB during this entire delay period has also eroded confidence that the USDA is operating transparently and managing the NOP to ensure consistent standards are applied to all certified operations."). It is hard to imagine a more qualified group than NOSB to weigh in on when, and whether, a rule impacting the organic industry should be implemented.

At the time of publication of the rule that established the entire National Organic Program eighteen years ago, USDA said:

> The national standards implemented by this final rule can be amended as needed to establish more restrictive national standards. Anyone may request that a provision of

> these regulations be amended by submitting a request to the NOP Program Manager or
> the Chairperson of the NOSB. Requests for amendments submitted to the NOP Program
> Manager will be forwarded to the NOSB for its consideration. The NOSB will consider
> the requested amendments and make its recommendations to the Administrator. When
> appropriate, the NOP will conduct rulemaking on the recommended amendment. Such
> rulemaking will include an opportunity for public comment.

*See* 65 Fed. Reg. at 80,608.  There is a vast gap between the collaborative sentiment

underpinning this statement and the position taken by defendants in the Withdrawal,  "OFPA

does not require AMS to consult with the NOSB prior to undertaking a rulemaking to withdraw

the OLPP final rule." 83 Fed. Reg. 10,778 at n. 6.

      In sum, Plaintiffs have adequately pled Count Three by providing sufficient facts to show

that USDA had a duty to consult with NOSB prior to enacting the Delay and Withdrawal Rules,

and that USDA failed to do so, in contravention of its obligations under the OFPA and the APA.

### D.  THE COURT SHOULD GRANT PLAINTIFF'S REQUEST FOR LEAVE TO AMEND.

      Under Rule 15 leave is freely granted.  The USDA has twice issued new final rules while

this case has been pending and the interests of justice are served by allowing the amendment to

the case pleadings.  It makes not sense to segregate what is a single course of interlocking

administrative actions into separate or balkanized litigation.  The Court should find that all

Plaintiffs have standing to bring this lawsuit. In the event the Court decides any of the Plaintiffs

failed to demonstrate standing, it should grant them leave to amend their pleadings to meet this

burden. *See, e.g., Warth*, 422 U.S. at 521 ("[I]t is within the trial court's power to allow or

require the plaintiff to supply, by amendment to the complaint or by affidavits, further

particularized allegations of fact deemed supportive of plaintiff's standing.").

Respectfully Submitted:

 /s/ Andrea M. Downing
William J. Friedman (admitted *pro hac vice*)
107 S. West Street
Alexandria, Virginia 22314
Phone: 571-217-2190
Email: pedlarfarm@gmail.com

Andrea M. Downing (DC Bar No. 1005865)
Wade, Grimes, Friedman, Meinken & Leischner, PLLC
616 North Washington Street
Alexandria, Virginia 22314
Phone: 703-826-9030
Email: downing@oldtownlawyers.com

COUNSEL FOR PLAINTIFF ORGANIC TRADE
ASSOCIATION


Jennifer H. Chin (admitted *pro hac vice*)
Jaime K. Olin (admitted *pro hac vice*)
The American Society for the Prevention of Cruelty to
Animals
520 Eighth Avenue, 7th Floor
New York, New York 10018
Phone: 212-876-7700
Email: jennifer.chin@aspca.org
       jaime.olin@aspca.org

Cathy A. Harris (DC Bar No. 467206)
Daniel Clark (DC Bar No. 156052)
Kator, Parks, Weiser & Harris, PLLC
1200 18th Street, NW, Suite 1000
Washington, D.C. 20036
Phone: 202-898-4800
Email: charris@katorparks.com
       dclark@katorparks.com

COUNSEL FOR PLAINTIFF AMERICAN SOCIETY
FOR THE PREVENTION OF CRUELTY TO ANIMALS


Erin Thompson (*pro hac vice* pending)

Animal Welfare Institute
900 Pennsylvania Avenue, SE
Washington, D.C. 20003
Phone: 202-446-2147
Email: erin@awionline.org

Nick Lawton (DC Bar No. 1046604)
Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Avenue NW, Suite 210
Washington, D.C. 20016
Phone: 202-588-5206, ext. 107
Email: nlawton@meyerglitz.com

COUNSEL FOR PLAINTIFF THE ANIMAL WELFARE
INSTITUTE

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 16, 2018, I filed a copy of this brief with this Court electronically, and all participants in this case who are registered CM/ECF users will be served via the CM/ECF system.

/s/ William J. Friedman

Counsel for Plaintiff Organic Trade Association