UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ORGANIC TRADE ASSOCIATION,** | **Civil Case No. 1:17-cv-01875-RMC** |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES DEPARTMENT OF AGRICULTURE,** *et al.,* | |
| **Defendants.** | |

CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT AND DEFENDANT'S OPPOSITION TO PLAINTIFF'S REQUEST FOR LEAVE TO AMEND UNDER RULE 15

Pursuant to this Court's scheduling Order, ECF No. 33, and Minute Order of May 25, 2018 Plaintiff respectfully submits this Consolidated Response in Opposition to the Defendants' Motion to Dismiss Second Amended Complaint and Opposition to Plaintiff's Motion for Leave to Amend.

INTRODUCTION

Plaintiff Organic Trade Association's ("OTA") proposed Second Amended Complaint, ECF No. 34 (hereinafter "SAC") encompasses a single course of interlocking administrative actions that unfolded across five rulemakings and seven Federal Register publications over the last fourteen months.[1] The saga began with the publication of a Final Rule in January 2017, *The Organic Livestock Production Practices Rule* ("OLPP")*,* and was followed by three final rules each of which serially delayed the effective date of the OLPP, and ended with its withdrawal in March 2018.  Each interim administrative action between publication of the OLPP and its withdrawal was kindling for the flame that consumed it and each has been challenged in this

---

[1] The relevant Federal Register publications and references are listed in Appendix A.

litigation.  None of these actions can be viewed in isolation because defendants have relied on each successive action and cited to parts of the record of each in the March 2018 Final Withdrawal. Prior to the withdrawal proceeding initiated in December 2017 USDA had not disclosed its scientific, economic or legal grounds for delay or withdrawal.  Now, in addition to the reconsideration of the OLPP record, it is apparent that a breathtaking repudiation of more than 20 years of organic program policy, standards development and implementation is underway. *See e.g.* SAC at ¶¶1-15.  The SAC consolidates the allegations arising from each challenged administrative action into a single, cohesive pleading.

The OLPP was the product of more than ten years of agency and public process arising from "recommendations provided by USDA's Office of Inspector General and nine separate recommendations from the National Organic Standards Board." ("NOSB")  82 Fed. Reg. at 7082.  The recommendations accepted by the agency were based on long-standing and well-settled agency constructions of the Organic Foods Production Act ("OFPA") with regard to organic standards for livestock care, and the role of the NOSB in developing those standards.  It clarified and extended animal care assurances on organic farms. The Withdrawal Rule, in stark contrast, relied on a novel and erroneous construction of the OFPA that conflicts with, and contradicts, statutory mandates set by Congress for organic standards for livestock care, and the role of the NOSB in developing those standards.  The Withdrawal Rule conflicts with every prior administration's approach to organic rulemaking under the OFPA and the NOSB.  The SAC presents several first-impression questions of law under the OFPA and issues of major significance to all organic trade participants and consumers of organic food products that are concerned about farm animal well-being.

# BACKGROUND

## A. The Organic Foods Production Act

The Organic Food Products Act ("OFPA") was enacted in 1990 to correct a market failure arising from a patchwork of state and private organic production and processing standards that resulted in inconsistent certification requirements for organic products, consumer confusion, and fragmented markets for organic farmers, food processors and their products.[2]  Congress sought to "facilitate interstate commerce" by "establishing national standards governing the production and marketing of certain agricultural products. . . ." in order to "assure consumers that organically produced products meet a consistent standard." 7 U.S.C. § 6501.  Congress directed the USDA to develop and implement the new "national standards." 7 U.S.C.§ 6503.  Further, Congress took an "opt-in" approach to regulating organic products by creating "national standards" solely for those persons who voluntarily choose to produce and market products bearing an "organic" marketing claim. 7 U.S.C. § 6504; 83 Fed. Reg. at 10779 (["P]articipation in the NOP is technically voluntary…").

1. Purpose of the NOSB and Consultation Duty in the Statute, Legislative History and Agency Practice

To guide USDA in this undertaking, Congress created an expert citizen-advisory board, the National Organic Standards Board ("NOSB"). 7 U.S.C. § 6518.  The NOSB is composed of fifteen members appointed according to statutory criteria. The OFPA requires the Secretary to seat four certified farmers, two certified handlers, one organic retailer, one accredited certifying

---

[2] Organic Foods Production Act of 1990, Pub. L. No. 101-624, § 2102, 104 Stat. 3359 (1990)(codified at 7 U.S.C. §§ 6501-6522) ("OFPA"); 7 C.F.R. Part 205 (National Organic Program); *see also* S. Rep. No. 101-357 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 4656, 4949; *see generally* Senate Committee on Agriculture, Forestry and Nutrition, *Report of the Committee on Agriculture, Forestry and Nutrition to Accompany S. 2830 Together with Additional and Minority Views, 101st Congress,* S. REP. NO. 101–357 (1990) (hereinafter "Senate Report")

agent, three members with environmental and resource conservation expertise, three members that represent, or are, public or consumer interest groups, and one member with expertise in toxicology, ecology or biochemistry.  7 U.S.C. § 6518(b). The statutory criteria established viewpoint diversity that Congress expressly intended the Secretary to consult when considering new organic standards, or amending existing ones.   7 U.S.C. § 6518.  As a marketing program, consumer expectations in shaping emerging organic norms have been increasingly recognized. *See e.g.*, 82 Fed. Reg. at 7043, 7066 (recognizing consumer expectations in deliberations of NOSB); 75 Fed. Reg. 7154 (Feb. 17, 2010) (recognizing role of consumer expectations in establishing national organic standards)

Congress mandated the Secretary: "shall establish [the NOSB] ….to assist….and to advise the Secretary on any other aspects of the implementation of this chapter." 7 U.S.C. § 6518(a).  The Secretary: "[S]hall consult with the National Organic Standards Board…" 7 U.S.C. § 6503(c) Correspondingly, the NOSB: "[S]hall provide recommendations to the Secretary regarding the implementation of this chapter," 7 U.S.C. § 6518(k)(1). Congress further and specifically directed that the minimal livestock production standards it placed in the OFPA be augmented: "[the NOSB] *shall recommend to the Secretary standards in addition to those in [the foregoing section] for the care of livestock to ensure that such livestock are organically produced*." 7 U.S.C. § 6509(d)(2) (italics added by Plaintiff). The public's role was likewise confirmed: "[the Secretary] [S]hall hold public hearings *and shall develop detailed regulations*, with notice and public comment, to guide the implementation of the standards for livestock products…" 7 U.S.C. § 6509(g) (italics added by Plaintiff). The role of the NOSB was re-confirmed in 1998 when Congress directed the Secretary develop organic standards for "wild

seafood" and mandated "the Secretary shall consult with…the National Organic Standards Board." *See* 7 U.S.C. § 6506(c) (2)

The legislative history confirms the central role of the NOSB.  The Senate's Organic Report states: "The Committee regards this Board as an essential advisor to the Secretary on all issues concerning this bill and anticipates that many of the key decisions concerning standards will result from recommendations by this Board." *Senate Organic Report*, at 289 (1990) The Senate Report demonstrate confirm a unique and novel public-private partnership. "[M]uch of this title breaks new ground for the Federal government and will require the development of a unique regulatory scheme." *Senate Organic Report*, at 293. The Senate Report explains that the NOSB's role in the development of policy ensured a continual updating of organic standards, as occurred here with the OLPP.  "The Committee is concerned that production materials and practices keep pace with our evolving knowledge of production systems." *Senate Organic Report* at 297.

2. The Specific Duty of the NOSB Regarding Development of Organic Livestock Production and Animal Wellbeing Standards

At the time of passage of the OFPA, Congress recognized that limited knowledge or consensus on appropriate organic livestock production standards existed. *Senate Report* at 289. "[T]he Committee expects that USDA, with the assistance of the National Organic Standards Board will elaborate on livestock criteria." *Senate Report* at 289; *id.* at 303 ("The Board shall recommend livestock standards, in addition to those specified in this bill, to the Secretary."). When the House and Senate were reconciling their respective versions of the OFPA, Congress stated that the "Conference substitute adopts the House provision with an amendment which requires the Secretary to hold hearings and develop regulations regarding livestock standards *in addition to* those specified in this title." H.R. Rep. 101-916 at 1177-78 (Oct. 22, 1990) (italics

added by Plaintiff).  The Conferees, "recognize[d] the need to further elaborate on the standards

set forth in the title and expect[ed] that by holding public discussions with interested parties and

with the National Organic Standards Board, the Secretary will determine the necessary

standards." *Id.*  Following this approach for nearly ten years after passage of the OFPA, USDA

published the National Organic Program Final Rule ("NOP") in December 2000.  *National*

*Organic Program*, 65 Fed. Reg. 80,548 (Dec. 21, 2000) (codified at 7 C.F.R. pt. 205) ("2000

Rule").

**B.     History of Organic Livestock Standards at the National Organic Program.**

Consistent with the legislative history and the statute's requirement that additional livestock

production practices for organic livestock operations be developed by the Secretary in

consultation with the NOSB, 7 U.S.C. § 6509(d)(2); 7 U.S.C. § 6509(g), there has been constant

effort to refine and improve organic livestock practices.  The content of the administrative

actions taken by the NOSB and USDA over the last approximately 20 years are more fully set

forth in the SAC and are not reproduced here.[3]  *See* SAC ¶¶93-149

1. The Final Rule Published in 2000 -A Work in Progress

These standards were developed from specific requirements in the OFPA, recommendations
from the NOSB, review of existing organic industry practices and standards, public
comments received on the 1997 proposal and subsequent issue papers, public meetings, and
comments received on the 2000 proposal." *See* 65 Fed. Reg. at 80,666

From the outset of organic rulemaking in 2000 the NOSB has had a central role.  Since that

time the binding organic livestock production requirements have included provisions for animal

care and well-being that are not limited rules governing feed and restrictions on medication for

---

[3] *See e.g.* 65 Fed. Reg. at 80,666 (describing public/NOSB/agency collaboration); 82 Fed. Reg.
at 7045 (listing NOSB recommendations from 1994-2011 and federal register notices and
hearing dates); SAC ¶¶99-116 (listing NOSB and NOP actions from 2000 through 2012).

healthcare.  *See e.g.* 7 C.F.R. §§ 205.236 (Origin of Livestock); 205.237 (Livestock Feed);

205.238 (Livestock Healthcare practice standard); and 205.238 (Livestock living conditions).

Related provisions appear at 7 C.F.R. §§ 205.201, 205.400, and 205.401 The 2000 Rule sought

to eliminate many of the common healthcare and animal well-being issues known to arise from

confinement and management practices that are associated with non-organic animal production

systems. Some relevant excerpts demonstrating the breadth of animal wellbeing measures that

have always been part of the federal organic program are listed in Appendix C.

   2.   The Open Questions for the NOSB after the 2000 Final Rule

   The 2000 rule also noted many livestock production questions remained unanswered, and

reserved the key role for the NOSB.[4] "The NOP will work with the NOSB to develop additional

guidance for managing ruminant production operations." 65 Fed. Reg. at 80,573 (italics added).

"We anticipate that additional NOSB recommendations and public comment will be necessary

*for the development of space requirements*." *Id.* (italics added by Plaintiff) ("We will continue to

explore with the NOSB specific conditions under which certain species could be temporarily

confined to enhance their well-being."); 65 Fed. Reg. at 80,574 (The NOSB has the authority to

reconsider this issue and propose an alternative annotation for the Secretary's consideration.)

   The primacy of the NOSB's role and the unfinished work was recognized:

> Requests for amendments submitted to the NOP Program Manager will be forwarded to
> the NOSB for its consideration. The NOSB will consider the requested amendments and
> make its recommendations to the Administrator. When appropriate, the NOP will conduct
> rulemaking on the recommended amendment. Such rulemaking will include an
> opportunity for public comment.  65 Fed. Reg. at 80608

---

[4] *See e.g.* ECF No. 50, Exhibits 1-5 (Declarations of former NOSB chairs covering
approximately 15 years, noting USDA has not conducted rulemaking on organic livestock
production practices without consulting with and receiving recommendations from the NOSB
regarding the relevant issues, providing notice and comment and holding public hearings.)

3.   The Access to Pasture Rule Published in 2010

In 2010, USDA published its first major organic livestock rule since 2000, the *Access to Pasture Rule* and added more specific feed and living conditions for ruminant animals to the federal regulations. *See National Organic Program; Access to Pasture (Livestock)*, 75 Fed. Reg. 7154-7195 (Feb. 17, 2010) (hereinafter "*Access to Pasture Rule*") (codified at 7 C.F.R. §§ 205.237; 205.239; 205.240).

> The NOP regulations provide for certification of an operation based on a set of sustainable practices in order to meet a marketing claim intended to satisfy consumer expectations. In the case of organic ruminant animals, consumers expect that these animals graze on pasture and derive a significant portion of their nutrition while grazing on pasture. *See* 75 Fed. Reg. at 7159

> "[O]ne of the tenants [sic] of organic production is that animals are able to express their natural behaviors, and exercise and move freely." *Id.* at 7171.

> A stated purpose of the OFPA (7 U.S.C. 6501) is to assure consumers that organically produced products meet a consistent and uniform standard. This action is being taken to facilitate and improve compliance and enforcement and satisfy consumer expectations…. Sufficient specificity and clarity will bring uniformity in application of the livestock regulations and enable certifying agents and producers to assess compliance. *See Id.* at 7184.

4.   Other Administrative Actions Regarding Organic Livestock Production Practices that Predate the OLPP

In March 2010, the USDA's Office of Inspector General conducted an audit of the NOP and issued a report entitled *Oversight of the National Organic Program.* The Report found inconsistent treatment of "outdoor access" requirements, especially for poultry by accredited certifying agents. *Oversight of the National Organic Program,* OIG Audit Report No. 01601-03-Hy, 22 ("OIG Report") *available at* https://www.usda.gov/oig/webdocs/01601-03-HY.pdf. Later, USDA published *Guidelines for Organic Certification of Poultry*: "Animal health is the result of preventative and on-going management efforts to create living soils, provide nourishing forage and feed, and improve the quality of livestock life. Animals must be kept in healthy, low

stress environments."[5] USDA's *Guidelines for Organic Certification of Dairy Livestock* contains

identical language as appears in the poultry guidance quoted above.[6]

5.   The Proposed Organic Livestock and Poultry Practices Rule

On April 16, 2016, USDA published its second major livestock related rule since 2000, the

proposed *Organic Livestock and Poultry Practices Rule* ("the Proposed Organic Livestock Rule"

or "Proposed OLPP") in an extremely detailed 54-page publication.  81 Fed. Reg. at 21,956-

22,009 (April 13, 2016). "AMS is proposing this rulemaking to maintain consumer confidence in

the high standards represented by the USDA organic seal." *Id.* at 81 Fed. Reg. at 21,980.  The

connective thread between the OFPA, the multiple NOSB recommendations, the 2000 Rule and

the 2010 *Access to Pasture* rule was repeatedly highlighted. 81 Fed. Reg. at 21998 ("This action

completes the process, as intended by OFPA and reiterated in the USDA organic regulations, to

build more detailed standards for organic livestock."); *see also e.g.* SAC ¶¶102; 138; 148, 154,

157, 224, 262-267 (references to the OLPP record on need to eliminate regulatory asymmetry

around poultry houses with "porches" that do not meet consumer expectations of "outdoor

access.")  Additional relevant excerpts appear in Appendix C.

6.   The Final Organic Livestock and Poultry Practices Rule ("OLPP")

On January 19, 2017, the USDA issued a 51-page final rule, entitled *Organic Livestock and*

*Poultry Practices*.  82 Fed. Reg. at 7042-92 (January 19, 2017) ("OLPP"). "This final rule

addresses care and production practices, transport, slaughter, and living conditions for organic

---

[5] U.S. Department of Agriculture, *Guidelines for Organic Certification of Poultry, available at*
https://www.ams.usda.gov/sites/default/files/media/Poultry%20-%20Guidelines.pdf.
[6] U.S. Department of Agriculture, *Guidelines for Organic Certification of Dairy Livestock*,
*available at* https://www.ams.usda.gov/sites/default/files/media/Dairy%20-%20Guidelines.pdf.

livestock and poultry." 82 Fed. Reg. at 7043[7]  The SAC cites many of the OLPP's key provisions regarding poultry and mammalian well-being and they are not all reproduced here. SAC ¶¶133-59 In addition, the SAC tracks the history and substance of the core asymmetry in the programmatic treatment of "outdoor access" that led to the OIG findings cited at pg. 8 above and substantiated the need for the OLPP rulemaking.  *See* SAC ¶¶102; 138; 148, 154, 157, 224, 262-267.  According to the OLPP, the adverse impact on competition and consumer trust of the USDA organic seal drove the OLPP's development. *See* 82 Fed. Reg. at 7082 ("This variability perpetuates an uneven playing field among producers and sows consumer confusion about the meaning of the USDA organic label."); SAC at ¶ 155 (citing Final Regulatory Impact Assessment) ("This disparity in outdoor access has economic implications for producers and jeopardizes consumer confidence in the organic label."); *see also* SAC at ¶¶150-159 (citing corresponding sections of the Final Regulatory Impact Analysis)[8]  Additional relevant excerpts appear in Appendix C. The qualitative benefits of the OLPP were listed in the Final RIA:

> Protects the value of the USDA organic seal to consumers; Facilitates level enforcement of organic livestock and poultry standards; Alleviates the need to maintain additional third-party animal welfare certification and the associated costs and resources. This variability leads to consumer confusion about the meaning of the USDA organic label and perpetuates an uneven playing field among producers.  *See* SAC at ¶ 151 (citing Final RIA)

**C.    The Three Delay Rules**

1.    The First Unlawful Administrative Stay--60 Days**.**

---

[7] Upon publication the OLPP became the "status quo" or existing policy of the National Organic Program. *SAC* ¶ 91; *see also Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (agency is "bound by the rule until that rule is amended or revoked.")

[8] Hereinafter "Final RIA." The Final Regulatory Impact Statement is summarized in the Final OLPP.  *See* 83 Fed. Reg. 7082-84.  The full RIA is a separate 154-page document and is available at https://www.ams.usda.gov/rules-regulations/organic-livestock-and-poultry-practices-historical

The OLPP was originally set to take effect on March 20, 2017. President Trump was inaugurated at noon on Friday, January 20, 2017. Later that day, White House Chief of Staff Reince Priebus issued a "Memorandum for the Heads of Executive Departments and Agencies" ("*Priebus Memorandum*"). The *Priebus Memorandum* was published in the Federal Register on Tuesday, January 24, 2017. 82 Fed. Reg. 8346 (Jan. 24, 2017). The *Priebus Memorandum* directed agencies with "regulations that have been published in the [Federal Register] but have not taken effect" to "temporarily postpone their effective date for 60 days from the date of the memorandum." *Id*. The *Priebus Memorandum* plainly stated agencies were directed to postpone any published but not yet effective rule only "as permitted by law." *Priebus Memorandum,* at ¶ 3 (emphasis added).)

On February 9, 2017, the rule's effective date was delayed to May 19, 2017 based on the *Priebus Memorandum*. 82 Fed. Reg. 9967 (February 9, 2017) ("First Delay Rule"). None of the multiple implementation dates were altered.[9] No notice and comment was undertaken and no consultation with the NOSB occurred. *See e.g.* ECF No. 34, Exhibit 15--*Declaration of Tom Chapman* (NOSB Chairman 2017-2018) at ¶ 15. USDA further claimed the First Delay Rule was exempt from notice and comment under the APA because it was "impracticable, unnecessary, or contrary to the public interest pursuant to 5 U.S.C. 553(b)(B). 82 Fed. Reg. at

---

[9]. The defendants' MTD argued, "The rule was published without notice and comment but did not affect the March 2018, March 2020, or March 2022 deadlines by which the OLPP Rule's substantive provisions were to be implemented." MTD at 11; *see also* MTD at p. 41 ("Those Rules collectively postponed the effective date of the OLPP Rule until November of 2017 but did not alter any requirement or implementation deadline under the OLPP Rule and therefore did not impact any competitive condition or animal welfare standard that might have otherwise existed.") The Declarations submitted by OTA members amply rebut the Defendants' contention here. *See Appendix B* (list of Declarations) and discussion at pgs. 22-30 herein.

9967.  No factual explanation for invocation of the rare exception was given.  *See* 82 Fed. Reg. at 9967

The NOSB conducted its semi-annual public meeting on April 19-21, 2017.  *See* 81 Fed. Reg. at 85,205 (Nov. 25, 2016) (meeting notice).  The USDA refused to discuss, much less consult the NOSB regarding the delays, the impact on implementation deadlines, or possible withdrawal of the OLPP.  *See e.g.* ECF No. 16, Exhibit 10 (NOSB meeting transcript at p. 411— NOP Program head: "[OLPP] effective date is delayed until May 19th.  It's under review by the department"); *see also* ECF No. 34, Exhibit 15--Declaration of NOSB Chair Tom Chapman at ¶ 15 (no consultation at meeting on first delay); ECF No. 16, Exhibits 12-13 (Federal Register Meeting Notice for NOSB; no OLPP matters).

Having been excluded from all deliberations regarding the decision to delay, the board in open session unanimously adopted a resolution expressing its view that the OLPP become effective on May 19th as proposed in the February 9 delay rule.  *See* ECF No. 16, Exhibit 10 (NOSB meeting transcript at pp's. 184-87) Similarly, on April 28, 2017, three hundred and thirty-four certified organic livestock and poultry producers with estimated revenue of $1.95 billion dollars sent a letter to the Secretary requesting immediate implementation of the OLPP. The letter said, "…if consumers lose confidence in the organic seal it will have catastrophic impacts throughout the industry."  *Available at* https://www.regulations.gov/document?D=AMS-NOP-17-0031-0006.

2.  The Second Unlawful Administrative Stay--180 Days.

On May 10, 2017, USDA issued its second stay of the OLPP effective date, this time to November 14, 2017. 82 Fed. Reg. at 21,677 (May 10, 2017) (the Second Delay Rule). The Second Delay Rule, entitled "Final rule; delay of effective date," was published without prior

notice or an opportunity for public comment, or any consultation with the NOSB, and delayed

the effective date of the Organic Livestock Final Rule by an additional 180 days. 82 Fed. Reg. at

21,677 *see also* ECF No. 34, Exhibit 15--Declaration of NOSB Chair Tom Chapman at ¶¶ 20-22

(no consultation on second delay and no inquiry regarding the intent behind the four procedural

options posed in the second delay Notice)  Again, none of the multiple implementation dates

were altered thus leaving the regulatory uncertainty unaltered.

USDA said, "Because there are significant policy and legal issues addressed within the final

rule that warrant further review by USDA, AMS is delaying the effective date of this rule by 180

days. . . " 82 Fed. Reg. at 21677.  USDA claimed again, "good cause" existed for waiving notice

and comment, and further claimed the 180-day stay was exempt from notice and comment under

the APA because it was "impracticable, unnecessary, or contrary to the public interest pursuant

to 5 U.S.C. 553(b)(B)."  *Id.* No factual support for the invocation of this rare exception was

offered.

3.  The Proposed Third Delay Rule.

On the same the Second Delay Rule was published, USDA published a proposed rule

containing four procedural options.

1.  Let the Organic Livestock Rule become effective on November 14, 2017;
2.  Suspend the Organic Livestock Rule indefinitely;
3.  Further delay the effective date of the Organic Livestock Rule; or
4.  Withdraw the Organic Livestock Rule.  82 Fed. Reg.  21,742 (May 10, 2017)
    ("Proposed Third Delay Rule").

The Proposed Third Delay Rule posited no substantive inquiry; identified no deficiency in the

existing administrative record made over approximately ten years; did not identify *any*

outstanding issue of law, fact or policy; and did not mention the NOSB's role or its view on the

proposed rule.  *Id.*  The Proposed Rule merely said, "[T]here are significant policy and legal

issues addressed within the FR that warrant further review by USDA. . ." *Id.*  No description of the issues and no request for comment thereon was published. The sole legal authority cited was the *Priebus Memorandum* and a single sentence guided potentially affected parties: "USDA is asking the public to comment on the possible actions USDA should take in regards to the disposition of the [OLPP]." 82 Fed. Reg. at 21,742.

    4.  The Third Unlawful Administrative Stay--180 Days.[10]

On November 14, 2017, USDA issued its third stay of the OLPP's effective date, this time to May 14, 2018, a date more than 14 months after the original effective date of the final rule. The stay was styled "Final rule; delay of effective date." ("Third Delay Rule") 82 Fed. Reg. 52,643. The Third Delay Rule, like the Proposed Third Delay Rule, was published without any consultation with the NOSB.  *See* ECF No. 34, Exhibit 15--Declaration of NOSB Chair Tom Chapman at ¶ 24 (no consultation with NOSB on second delay and no inquiry regarding the intent behind the four procedural options posed in the Proposed Third Delay Rule) It did not alter any of the multiple implementation dates despite their having all become nearly a year out of date.

USDA summarized that further delay was necessary "so that important questions regarding USDA's statutory authority to promulgate the OLPP rule and the likely costs and benefits of that rule, can be more fully assessed through the notice and comment process prior to AMS making a final decision on whether the OLPP final rule should take effect." 82 Fed. Reg. 52,643. USDA then revealed for the first time that it had not been considering the record made in the instant

---

[10] The comments received in the 30-day comment period regarding the Third Delay New Proposed Rule reportedly exceeded 47,000. 82 Fed. Reg. 52,643.  AMS acknowledged that "more than 34,600" comments supported immediate implementation of the Organic Livestock Rule.  *Id*. at 52643.  Upon information and belief, the full administrative record will disclose closer to 45,000 comments supported Option 1, immediate effectiveness of the OLPP.

rulemaking, but instead had been reviewing the original record made with the OLPP. "In the course of reviewing the record for the Organic Livestock Rule final rule, AMS discovered a significant, material error in the mathematical calculations of the benefits estimates." 82 Fed. Reg. 52,643-44 Based on this, USDA concluded, "It is not appropriate for AMS to allow a final rule to become effective based on a record containing such a material error." *Id.* These findings conflicted with those made in January 2017. *See e.g.* 82 Fed. Reg. at 8043 ("Regulatory Authority for Final Rule")

As noted above, the Proposed Third Delay Rule did not mention either of these specific areas of inquiry, and the technical reports and documents that underpinned the finding of a mathematical "material error" were not provided. Later, more than one month after publishing its Third Delay Rule, and more than six months after publishing its Proposed Third Delay Rule, USDA posted on a website the technical reports that it referred to here.[11]

**D.    The Proposed Withdrawal Rule and Final Withdrawal of the OLPP.**[12]

On December 18, 2017, USDA published "*National Organic Program (NOP); Organic Livestock Production Practices—Withdrawal*" proposing to withdraw the OLPP and limiting the comment period to 30 days. 82 Fed. Reg. 59,988-992 (Dec. 18, 2018) ("Proposed Withdrawal"). There was no consultation with the NOSB prior to publishing the Proposed Withdrawal.  *See e.g.*

---

[11] These documents were never published in the Federal Register but instead appeared in a secondary folder on the Regulations.gov website.  See "Supporting Documents Folder" (OLPP-PRIA) and "Benefit+Cost Workbook for OLP Notice" *available at* https://www.regulations.gov/docket?D=AMS-NOP-15-0012.

[12] USDA ultimately received over 72,000 comments, the vast majority of which supported the OLPP. 83 Fed. Reg. at 10775 ("AMS received approximately 72,000 comments . . . over 63,000, opposed the withdrawal * * * Approximately fifty comments supported withdrawal. . *.*" ); *see also*  https://www.regulations.gov/document?D=AMS-NOP-15-0012-6686 (recording more than seventy-two thousand comments) (last visited March 21, 2018)

ECF No. 16, *Exhibit 3: Declaration of NOSB Chair Tom Chapman* at ¶¶ 26-27. Two principal

rationales were asserted.

> [USDA] now believes OFPA does not authorize the animal welfare provisions of the [OLPP] final rule. 82 Fed. Reg. at 59,988.

> In reviewing the OLPP final rule, AMS found that the calculation of benefits contained mathematical errors * * * In addition, the range used for estimating the benefit interval could be replaced with more suitable estimates.

82 Fed. Reg. at 59,990 (discussing its re-examination of the Final Regulatory Impact Statement

published with the OLPP).  A third rationale was adduced that had not previously been

mentioned, "The RIA for the OLPP final rule did not identify a significant market failure to

justify the need for rule." *See* 82 Fed. Reg. at 59,991. The revised cost-benefit calculations not

disclosed in the Proposed Third Delay Rule were placed online. *Id.* ("Copies of the full analysis

are available on the Regulations.gov website."); *Id.* ("The PRIA also provides additional

information regarding the estimated benefits and explains why they likely were overstated in the

OLPP final rule RIA.").

Days later, on December 22, 2017 OTA submitted a written request that USDA enlarge

the time for comment from 30 to 90 days, due in part to the complexity of the newly raised cost-

benefit analysis issue raised and coordination difficulties associated with the winter holidays.  On

Jan. 10, 2018, USDA rejected the requested enlargement by letter ruling.  *See* ECF No. 34,

Exhibit No's. 1 & 6; *see also* 83 Fed. Reg. at 10,775 (March 13, 2018) ("Commenters also

requested an extension of the public comment period, from 30 to 90 days, specifically noting

they needed more time to study the revisions discussed in the Preliminary Regulatory Impact

Analysis (PRIA) and develop meaningful comments.")  On Jan. 18, 2018 OTA submitted its

comment to USDA on "*National Organic Program (NOP); Organic Livestock Production*

*Practices—Withdrawal*" and again asked for enlargement of time to prepare comments. *See* ECF

No. 34, Exhibit 4.

On March 13, 2018 USDA published "*Final Rule; Withdrawal*" *See* 83 Fed. Reg. 10,775-

783 (March 13, 2018) ("Withdrawal").  Despite receiving over 63,000 comments to the contrary

(and only 50 in support of withdrawal), USDA made, *inter alia,* the following three conclusions:

> [O]FPA does not authorize the animal welfare provisions of the OLPP final rule." 83
> Fed. Reg. at 10,776; *accord* at 10,781 ("AMS maintains that the OLPP final rule
> exceeds AMS' scope of authority...");

> [A]MS maintains that the costs of the OLPP final rule outweigh potential benefits.
> After publication of the OLPP final rule, AMS discovered a mathematical error in the
> calculation of benefits." 83 Fed. Reg. at 10,779; and

> OFPA does not require AMS to consult with the NOSB prior to undertaking a
> rulemaking to withdraw the OLPP final rule." 83 Fed. Reg. 10,778 at n. 6.

With regard to (a) above, USDA rejected comments that the existing organic livestock

standards regarding animal well-being authorized by Section 6509 set the appropriate reading of

that statutory section and instead concluded such arguments were, "largely divorced from the

surrounding context of the OFPA," 83 Fed. Reg. 10,777, and because commenters failed to

demonstrate "animal health and welfare are 'inextricably linked.'" *Id.*  USDA also rejected

references to additional sections of the OFPA that plainly authorized the OLPP.  *See* SAC at

215-225 (citing comments in the record with specific OFPA references); *see e.g.* 7 U.S.C. §§

6506 (b)(11) and 6512.  With regard to (b) the Withdrawal Rule stated no comment regarding its

cost benefit analysis was received.  83 Fed. Reg. at 10,781; *but see e.g.* ECF No. 34, Exhibits 4

and 5 (comments discussing market failure) With regard to (c) above, USDA did not cite 7

U.S.C. §§ 6509(d)(2) and (g) in its discussion of the role of the NOSB in the Withdrawal Rule.

As discussed more fully in the Argument section of this brief, the conclusions expressed in the

Withdrawal Rule in March 2018 directly conflicted with those appearing in the OLPP in January 2017.

**E.     The OTA Lawsuit**

This lawsuit was filed in September 2017 challenging the USDA's two initial unlawful delays of the effective date of the OLPP.  ECF No. 1  A third unlawful delay of the effective date of the OLPP in November 2017 necessitated the filing of Plaintiff's First Amended Complaint. ECF No. 13 ("FAC").  The FAC challenged each of the three final rules delaying the OLPP. A final rule issued March 13, 2018 withdrawing the OLPP completed the administrative cycle and necessitated the submission of Plaintiff's request for leave to file a Second Amended Complaint, with a copy of the proposed Second Amended Complaint attached. ECF No. 34.

**APPLICABLE STANDARDS OF REVIEW**

A motion to dismiss under Rule 12(b)(1) tests the factual allegations necessary to establish the Court's subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.  At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.

*Warth v. Seldin,* 422 U.S. 490, 501-02, 95 S.Ct. 2197, 2206-07, 45 L.Ed.2d 343 (1975) (internal citations omitted); *see also Hudson v. Am. Fed'n of Gov't Employees*, No. CV 17-1867 (JEB), 2018 WL 707431, at *3 (D.D.C. Feb. 5, 2018) (noting the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.")

Challenges under 12(b)(6) are met when the complaint contains sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when it contains factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Banneker Ventures, LLC v. Graham,* 798 F.3d 1119, 1129 (D.C. Cir. 2015) (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678). In this inquiry, a court must "draw all reasonable inferences from those allegations in the plaintiff's favor." *Id.*

Rule 15 provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend or supplement should be "freely granted when [it] will promote the economic and speedy disposition of the entire controversy between the parties," but it may be denied when the proposed amendment or supplementation is futile or will cause undue delay or prejudice to the rights of other parties. *Hall v. Cent. Intelligence Agency*, 437 F.3d 94, 101 (D.C. Cir. 2006) (citing 6A Charles Alan Wright & Arthur R. Miller, et al., Federal Practice and Procedure § 1504 (2d ed. 1990)).

## ARGUMENT

Defendants have challenged OTA's standing with regard to each of the three counts in the SAC and have challenged Counts 1 and 3 under Rule 12(b)(6). Each is addressed separately below.

### A. OTA has Demonstrated Organizational Standing

"USDA's repeated violations of the OFPA and APA injures both OTA as an organization and OTA's members." *See* SAC ¶ 23; SAC ¶ 24 (unlawfully closed NOSB consultation); SAC ¶¶ 184-187 (failed to provide adequate notice in third rulemaking; failed to provide technical reports it relied upon in final rule); SAC ¶ 281 (failed to consult NOSB in each challenged proceeding); SAC ¶280 (failed to provide adequate Notice in the third delay rulemaking); SAC ¶

247 (failure to provide adequate time to prepare comments in the Withdrawal rulemaking.)  To

establish organizational standing, a plaintiff "must make the same showing required of

individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's

allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Soc.*

*for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011).

When plaintiffs challenge an action taken without required procedural safeguards, they must

establish the agency action threatens their concrete interest." *Fla. Audubon Soc'y,* 94 F.3d 658,

664 (D.C.Cir. 1996); *see also Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

Defendants contend OTA lacks standing because it claims harm only from "issue advocacy and

litigation."  MTD at 22.  This is meritless.

OTA is a "business association for organic agriculture and products…and is the leading

voice for the organic trade in the United States …"  SAC ¶ 21. OTA's "mission is to promote,

develop and protect organic standards, ensure the due process rights of its members…"  SAC ¶

22  OTA submitted written comments and testimony on all NOSB recommendations that led to

the OLPP and all on all proceedings involving the OLPP.  *Id.* "OTA's members rely on the

organic label to ensure that organic food was produced with high and consistently applied

standards, including animal welfare standards…"  SAC ¶ 24. Last, OTA's mission is to promote

and protect the growth of organic trade to benefit the environment, farmers and consumers…."

*See First Declaration of Laura Batcha,* OTA Exec. Director, ECF No. 34, Attachment 15 at ¶ 11

Prior to passage of the OFPA there was a welter of voluntary private and state organic

standards and little reciprocity between the various industry participants that hampered growth.

*See* 65 Fed. Reg. at 80,677-78 (Dec. 2000) (Final Rule creating NOP) (Final Regulatory

Flexibility Analysis).  OTA was created to attempt harmonization and reciprocity with the

various entities. *See* ECF No. 50, Exhibit 7—*Second Declaration of Laura Batcha*, at ¶ 2

("Second Batcha Dec.") These efforts were underway prior to the passage of the OFPA. *Id.*

Later OTA led the industry effort to create voluntary, consensus national organic standards. *See*

Second Batcha Dec. at ¶ 3; *see also* 65 Fed. Reg. at 80,676 (noting "the organic industry

attempted to establish a national voluntary organic certification program."); 65 Fed. Reg. at

80,667 (referencing "the industry developed standards recently proposed by the Organic Trade

Association.")

OTA supported the passage of the OFPA, and in particular supported two key purposes,

the creation of a uniform national standard enforceable by USDA, Second Batcha Dec ¶ 4, and

the creation of the National Organic Standards Board to ensure a public-private partnership

would be at the heart of organic standards development going forward. *See* Second Batcha Dec.

at ¶3; *see also* SAC at ¶¶ 62-68 (citing legislative history of NOSB creation); 65 Fed. Reg. at

80678 (USDA noting OTA published guidelines for the organic industry).

Following passage of the OFPA, OTA transformed from a clearing house interacting with

many industry-based, private and state certification participants to an organization focused on the

USDA's NOP and the role of the NOSB.  *See* Second Batcha Dec. at ¶6; 65 Fed. Reg. at 80666

(describing history of marketplace and transition to federal program from private certification).

At the time of the 2000 Rule USDA rejected voluntary "industry developed standards" finding a

single national standard required federal intervention because "it would be difficult [for industry]

to develop consensus standards."  65 Fed. Reg. at 80666. Since that time the USDA has

consistently rejected private standards and certifications that use the word "organic" outside of

the single national standard created by the federal program.  *See* Second Batcha Dec. at ¶12; *see*

*also SAC* at ¶ 248[13] (review of Economic Research Service Report conclusions regarding value of single, federal labeling standard)

Following the unlawful delays that underpinned the Withdrawal Rule USDA reversed course on the single national standard and the role of the NOSB. 83 Fed. Reg. at 10,782 (approving use of private certification labels that are in addition to organic); 83 Fed. Reg. 10778 (rejecting NOSB consultative role); *see also* Second Batcha Dec. at ¶ 9.  OTA, as an organization is severely harmed by these policy reversals. *See* Second Batcha Dec. at ¶¶ 10-19. The Second Batcha declaration establishes that OTA's modern mission is organized around the lodestone of a single federal organic program, and a single federal organic standard, and federal activities which would be destroyed by a return to the patchwork of multiple private organic standards that Congress sought to eliminate with the OFPA.  In short, OTA and its activities will cease to be federally-focused and will again become a 50-state clearinghouse, which it is no longer organized to accomplish. Second Batcha Dec. at ¶¶ 10-19

OTA's activities in promoting trade in organic products, protecting the due process rights of its members, promoting consumer awareness of the single, consistent national standard and working with NOSB have been materially impaired by the delay rulemakings and the Final Withdrawal and establish organizational standing. Second Batcha Dec. at ¶¶ 10-19; *Abigail All. for Better Access to Developmental Drugs v. Eschenbach,* 469 F.3d 129, 133 (D.C.Cir.2006) (organizational standing approved based on organizational activities not because agency

---

[13] *A Report Summary from the Economic Research Service, Beyond Nutrition and Organic Labels—30 Years of Experience With Intervening in Food Labels*, Report No. 39 (November 2017) ("ERS Report No. 39").

challenged the unlawful regulation); *Food & Water Watch, Inc. v. Vilsack,* 808 F.3d 905, 919

(D.C. Cir. 2015) (discussing standard).

## B. OTA has Demonstrated Associational Standing on Behalf of its Members.

> An association has standing to bring suit on behalf of its members when: (1) its members
> would otherwise have standing to sue in their own right; (2) the interests it seeks to
> protect are germane to the organization's purpose; and (3) neither the claim asserted nor
> the relief requested requires the participation of individual members in the lawsuit.

*Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (internal quotation

marks removed) Each factor is addressed below.[14]  Defendants contend OTA members lack

standing because they have failed to show injury in fact. MTD at 27-30.  This contention is

meritless.

### 1. Individual Member Standing

> OTA members include organic product consumers, farmers and livestock growers,
> ingredient suppliers, processors, manufacturers, distributors, retailers, accredited certifying
> agents and those in international trade. OTA's members grow, make, distribute, and certify
> organic products including livestock products worldwide."  SAC at 21.

*See e.g.* 7 U.S.C. § 6501 (consumers benefit from single national standard consistently applied);

7 U.S.C. § 6504 (creating federal organic program for "producers and handlers" of organic

products); 7 U.S.C. § 6505 (use of USDA Seal by producers and handlers to demonstrate product

compliance to consumers);  7 U.S.C. § 6514-15 (certifying agents); 7 U.S.C. § 6518 (National

Organic Standards Board members)  In short, OTA membership is built around the categories of

regulated parties in the OFPA including participants on the NOSB as evidenced by the statutory

---

[14] An individual has standing when, (1) she has suffered an "injury in fact" that is concrete and
particularized, and actual or imminent rather than conjectural or hypothetical; (2) the injury is
fairly traceable to the challenged action; and (3) it is likely, as opposed to merely speculative,
that the injury will be redressed by a favorable decision. *Ctr. for Sustainable Econ. v. Jewell*, 779
F.3d 588, 596 (D.C. Cir. 2015) citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112
S.Ct. 2130, 119 L.Ed.2d 351 (1992).

makeup of the NOSB, and accredited certifying agents involved in OFPA compliance. Each is demonstrated below to have been harmed by the actions challenged in the SAC.

In addition to the procedural deprivations underpinning Count 1 and part of Count 3, the SAC alleged, *inter alia,* that USDA's delay and withdrawal caused harm by "failing to ensure fair competition in the marketplace between organic egg producers and handlers and organic meat producers and handlers; failing to eliminate conflicting interpretations of the organic regulations that certifying agents must enforce; damaging and diminishing consumer trust in the USDA organic seal; and failing to keep open the consultative channel with the NOSB, which is a key mechanism by which OTA members participate in the development of organic standards and policies."  SAC ¶ 24; *see also* SAC ¶ 46; SAC ¶¶165-66 (harm from failure of notice and comment—first delay); SAC ¶¶171, 174 (same—second delay); SAC ¶¶184-84, (failure to provide the necessary technical reports that USDA ultimately relied upon);  SAC ¶ 247 (failure to provide adequate time to prepare comments in the Withdrawal rulemaking); SAC ¶ 280 (inadequate Notice in the third delay rulemaking); SAC ¶ 281 (failure to consult NOSB in each proceeding)  As discussed below under the specific doctrine of competitor standing, the standing of individual OTA members is self-evident.[15]

1. Competitive Harm to OTA Members

Standing is also established because OTA members, "suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" against them. *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) quoting *La.*

---

[15] This echoes OTA's argument in response to the Defendants' Motion to Dismiss the FAC, and is strengthened by the addition of the challenges to the unlawful Final Withdrawal. *See* ECF No. 16 at p. 7; *see also* MTD at fn 5 (Defendants incorporating arguments from prior Motion to Dismiss)

*Energy & Power Auth. v. FERC,* 141 F.3d 364, 367 (D.C.Cir.1998); *accord New World Radio,*

*Inc. v. FCC,* 294 F.3d 164, 172 (D.C.Cir.2002) ("basic law of economics" that increased

competition leads to actual injury).

At the time of publication of the OLPP in January 2017, USDA declared the OLPP

necessary, *inter alia,* to "ensure fair competition among producers by facilitating equitable

certification and enforcement decisions." 82 Fed. Reg. at 7083; *see also* SAC at ¶178 (citing

OLPP description of one of the unfair practices corrected by the OLPP—the use of "porches" in

poultry production to meet "outdoor access" requirements.)  Upon publication in the Federal

Register the new competition-protecting livestock production rules became binding federal

organic policy. *See* SAC at ¶298 (citing *Clean Air Council v. Pruitt,* 862 F.3d. 1, 9

(D.C. Cir. 2017) (agency is "bound by the rule until that rule is amended or revoked.")  Upon

publication of the Withdrawal Rule, the competition distorting practice of using "porches" was

restored thus USDA "lifted regulatory restrictions" on certified operations to the detriment of

OTA members. *Sherley v. Sebelius*

"USDA's unlawful delay rules and Withdrawal Rule harms OTA members by… failing

to ensure fair competition in the marketplace between organic egg producers and handlers and

organic meat producers and handlers."  SAC at ¶24  OTA member declarations identify specific

harm to fair competition arising from delay and withdrawal of the OLPP. *See e.g.* ECF No. 34,

Exhibit 14 at ¶ 2--*Declaration of George Siemon,* (certified organic egg producer) and ¶ 21

(OLPP "is necessary to ensure fair competition in the marketplace"); ECF No. 34, Exhibit 11--

*Declaration of Jesse LaFlamme*, at ¶ 2 (owner and CEO of largest certified organic egg producer

in the U.S.) and at ¶ 6 (without OLPP "inconsistent practices" prevail); ECF No. 34, Exhibit 14--

*Declaration of Gina Asoudegan*, ¶ 2 (leading U.S. seller of certified organic meat products) and

at ¶ 8 (producers that exploit organic inconsistencies "distort the marketplace for organic livestock products" and "our company is harmed."); ECF No. 34, Exhibit 16--*Declaration of John Lee*, at ¶10 (egg sale profitability drop in 2017 attributed to "rapidly expanding supply arising from the use of production systems that were set to be disallowed under the OLPP."); ECF No. 54, Exhibit 11--*Declaration of Eric Pierce*  at ¶¶ 14-18 (detailing significant decline in organic egg and dairy market growth in 2017); *see also* April 28, 2017 Letter to Sec. Perdue[16] (urging OLPP implementation; predicting loss of consumer confidence will have "catastrophic" consequences from three hundred and thirty-four certified organic livestock and poultry producers with estimated revenue of $1.95 billion); ECF No. 34, Exhibit 3—*First Declaration of K. Smith*, at ¶ 1 (chair of Accredited Certifiers Association) and ¶¶ 12-19 (inconsistent handling of "outdoor access" by USDA harms its certifying agents.); ECF No. 34, Exhibit 7—*Second Declaration of K. Smith*, at ¶¶ 5-6, 9-10 (withdrawal harms certifying agents; increases risk of civil liability)

    a.  <u>Loss of Consumer Trust and Reliance on the USDA's Organic Seal as Proof of Highest Standards Harms Competitive Position of OTA Members</u>

OTA has consistently asserted that a unique form of competitive injury arises under the OFPA because of the shared reliance on the USDA's organic seal.  *See* Second Batcha Dec. at ¶ 8.  OTA members that rely on the USDA organic seal and consumer acceptance thereof have been harmed by delay and withdrawal of the OLPP. This is an injury recognized by USDA.

> One of the key objectives in implementing this final rule is to assure consumers that the practices used to produce organic products meet a consistent standard, including outdoor access for poultry. This objective is guided by the NOSB recommendations and public and expert comment received during those deliberations that indicated a risk to the integrity and value of the organic seal from the gap between consumer expectation and current industry practice.  82 Fed. Reg. at 7068

---

[16] *Available at* https://www.regulations.gov/document?D=AMS-NOP-17-0031-0006.

This final rule will resolve the current ambiguity about outdoor access for poultry and address the wide disparities in production practices among the organic poultry sector. Greater clarity about the significance of the USDA organic seal in the marketplace will help to maintain consumer confidence in the organic label, which drives the $43 billion in sales of organic products, and support a fair, viable market for producers who chose to pursue organic certification. 82 Fed. Reg. at 7082-83; *see also id.* at 7082 ("AMS is conducting this rulemaking to maintain consumer confidence in the USDA organic seal.")

OTA members, including egg and livestock producers, certified organic retailers and accredited certifying agents, have submitted declarations detailing the harm to the USDA seal and their related businesses.  *See e.g.* ECF No. 34, Exhibit 14--*Declaration of George Siemon,* at ¶ 27 ([C]onsumers have become increasingly aware that the pre-OLPP requirements of "outdoor access" are not being consistently applied thus causing reputational harm to farmers that are willing to comply with the new requirements and lowering consumer trust and diluting the value of the USDA's organic seal."); ¶ 28 ("If consumers understand that some organic livestock products meet higher welfare standards than others the USDA organic seal is concretely damaged by that inconsistency because consumers cannot know which organic products meet the higher requirements and which don't."); ECF No. 34, Exhibit 11--*Declaration of Jesse LaFlamme*, at ¶ 9 (failure to implement OLPP "will irremediably damage to consumer trust in the USDA's organic seal because it will fall behind consumer's expectation for egg production and thus our farmers will suffer severe financial setbacks."); ECF No. 34, Exhibit 14-- *Declaration of Gina Asoudegan*, at ¶ 13 ("[T]he decision to propose [OLPP] withdrawal, further undermines the trust of consumers in the USDA's organic seal."); ECF No. 34, Exhibit 15-- *Declaration of Tom Chapman*, NOSB Chairman, at ¶ 32 (failure to implement OLPP will "harm consumer trust in the USA Organic seal"); ECF No. 34, Exhibit 13—*Second Declaration of Kyla Smith,* Chair, Accredited Certifiers Association, at ¶ 19 (withdrawal of OLPP "could lead to

profound disruption to the marketplace for certified organic products by irretrievably damaging

consumer trust in the USDA organic seal.")

Defendants complain that "OTA fails to articulate how such confusion is caused by

withdrawal of the OLPP Rule or redressable by its implementation."  MTD at 28-29.  But in

January 2017 USDA said,

> Some organic poultry operations provide large, open-air outdoor areas, while other
> operations provide minimal outdoor space or uses screened and covered enclosures
> commonly called ''porches'' to meet outdoor access requirements. This variability
> perpetuates an uneven playing field among producers and sows consumer *confusion*
> about the meaning of the USDA organic label.  Greater clarity about the significance of
> the USDA organic seal in the marketplace will help to maintain consumer *confidence in*
> *the organic label*, which drives the $43 billion in sales of organic products, and support a
> fair, viable market for producers who chose to pursue organic certification.

82 Fed. Reg. at 7082  The OLPP was adopted to eliminate the consumer confusion arising from

the use of "porches" instead of real outdoor access and restore the single national standard for

"outdoor access" as required by Section 6501 of the OFPA. The withdrawal of the OLPP

frustrates that purpose and individual OTA members are harmed thereby. Moreover, retailers are

hurt by loss of consumers.  *See e.g.* ECF No. 34, Exhibit 12—*Second Declaration of Robynn*

*Schrader*, (CEO of National Co+op Grocers) ¶ 6 ("Consumer confidence in the USDA Certified

Organic Seal is foundational to our business."); *see also* ¶ 7-9 (describing consumer

expectations); ¶ 11 (withdrawal of OLPP "harms and will continue to harm NCG" by

"irretrievably damaging consumer trust in the USDA organic seal.")

Defendants also contend that stale sales data from 2016 showing significant growth in

organic sales establishes there has been no harm from delay and withdrawal of OLPP.  MTD at

29.  The updated data for 2017 shows a starkly different outcome.  *See* ECF No. 54, Exhibit 11--

*Declaration of Eric Pierce* (V.P. of Nutrition Business Journal) at ¶ 14-18  The *Pierce*

*Declaration* summarizes the data that was gathered for the OTA annual "Organic Industry

Survey" which became available for order by the public on May 18, 2018.

14. The growth in the overall organic marketplace in 2017, based on analysis of 2017 data, is
approximately 6.4%.

15. The annual growth in the organic dairy and egg category in 2017 is 0.9%  The dairy and egg
category for 2017 has the lowest sales growth rate of any category and the lowest growth rate
for the category since the recession declines observed in 2009.

16. The dairy and egg category has added the fewest new dollars of any organic food category in
2017, despite being the third largest category of sales in terms of dollar values.

17. The 2017 growth rate for organic overall declined by approximately 28% and the decline for
dairy and eggs is approximately 86% from 2016 levels.

18. The downward pressure on the dairy and egg category is significantly greater than other
categories, and the steeper decline correlates to the period of regulatory inaction on the
Organic Livestock Production Practices rule.


 Although organic sales overall continue to grow, dairy and egg sales growth declined by 86%.

This demonstrates harm that is coincident with the agency's unlawful actions on the OLPP and

that is not shared across all sectors.

Moreover, when consumers learned that the OLPP was delayed and likely to be scuttled,

the worm turned.  *See e.g.* ECF No. 34, Exhibit 14--*Declaration of George Siemon,* at ¶ 27-28

(consumers have learned USDA's pre-OLPP practice was inconsistent and organic label and seal

are devalued thereby); *see also*  ECF No. 34, Exhibit 16--*Declaration of John Lee*, at ¶ 3; ¶ 6

("The sharpest drop in the growth rate in both volume of products and dollars in sales occurred

in January 2017 and coincided with the administration's announcement that it would delay the

Organic Livestock Production Practices ("OLPP") rule."); ¶ 9; ¶10 (egg sale profitability drop in

2017 attributed to "rapidly expanding supply arising from the use of production systems that

were set to be disallowed under the OLPP.").

b.  Declarations of Five Former NOSB Chairs Establish Harm to OTA Members by
Dilution of Historic Role of NOSB and Loss of Consumer Trust in USDA's Organic
Seal Arising from Dilution of NOSB Role

The declarations of five former chairs of the NOSB confirm that (1) past practice at the

agency was to consult NOSB prior to any rulemaking on organic standards and (2) that the role

of the NOSB is a central wellspring of consumer trust in the organic program.  *See* ECF No. 50,

Exhibit 1--*Declaration of Robert Anderson* (former NOSB Chairman); ECF No. 50, Exhibit 2--

*Declaration of Michael Sligh*--(former NOSB Chairman); ECF No. 50, Exhibit 3--*Declaration of*

*Mac Stone* (former NOSB Chairman); ECF No. 50, Exhibit 4--*Declaration of Jeffrey Moyer*

(former NOSB Chairman) (every NOP rulemaking was based on NOSB recommendation during

tenure) (key role of board is protecting consumer trust in standards); ECF No. 50, Exhibit 5--

*Declaration of Tracy Miedema* (former NOSB Chairman)  Together these declarants have

chaired the NOSB for approximately 15 of the last 20 years.  The refusal to consult the NOSB

during the last sixteen months has a deleterious and non-speculative effect on consumer

confidence and trust in the USDA organic seal thus further harming OTA members.

2.  Organizational Germaneness

The germaneness requirement mandates "pertinence between litigation subject and

organizational purpose." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015)

The allegations in the SAC at ¶¶ 21-25 and first and second declarations of Laura Batcha

establish this challenge to the USDA's actions is pertinent to OTA's purpose. *Sec. Indus. & Fin.*

*Markets Ass'n v. United States Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 401

(D.D.C. 2014)

3.  Individual Litigants are Unnecessary

Member participation is not required where a "suit raises a pure question of law" and

neither the claims pursued nor the relief sought require the consideration of the individual

circumstances of any aggrieved member of the organization.  *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) Here OTA seeks declaratory and injunctive relief. Declaratory and injunctive relief does not require the participation of any individual member.

**C**.      **Count One is Not Moot**

OTA requests this Court "vacate and set aside the First, Second and Third Delay Rules *ab initio* and vacate and set aside the Withdrawal Rule challenged in this Complaint." SAC ¶ 307 The APA, of course, empowers and requires this court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The interlocking steps taken over five rulemakings in sixteen months can be serially unwound making the OLPP effective as published and leaving only the question of what adjustment to implementation dates is required. This is a remedy question, not a redressability question.

Defendants contend challenges to the three delay rulemakings in Count One of the SAC are moot. Mootness is inapplicable because it is well settled in this circuit that, "[e]ven though the specific action that the plaintiff challenges has ceased, a claim for declaratory relief will not be moot" if "the specific claim fits the exception for cases that are capable of repetition, yet evading review." *Grant v. Vilsack*, 892 F. Supp. 2d 252, 257 (D.D.C. 2012) *citing Del Monte Fresh Produce Co. v. United States,* 570 F.3d 316, 321 (D.C. Cir. 2009) (internal quotation marks omitted).

The exception requires plaintiffs demonstrate that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Del Monte*, 570 F.3d at 321 (internal citations and quotation marks omitted). With regard

to the evading review prong, the D.C. Circuit generally recognizes a two-year minimum period

for challenging agency actions. *Id.* at 322. Here, the challenged delays in February and May

2017 were 60 and 180 days respectively, each within the required limit. The third delay rule of

180 days is likewise within the limit.

With regard to repetition, the focus is not "whether the precise historical facts that

spawned the plaintiff's claims are likely to recur" but "whether the legal wrong complained of by

the plaintiff is reasonably likely to recur." *Del Monte*, 570 F.3d at 324. In fact, the *Del Monte*

court expressly noted that no "precedent requires that the very same facts must recur for the

capable of repetition exception to apply." *Id*. at 325; *see also Campbell v. Clinton*, 203 F.3d 19,

34 (D.C. Cir. 2000) (finding "Circuit precedent requires us to determine whether the activity

challenged is 'inherently' of a sort that evades review"). The Plaintiffs alleged:

> USDA's publication of each of the three delay rules violated the OFPA because the
> USDA failed to complete the pre-rulemaking consultation with the NOSB prior to each
> amendment to the effective date of the OLPP, failed to disclose or provide an opportunity
> to the NOSB to address the substantive concerns that had apparently arisen since
> publication of the OLPP, and failed to consult the NOSB regarding the "implementation"
> of the livestock standards. & U.S.C. §§ 6503(c); 6509(d)(2); 6509(g); 6518(a);
> 6518(k)(1).

SAC ¶ 281. Defendants argue that the mootness doctrine applies to all three delay rules because,

"[A]ll of the rules were superseded by each other and/or are by the recently-published

Withdrawal Rule. In that process, plaintiffs received precisely the relief they purport to seek in

count one: notice of, and opportunity to comment on, the issue underlying the postponement and

withdrawal."  MTD at 33. This argument fails for several reasons.[17]

---

[17] Defendants also claimed the First and Second Delay Rules were each exempt from the APA's
notice and comment requirements because it was "impracticable, unnecessary, or contrary to the
public interest" pursuant to 5 U.S.C. 553(b)(B). 82 Fed. Reg. at 9967 (first delay); 82 Fed. Reg.
at 21677 (second delay). In light of the fact that the delay never ended and is now permanent, the
record contradicts Defendants' reliance on this rarely necessary and uniformly disfavored

First, Defendants misstate the legal test in the D.C. Circuit, which is stated in *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C. Cir. 1985), "[T]he proper inquiry is whether "the [challenged] activity is *'by its very nature' short in duration,* 'so that it could not, or probably would not, be able to be adjudicated while fully "live." (citations and internal quotations omitted)(emphasis in original). Amendments to the effective dates of final rules that create fixed periods of delay that expire and are renewed, like those in this case, are precisely the type of activity the D.C. Circuit refers to as an activity that "inherently" evades review. Accepting Defendants' characterization would mean a court has no authority to step in and halt abuse since the fact of the activity's termination would function as a shield to judicial scrutiny.

Second, "(p)ermitting the submission of views after the effective date (of a regulation) is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981).  Here the first two delay rules were incontrovertibly final without any public participation.  The third delay rule suffered from substandard notice and was not a logical outgrowth of proposed rule.  *See e.g. supra,* pgs. 13-14; *see also infra,* pgs. 36-39 (full discussion of deficiencies of Proposed Third Delay Rule).  Under these conditions the APA is violated.  *See Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 28 F.3d 1288, 1291 (D.C. Cir. 1994) citing *National Tour Brokers Ass'n v. United States,* 591 F.2d 896, 902 (D.C. Cir. 1978) (stressing "[T]he importance of the Administrative Procedure Act's "requirement that the parties be able to comment on the rule

---

exemption. *See Mid–Tex Elec. Coop. v. Fed. Energy Regulatory Comm'n,* 822 F.2d 1123, 1132 (D.C. Cir. 1987) ("This court has cautioned that the § 553(b)(3)(B) exception should be narrowly construed and reluctantly countenanced."). In any event, Plaintiffs challenged these findings. SAC ¶166 (first delay); SAC ¶173 (second delay).

while it is still in the formative or 'proposed' stage . . . [to ensure] that the agency maintains a flexible and open-minded attitude.").

Moreover, in the OLPP withdrawal proceeding Defendants persisted in refusing to discharge pre-rulemaking duties imposed by the OFPA. *See* SAC ¶ 293(d); *id.* at ¶ 281 (citing relevant statutory sections). In fact, Defendants announced a construction of the OFPA under which even rulemakings conducted under statutory provisions expressly calling for consultation with the NOSB, such as livestock-related standards, are ignored: "OFPA does not require AMS to consult with the NOSB prior to undertaking a rulemaking to withdraw the OLPP final rule." 83 Fed. Reg. 10,778 at n. 6; *compare* 7 U.S.C. § 6509(d)(2)  USDA also said that "nothing in OFPA requires AMS to consult the NOSB at every phase of the rule making process or makes the NOSB's recommendations binding on the Secretary, nor could it." 83 Fed. Reg. 10778.

The approach taken today differs substantially from that announced in the final rule that created the National Organic Program in 2000 and has been applied since:

> The national standards implemented by this final rule can be amended as needed to establish more restrictive national standards. Anyone may request that a provision of these regulations be amended by submitting a request to the NOP Program Manager or the Chairperson of the NOSB. Requests for amendments submitted to the NOP Program Manager will be forwarded to the NOSB for its consideration. The NOSB will consider the requested amendments and make its recommendations to the Administrator. When appropriate, the NOP will conduct rulemaking on the recommended amendment. Such rulemaking will include an opportunity for public comment."

65 Fed. Reg. at 80,608.

Accordingly, one of the "legal wrongs" Plaintiff contends is capable of repetition is USDA's refusal to undertake consultation and consideration of a recommendation from the NOSB on the subject matter of the rulemaking before the rulemaking is initiated, or to properly consider public comment as required by the APA. This legal wrong will come up every time Defendants wish to conduct a rulemaking regarding organic standards. The NOSB is not going

away. *See e.g.* 7 U.S.C. § 6518(a) (non-discretionary duty to "establish a National Organic Standards Board…to advise…the Secretary on…implementation of this chapter."); *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Canada, AFL-CIO*, 721 F.3d 678, 688 (D.C. Cir. 2013) (stating "[t]he 'wrong' that is, or is not, 'capable of repetition' must be defined in terms of the precise controversy it spawns," to wit, "in terms of the legal questions it presents for decision.").  OTA can predict its future participation in any organic policy rulemaking with certainty. *See e.g.* SAC ¶¶ 24-25; 44.

Finally, Defendants wrongly contend the First Delay Rule was authorized by the *Priebus Memorandum*. *See* SAC ¶¶ 161-164. "The advent of a new Administration cannot justify the Government's complete and continued disregard of the APA's rulemaking requirements." *Pub. Citizen v. Dep't of Health & Human Servs*., 671 F.2d 518, 520 (D.C. Cir. 1981). Significantly, contrary to the use to which Defendants would put the *Priebus Memorandum* here, it *did not* authorize the departure from the APA's or the OFPA's required procedures. SAC ¶ 163 The *Priebus Memorandum* plainly states agencies are directed to postpone any published but not yet effective rule only "*as permitted by law*." *Priebus Memo,* at ¶3 (emphasis added by Plaintiff).

The D.C. Circuit's approach to amendment of "effective dates" in published rules was well settled at that time—amendment without notice and comment was unlawful. *See Environmental Def. Fund v. EPA,* 716 F.2d 915, 920 (D.C. Cir. 1983) (citing *Environmental Defense Fund v. Gorsuch,* 713 F.2d 802, 816 (D.C. Cir. 1983)); *see also Pub. Citizen,* 733 F.2d at 98 (holding that agency's suspension of rule was "a paradigm of a revocation," constituting "a 180 degree reversal of [the agency's] former views as to the proper course"); *see also Clean Air Council v. Pruitt,* 862 F.3d. 1, 9 (D.C. Cir. 2017). Administrations will change and the issue of whether an "effective date" will come up again at the time of transition is obvious.  *See* SAC at ¶

45; *Id.* at ¶ 92. Given the statements in the Final Withdrawal and the likelihood that a future administration will "freeze" regulatory action as has been repeatedly done by prior administrations, a clarifying ruling that "effective dates" require notice and comment rulemakings is appropriate and grounds for denying a mootness challenge.  The challenge to the three delay rules is not moot.

## C.  Count One States a Claim Upon Which Relief May Be Granted.

Count One sufficiently alleges that USDA's publication of three final rules amending the OLPP's effective date are unlawful because USDA failed to publish a notice of proposed rulemaking, failed to provide opportunity for comment, and failed to provide adequate justification for the First and Second Delay Rules. *See* SAC at ¶¶178-188 (summarizing notice and rule); *see also* SAC at ¶¶ 280-293.  Plaintiffs alleged:

> In violation of the APA and OFPA, the USDA published three final rules[18] *seriatim* that each unlawfully amended the effective date and temporarily revoked the OLPP. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (stating that an "order delaying the rule's effective date ... [is] tantamount to amending or revoking a rule.").

SAC ¶ 278.  Further,

> USDA published the Third Delay Rule following publication of a notice of proposed rule that was deficient under the APA because it failed to disclose (1) the legal authority upon which it intended to rely to amend the OLPP in violation of 5 U.S.C. § 553(b)(2); (2) that USDA intended to conduct a *de facto* reconsideration of the entire OLPP, and ultimately rescind it, based on (a) a lack of statutory authority under the OFPA and (b) technical errors in calculating the cost-benefit analysis in the OLPP; and (3) it failed to provide the technical reports and documents it ultimately relied upon to issue the Third Delay Rule and to later rescind.

SAC at ¶ 287.  Defendants advance two arguments in support of their Motion, both squarely in conflict with the law of this Circuit.

---

[18] 82 Fed. Reg. at 9967 (February 9, 2017) (first delay); 82 Fed. Reg. at 21677 (May 10, 2017) (second delay); 82 Fed. Reg. 52643 (Nov. 14, 2017) (third delay).

First, Defendants point to the discussion in *Clean Air Council v. Pruitt*, 862 F.3d 1, (D.C. Cir. 2017) regarding finality of agency decisions for purposes of review. MTD at 37. From this discussion, Defendants conclude that notice and comment rulemaking may be dispensed with so long as the agency action does not impact "rights or obligations." MTD 37. This is a facially erroneous application of *Clean Air Council* and its underlying authority, *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).   Agency actions staying or delaying a published rule's effective date (as occurred here three times) "are tantamount to amending or revoking a rule.") *Clean Air Council*, at 6  In contrast, whether an agency decision is final for purposes of review is irrelevant to determining whether an exception to the APA's notice and comment rulemaking requirements is authorized. The *Clean Air Council* holding regarding "effective dates" being substantive parts of published rules requiring notice and comment prior to amendment controls here.  *See e.g. Sierra Club v. EPA*, 873 F.3d 946, 952 (D.C. Cir. 2017) ("We agree, of course, that an amendment to a legislative rule must itself be legislative.") (internal citations omitted).

Moreover, even if some kind of adverse effects requirement applies, the SAC and the OTA member declarations discussed above establish direct and concrete harm flowing from amendments in the OLPP wrought by the challenged actions.  Defendants' argument must be rejected.

Defendants' crabbed reading of *Clean Air Council* conflicts with other relevant authority. First, it is well settled in the D.C. Circuit that "[t]he only exceptions for the absence of public procedures are found within section 553(b) itself." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 n. 4 (D.C. Cir. 1981). Second, when applying Section 553, "[i]f a rule ranks as a substantive regulation, the limited nature of the rule cannot in itself justify a failure to follow

notice and comment procedures." *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 582

(D.C. Cir. 1981). Thus even if effective date revocations are brief, the APA is still binding.

   Second, Defendants contend the Third Delay Rule provided a notice and comment

opportunity that cured the two prior failures. *See* MTD at 37.  This is not the law in this Circuit.

> [P]ermitting the submission of views after the effective date (of a regulation) is no
> substitute for the right of interested persons to make their views known to the agency in
> time to influence the rule making process in a meaningful way.

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d at 1158.  Three substandard rulemakings

are evidence of harmless error that was later corrected.  Notice and an opportunity to comment

after the decision has been made, even if on the same grounds, is unavailing.  In addition, the

SAC alleged the Notice for the Third Delay Rule was deficient. SAC at ¶¶ 181, 185-188.

Although the Proposed Third Delay Rule said, "[T]here are significant policy and legal issues

addressed within the FR that warrant further review by USDA. . ." there was no description of

the issues and no request for comment thereon and disclosure of the substantive issues in the

final rule can't save the defective notice.  The statutory authority question for the OLPP had been

raised and rejected by the agency in the OLPP rulemaking. 82 Fed. Reg. at 7043. There was no

reason to believe it was being revisited *sub silento*.

   Moreover, "[a]mong the information that must be revealed for public evaluation are the

'technical studies and data' upon which the agency relies [in its rulemaking]." *Chamber of*

*Commerce v. SEC* (Chamber of Commerce II), 443 F.3d 890, 899 (D.C.Cir.2006) (citation

omitted); *see also Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 236 (D.C. Cir. 2008)

The technical reports relied upon by USDA were not posted to the regulations.gov website until

December 18, 2017. *See* https://www.regulations.gov/docket?D=AMSNOP-15-0012

("Supporting Documents Folder" (OLPP-PRIA) and ("Benefit+Cost Workbook for OLP

Notice"). There was no way for Plaintiff's members to know in May 2017 that USDA intended parties comment on the legal and factual positions resolved in January 2017. The absence of the necessary technical reports foreclosed meaningful commentary. *See* ECF No. 34, Exhibit 18— *First Batcha Declaration* at ¶¶ 14-19.  Defendants' claim that reference to "legal and policy issues" was sufficient notice under the APA is incorrect.

> A final rule is the "logical outgrowth" of a proposed rule if "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (citation and internal quotation marks omitted). A final rule "fails the logical outgrowth test" if "interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *Id*. (citations and alterations omitted).

*Clean Air Council,* 862 F.3d at 10.  The Third Delay Rule was not a logical outgrowth of its Notice.

Last, the declarations attached to the SAC and reviewed at pgs. 22-30 herein, demonstrate an ongoing impact of the USDA's delay in 2017 that flowed into 2018 with the Final Withdrawal. *See also* ECF No. 34, Ex. 12—*Second Declaration of R. Schrader* at ¶¶ 4-6:

> Since the time of my initial declaration in this case the USDA has failed to allow the *Organic Livestock and Poultry Practices* final rule to become effective. The continued delay of the OLPP is causing consumer confusion in NCG co-op stores about the meaning of organic livestock standards and the USDA organic seal. In particular many consumers are hearing that organic chickens, both broilers and egg layers, do not have true outdoor access where the birds may express natural behavior such as ground-pecking and dust bathing and only go out of the chicken house into concrete floored, covered areas.  This conflicts with their understanding that "outdoor access" is required under the federal organic program, and is contributing to consumer confusion and degrading confidence in the USDA Certified Organic label.

*See also* ECF No. 34, Exhibit 16--*Declaration of John Lee* at ¶¶3, 6; *see also* ECF No. 54, Exhibit 11 at ¶¶--*Declaration of Eric Pierce* (V.P. of Nutrition Business Journal) at ¶¶14-18.

The harm to certified organic operations arising from the delay rulemakings began almost

immediately and continues to this day. For the foregoing reasons, Defendants' request to dismiss Count 1 should be denied.

**B.  Count Three States a Claim Upon Which Relief May Be Granted.**

The OFPA imposes unique pre-rulemaking duties on the USDA that are in addition to the requirements of the APA. *See* SAC ¶¶ 52-73; *see also supra,* Background at pgs. 3-10. The statutory duties require the Secretary to consult with the NOSB prior to undertaking rulemaking regarding organic standards. *See* 7 U.S.C. § 6503(c); 7 U.S.C. § 6509(d)(2); 7 U.S.C. § 6509(g); 7 U.S.C. § 6518(a); 7 U.S.C. § 6518(k)(1).  In addition, Congress the duty is more specific with regard to the development of organic standards regarding livestock. *See* 7 U.S.C. § 6503(a) and (c); § 6509(d)(2); SAC ¶ 300.  The agency has always accepted this arrangement.  *See e.g.* 65 Fed. Reg. at 80,666 (2000) ("The NOSB has assisted in developing the standards promulgated in this final rule and will play an advisory role for the NOP even after the final rule is in place."); *Id.* at 80,608 ("Anyone may request that a provision of these regulations be amended… amendments submitted to the NOP Program Manager will be forwarded to the NOSB for its consideration*"*) Even today USDA recognizes,

> The unique nature of the NOSB and its relationship with the NOP, as established through OFPA, requires that the volunteer Board, which regularly receives stakeholder input through public comment, must work collaboratively with the NOP.  Similarly, the NOP, as required through OFPA, must consult and collaborate with the NOSB. *See NOSB Policy Manual*, at 9 available at https://www.ams.usda.gov/sites/default/files/media/NOSB-PolicyManual.pdf

Since the creation of the NOSB and the inception of the NOP, USDA has observed a well-settled practice of publishing proposed and final organic livestock standards solely upon the receipt and consideration of a recommendation from the NOSB following significant public input. SAC ¶ 301.

In contrast to the statutory requirements, USDA failed to consult with the NOSB on each of the three delay rules that temporarily revoked the OLPP, and failed to consult on the proposed and final Withdrawal Rule. Each final rule that resulted in amendment to the OLPP, up to and including the Withdrawal, were published in excess of USDA's "statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). SAC ¶ 302.  *See also Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (agency is "bound by the rule until that rule is amended or revoked."); SAC ¶ 91

Defendants recognize the consultation duty exists but instead contend that it is inapplicable here because the "specific matter" of the delays to the OLPP and its ultimate withdrawal are outside the statutory consultative obligation.  MTD at 38 In support of this argument Defendants contend that "nothing in the regulatory history of the OFPA suggests USDA ever thought itself statutorily foreclosed from proposing or adopting new organic livestock policies that have not first been vetted with the NOSB…," MTD at 38, and "has never stated that it is statutorily required to do so."  MTD at 39.  This argument should be rejected for several reasons, and if not rejected outright the analysis should include rebuttal Declarations regarding the historical practice at USDA.

First, the statute repeatedly states the Secretary "shall" consult with the NOSB.  *See* 7 U.S.C. § 6503(c); 7 U.S.C. § 6509(d)(2); 7 U.S.C. § 6509(g); 7 U.S.C. § 6518(a); 7 U.S.C. § 6518(k)(1). This mandatory language may not be ignored because the agency never "thought itself" bound by its plain meaning.  Second, the legislative history confirms the central role of the NOSB in development of the federal organic program.  *See supra,* Background at pgs. 3-10.  Third, the history of organic livestock regulations beginning with the 2000 Rule, the *Access to Pasture Rulemaking,* and the OLPP each contain explicit references to the statutory requirement of

consultation and the agency's ongoing duty and intent to discharge it.  *See supra,* at pg. 40.

Fourth, the agency's own Policy Manual for the NOSB recognizes the mandatory character of

the duty.  *See supra,* at pg. 40  Fifth, the suggestion inherent in the Defendants' argument that

withdrawal or amending effective dates of duly promulgated rules is somehow not substantive,

or is merely a "phase" of rulemaking is contrary to well settled Circuit authority. *See e.g. Pub.*

*Citizen,* 733 F.2d at 98 (holding that agency's suspension of rule was "a paradigm of a

revocation," constituting "a 180 degree reversal of [the agency's] former views as to the proper

course")  In sum, the SAC and the agency's own documents amply rebut Defendants' argument.

    Next Defendants' argue that Plaintiffs are asking this Court to "engraft new consultation

requirements on the USDA that Congress clearly did not require in the OFPA. MTD at 39.

Plaintiffs are not asking the Court to add any other requirements onto USDA's existing

obligations, which are spelled out under the plain language of the statute.  The Supreme Court

has often stated "that when a statute uses the word 'shall,' Congress has imposed

a mandatory duty upon the subject of the command."  *D.C. Ass'n of Chartered Pub. Sch. v. D.C.*,

134 F. Supp. 3d 525, 535 (D.D.C. 2015) (citation omitted).

    Last Defendants argue that there is no deliberative value to consulting the NOSB

because, in part it lacks administrative law expertise.  MTD at 39-40.  This is not only

meritless but unfair to the organic industry.   First, the OFPA plainly authorizes a

mandatory role for the NOSB in both development of the standards *and* implementation

of the certification program.  7 U.S.C. § 6518(a); SAC ¶ 60; *see also* 7 U.S.C. §

6518(k)(1) ("The Board shall provide recommendations to the Secretary regarding the

implementation of this chapter."); SAC ¶ 59.  This mandate encompasses the actions

challenged here, especially since the NOSB has been convened twice since February

2017.  In fact, the chair of the NOSB at the time of the delay rulemakings flatly stated that board deliberations often result in solutions that are unanticipated prior to consultation and refusal to consult departed from past practice. *See* ECF No. 34, Exh. 15—*Declaration of Tom Chapman*, at ¶¶ 27-32).

Moreover, Congress created the NOSB as an expert citizen-advisory board. SAC ¶ 55; 7 U.S.C. § 6518. The composition of the NOSB posits the very viewpoint diversity that is prized in the organic regulatory setting and endorsed by Congress. SAC ¶ 56-57; 7 U.S.C. § 6518(b) Defendants ask nothing less than this court write the distinct perspectives Congress expressly intended the Secretary to meaningfully consult when considering new organic standards, or amending existing ones, out of the statute. SAC ¶ 58; 7 U.S.C. § 6518. Congress drew the lines of responsibility and defendants may not erase them.  Most importantly, the NOSB is the voice of diverse American agriculture at USDA and consumers expect it will be involved in major decisions affecting organic interests.  *See* ECF No. 34, Exhibit 15—*Declaration of T. Chapman* at ¶ 29) ("The failure to consult the NOSB diminishes the trust among consumers and the organic community and undermines the collaborative wisdom on a topic."; ECF No. 34, Exhibit 14-- *Declaration of George Siemon,* at ¶ 21 ("The failure to consult the NOSB during this entire delay period has also eroded confidence that the USDA is operating transparently and managing the NOP to ensure consistent standards are applied to all certified operations.").

Unlike many advisory boards, the NOSB is not weighted towards those directly regulated by the National Organic Program. Instead, the additional perspectives include consumer interests. The role of consumer expectations in shaping emerging organic norms has been increasingly recognized. *See e.g.*, 82 Fed. Reg. at 7043, 7066 (recognizing consumer expectations in deliberations of NOSB). By not giving the NOSB a chance to consider the views

of the new administration, Defendants eliminated consumers from the rulemaking equation.

With the NOSB Congress preserved as much as possible the existing, voluntary, self-directed

standards setting and private certification scheme that created the industry in the 1970s and

1980s.

At the time of publication of the 2000 Rule that established the entire National Organic

Program eighteen years ago, USDA said:

> The national standards implemented by this final rule can be amended as needed to
> establish more restrictive national standards. Anyone may request that a provision of
> these regulations be amended by submitting a request to the NOP Program Manager or
> the Chairperson of the NOSB. *Requests for amendments submitted to the NOP Program
> Manager will be forwarded to the NOSB for its consideration.* The NOSB will consider
> the requested amendments and make its recommendations to the Administrator. When
> appropriate, the NOP will conduct rulemaking on the recommended amendment. Such
> rulemaking will include an opportunity for public comment. (italics added by Plaintiff)

*See* 65 Fed. Reg. at 80,608.  There is a vast gap between the collaborative sentiment

underpinning this statement in 2000 and adhered to since that time and the position taken by

Defendants now. 83 Fed. Reg. 10,778 at n. 6 ("OFPA does not require AMS to consult with the

NOSB prior to undertaking a rulemaking to withdraw the OLPP final rule."

Plaintiff has adequately pled Count Three by providing sufficient facts to show that

USDA had a duty to consult with NOSB prior to enacting the Delay and Withdrawal Rules, and

that USDA failed to do so, in contravention of its obligations under the OFPA.

**C.  OTA's Request for Leave to File the SAC Should be Granted**

Under Rule 15 leave to amend is freely granted.  The USDA has twice issued new final

rules while this case has been pending and the interests of justice are served by allowing the

amendment to the case pleadings to incorporate into a single pleading all of the allegations.  The

interests of justice are not served by segregating what is a single course of interlocking

administrative actions into separate or balkanized litigation.  Nor are the proposed amendments futile, as is demonstrated in the foregoing sections.

**Conclusion**

For the foregoing reasons the Defendants' Motion to Dismiss and request that the SAC filing be rejected, should be denied.

Respectfully Submitted:

/s/ William J. Friedman
William J. Friedman (admitted *pro hac vice*)
107 S. West Street
Alexandria, Virginia 22314
Phone: 571-217-2190
Email: pedlarfarm@gmail.com

/s/ Andrea M. Downing
Andrea M. Downing (DC Bar No. 1005865)
Wade, Grimes, Friedman, Meinken & Leischner, PLLC
616 North Washington Street
Alexandria, Virginia 22314
Phone: 703-826-9030
Email: downing@oldtownlawyers.com

COUNSEL FOR PLAINTIFF ORGANIC TRADE
ASSOCIATION