# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ORGANIC TRADE ASSOCIATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil Action No. 17-1875 (RMC)** |
| ) | |
| UNITED STATES DEPARTMENT, ) | |
| OF AGRICULTURE, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OPINION

On January 19, 2017, the last day of the administration of former President Barack Obama, the United States Department of Agriculture (USDA) issued the final Organic Livestock and Poultry Practices Rule (Final OLPP Rule), which made more stringent the regulations that govern the certification of livestock as "organic" by USDA. On January 20, 2017, the first day of the administration of President Donald Trump, the White House directed executive agencies to delay implementation of all pending regulations that had not yet become effective, which included the Final OLPP Rule. USDA thereafter issued "Delay Rules" in February, May, and November 2017, each further delaying the effective date of the Final OLPP Rule. Eventually, on March 13, 2018, USDA formally withdrew the Final OLPP Rule.

The Organic Trade Association (OTA) challenged the delays to the effective date of the Final OLPP Rule in September 2017, while the November Delay Rule was open for public comment and not yet finalized. Between then and now, the Complaint has twice been amended and now also includes a challenge to the withdrawal of the rule. The government moves to

dismiss the Second Amended Complaint.  OTA opposes.  Having studied the parties' briefs, the

Court finds OTA has standing to sue but will dismiss its challenge to the Delay Rules.

## I.  BACKGROUND

### A.  The Organic Food Products Act

Congress enacted the Organic Food Products Act (OFPA) in 1990 "to establish

national standards governing the marketing of certain agricultural products as organically

produced products"; "to assure consumers that organically produced products meet a consistent

standard"; and "to facilitate interstate commerce in fresh and processed food that is organically

produced."  7 U.S.C. § 6501.  Consistent with this purpose, the OFPA requires the Secretary of

Agriculture to "establish an organic certification program" for producers and handlers of organic

agricultural products to ensure that those products are "produced and handled in compliance with

an organic plan" and, as a general matter, "without the use of synthetic chemicals."[1]  7 U.S.C.

§§ 6503(a), 6504(1) and (3).  Each organic operator must develop and follow an "organic plan,"

which is defined as:

> a plan of management of an organic farming or handling operation
> that has been agreed to by the producer or handler and the certifying
> agent and that includes written plans concerning all aspects of
> agricultural production or handling described in this chapter
> including crop rotation and other practices as required under this
> chapter.

7 U.S.C. § 6502(13).  One touchstone of the organic program is the "National List of approved

and prohibited substances that shall be included in the standards for organic production and

handling."  *Id.* § 6517(a); *see also* S. Rep. No. 101-357, at 298 (1990) (hereinafter "Senate

---

[1] The Secretary has delegated authority under the OFPA to the Agricultural Marketing Service
(AMS).  This Memorandum Opinion refers to AMS, USDA, and the Secretary collectively as
"USDA" or "the Secretary."

Report") ("Most consumers believe that absolutely no synthetic substances are used in organic production. For the most part, they are correct and this is the basic tenet of this legislation."). The National List touches virtually all aspects of the organic foods market, including organic crop production, 7 U.S.C. § 6508, organic animal production, *id*. § 6509, and organic handling practices, *id.* § 6510. Producers that do not satisfy the standards established under the OFPA may not market their products as organic, on pain of civil and criminal enforcement. *Id.* § 6519(c).

To aid the Secretary in this undertaking, the OFPA required the establishment of "a National Organic Standards Board . . . to assist in the development of standards for substances to be used in organic production and to advise the Secretary on any other aspects of the implementation of [the OFPA]." *Id.* § 6518(a). The National Organic Standards Board (occasionally, "Board") has 15 members appointed for staggered terms and drawn from a cross section of consumers, conservationists, scientists, and the organic agricultural industry. *Id.* § 6518(b) and (d). The Board "shall provide recommendations to the Secretary regarding the implementation" of the OFPA. *Id.* § 6518(k). Indeed, Congress regarded the National Organic Standards Board "as an essential advisor to the Secretary on all issues concerning [the OFPA] and anticipate[d] that many of the key decisions concerning standards [would] result from recommendations by this Board." Senate Report at 296.

Although "generally responsible for advising the Secretary on all aspects" of the OFPA, the National Organic Standards Board is "[s]pecifically . . . responsible for evaluating substances for inclusion on the Proposed National List." *Id.* at 297. Thus, the National List must be "based upon a proposed national list or proposed amendments . . . developed by" the Board, and the Secretary may not add exemptions to the National List that are not included on the

proposed national list developed by the Board. 7 U.S.C. § 6517(d)(1) and (2). Nothing requires

the Secretary to adopt recommendations made by the National Organic Standards Board in other

areas related to the OFPA. However, the Secretary has historically consulted the Board on all

rulemaking affecting organic standards. Resp. in Opp'n to the Gov't's Mot. to Dismiss, Ex. 3,

Decl. of Tom Chapman (Chapman Decl.) [Dkt. 16-3] ¶ 28.

With the assistance of the National Organic Standards Board, USDA has

promulgated a series of rules regulating the care of organic livestock.[2] For example, in 2000

USDA promulgated the National Organic Program Rule (Organic Program Rule), 65 Fed. Reg.

80,548 (Dec. 21, 2000), an extensive set of regulations covering a wide variety of organic

production practices, which required organic producers to "establish and maintain livestock

living conditions which accommodate the health and natural behavior of animals, including . . .

[a]ccess to the outdoors, shade, shelter, exercise areas, fresh air, and direct sunlight suitable to

the species, its stage of production, the climate, and the environment." *Id.* at 80,645. In 2010,

USDA followed up the Organic Program Rule with the 2010 Access to Pasture Rule, 75 Fed.

Reg. 7154 (Feb. 17, 2010), which reaffirmed and clarified the requirements for outdoor access.

In April 2016, USDA proposed the OLPP Rule, after it determined that its organic

regulations concerning livestock care needed "additional specificity and clarity to better ensure

consistent compliance by certified organic operations" and to "better satisfy consumer

expectations that organic livestock meet a uniform and verifiable animal welfare standard." 81

Fed. Reg. 21,956 (Apr. 13, 2016). USDA also noted that lack of uniform implementation

---

[2] The OFPA defines "livestock" as "any cattle, sheep, goats, swine, poultry, equine animals used for food or in the production of food, fish used for food, wild or domesticated game, or other nonplant life." 7 U.S.C. § 6502(11)

requirements for the Organic Program and Access to Pasture Rules resulted in "variation in the manner in which the regulations are applied." *Id.* at 21,958. USDA elaborated:

> For example, in organic poultry production, outdoor access ranges from extensive pasture to roofed enclosures, *i.e.*, porches with no access to soil or vegetation. This disparity in amounts of outdoor access has economic implications for producers and lessens consumer confidence in the organic label.

*Id.*

On January 19, 2017, after a decade of internal work and administrative review, including public notice and comment, USDA published the Final OLPP Rule, which addressed "care and production practices, transport, slaughter, and living conditions for organic livestock and poultry." 82 Fed. Reg. 7042, 7043 (Jan. 19, 2017). The Final OLPP Rule was to become effective on March 20, 2017, and was to be fully implemented by March 2018, except that outdoor access requirements for organic broiler operations were to be implemented by March 2020, and outdoor access requirements for organic egg operations were to be implemented by March 2022. *Id*.

Although the Final OLPP Rule regulated multiple practices, outdoor access for mammals and especially for birds was "a prominent issue." *Id*. Indeed, as part of its Regulatory Impact Analysis and Final Regulatory Flexibility Analysis (RIA), USDA predicted that the costs and benefits of the Final OLPP Rule would depend largely on the outdoor access and living space requirements for poultry. Mot. to Dismiss, Ex. F, RIA [Dkt. 43-7] at 12-13. Such requirements were the subject of several negative comments to the proposed OLPP Rule. *See, e.g.*, Mot. to Dismiss, Ex. B, Nat'l Ass'n of State Dep'ts of Agric. Comment to OLPP Rule [Dkt. 43-4] at 4 (arguing that the proposed OLPP Rule would "impose significant costs and production challenges on organic producers"). USDA ultimately determined that the benefits associated with the proposed OLPP Rule outweighed the costs of compliance.

## B. Delay and Withdrawal

On January 20, 2017, Reince Priebus, then-Chief of White House Staff in the newly-inaugurated Trump Administration, issued a moratorium directing departments and agencies in the Executive Branch to, *inter alia*, postpone for 60 days the effective date of any regulations that had been published in final form in the Federal Register but not yet taken effect, so that the new administration would have an opportunity to "review questions of fact, law, or policy they raise." Mem. for the Heads of Exec. Dep'ts and Agencies (Trump Moratorium), 2017 WL 280678, at *1 (Jan. 20, 2017). The Trump Moratorium further encouraged agencies to consider, where appropriate, additional rules, subject to public notice and comment, which could delay previously-final regulations beyond 60 days. *Id.*

On February 9, 2017, consistent with the Trump Moratorium and stating that there were "significant policy and legal issues . . . that warrant further review," USDA published, without notice or opportunity for public comment, and without input from the National Organic Standards Board, the February Delay Rule delaying the effective date of the Final OLPP Rule from March 20, 2017, until May 19, 2017. 82 Fed. Reg. 9967 (Feb. 9, 2017) (February Delay Rule); Chapman Decl. ¶¶ 14-15. In response, the National Organic Standards Board unanimously adopted a resolution urging USDA to allow the Final OLPP Rule to go into effect on May 19, 2017. *See* Defs.' Mot. to Dismiss, Ex. H, NOSB Formal Recommendation (Apr. 21, 2017) [Dkt. 14-10]. The February Delay Rule did not affect the implementation deadlines under the Final OLPP Rule.

On May 10, 2017, USDA published a May Delay Rule further delaying the effective date of the Final OLPP Rule, this time until November 14, 2017. *See* 82 Fed. Reg. 21,677 (May 10, 2017) (May Delay Rule). The May Delay Rule was also published without public notice and comment and without input from the National Organic Standards Board. *See*

Chapman Decl. ¶¶ 19-20. In a separate notice, also published on May 10, 2017, USDA repeated, without more elaboration, that there were "significant policy and legal issues . . . that warrant further review" of the Final OLPP Rule and issued a proposed rule seeking public comment on whether USDA should: (1) allow the Final OLPP Rule to become effective on November 14, 2017; (2) suspend the Final OLPP Rule indefinitely; (3) delay the Final OLPP Rule further; or (4) withdraw the Final OLPP Rule entirely. 82 Fed. Reg. 21,742 (May 10, 2017) (Proposed November Delay Rule).

USDA received approximately 47,000 comments on the Proposed November Delay Rule, most in favor of implementation of the Final OLPP Rule. On November 14, 2017, USDA finalized the Proposed November Delay Rule and postponed the effective date of the Final OLPP Rule until May 14, 2018. 82 Fed. Reg. 52,643. USDA explained that it was concerned that it may have exceeded its statutory authority in promulgating the Final OLPP Rule. *Id.* It also stated that it had identified a significant mathematical error which could impact the necessary cost/benefit analysis to the Final OLPP Rule. *Id.* at 52,644. Accordingly, USDA opted to delay so that it could engage in rulemaking with the purpose of withdrawing the Final OLPP Rule. *Id.*

On December 18, 2017, USDA noticed a 30-day public comment period on a proposed rule to withdraw the Final OLPP Rule. 82 Fed. Reg. 59,988 (Dec. 18, 2017) (Proposed OLPP Withdrawal Rule). Several organizations, including Plaintiff OTA, requested an extension of the comment period, due to the holiday season and the complicated nature of the Final OLPP Rule. Second Am. Compl. (SAC) [Dkt. 34-3], Ex. 4, OTA Comment to Proposed Withdrawal Rule [34-8] at 2. USDA refused to extend the comment period, stating that interested persons had already had an opportunity to comment on the Final OLPP Rule, that the Proposed OLPP

Withdrawal Rule concerned discrete issues that could be addressed within the 30-day comment period, and that extending the comment period would prevent USDA from issuing a final rule before the expiration of the November Delay Rule. SAC, Ex. 6, USDA Letter Denying Extension of Comment Period [34-10] at 1. OTA timely filed its comment.

On March 13, 2018, USDA published a final rule withdrawing the Final OLPP Rule. 83 Fed. Reg. 10,775 (Mar. 13, 2018) (OLPP Withdrawal Rule). Although acknowledging that the organic industry strongly supported the Final OLPP Rule, *id.* ("The majority of comments . . . opposed the withdrawal."), USDA provided two reasons for the OLPP Withdrawal Rule. First, USDA questioned its statutory authority to promulgate regulations centered around "stand-alone concerns about animal welfare." *Id.* at 10,776. That is, USDA decided that its authority to promulgate standards "for the care" of organically produced livestock was limited only to those health care practices "similar to those specified by Congress in the statute." *Id.* Second, after revisiting the regulatory impact analysis behind the Final OLPP Rule, USDA determined that the costs of the Final OLPP Rule outweighed its potential benefits and that no "significant market failure" had been identified to justify the Final OLPP Rule, so that even if USDA had the authority to regulate stand-alone concerns about animal welfare, it would choose not to do so as a matter of policy. *Id.* at 10,779-82.

### C. OTA's Legal Challenges

OTA is a membership-based business association which represents organic product consumers, farmers and livestock growers, ingredient suppliers, processors, manufacturers, retailers, accredited certifying agents, and those in international trade. OTA works generally to promote, develop, and protect organic standards, and worked for many years on behalf of its members specifically on the development of the Final OLPP Rule.

OTA filed suit on September 13, 2017, during the open comment period for the Proposed November Delay Rule, challenging the February and May Delay Rules. Compl. [Dkt. 1]. OTA subsequently amended its complaint after the November Delay Rule was finalized, challenging that rule as well. First Am. Compl. [Dkt. 13]. USDA moved to dismiss. Defs.' Mot. to Dismiss [Dkt. 14]. The matter was fully briefed as of March 1, 2018.

Then USDA finalized the OLPP Withdrawal Rule on March 13, 2018, causing OTA to move to amend its complaint again. Req. for Leave to File Second Am. Compl. [Dkt. 34]. With its motion, OTA submitted its Proposed Second Amended Complaint that alleges, in Count I, that the three Delay Rules violated the Administrative Procedure Act (APA); in Count II, that the OLPP Withdrawal Rule violates the APA; and in Count III, that the three Delay Rules and the OLPP Withdrawal Rule violate the OFPA because USDA did not engage in prior consultation with National Organic Standards Board. Proposed Second Am. Compl. (SAC) [Dkt. 34-3].[3] The Court granted leave to amend. 10/04/2018 Order [Dkt. 74]. USDA moves to dismiss the entire Complaint for lack of subject-matter jurisdiction and Counts I and III for failure to state a claim.[4]

---

[3] The SAC also added two animal welfare organizations as co-plaintiffs. However, those organizations have since withdrawn. Notice of Withdrawal of Allegations Involving ASPCA and AWI [Dkt. 56].

[4] Defs.' Mot. to Dismiss Second Am. Compl. [Dkt. 43]; Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss Second Am. Compl. and Opp'n to Pls.' Mot. for Leave to Amend (MTD) [Dkt. 43-1]; Pls.' Consolidated Resp. in Opp'n to Defs.' Mot. to Dismiss Second Am. Compl. and Opp'n to Pls.' Mot. for Leave to Amend (Opp'n) [Dkt. 50]; Defs.' Reply Brief in Supp. of Mot. to Dismiss Pl.'s Proposed Second Am. Compl. (Reply) [Dkt. 67].

## II.   LEGAL STANDARDS

### A.  Motion to Dismiss Under Rule 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  When a defendant challenges a plaintiff's standing to bring a lawsuit, the defendant's motion is properly understood as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).  This is because a "defect of standing is a defect in subject matter jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  The party claiming subject-matter jurisdiction bears the burden of demonstrating that it has standing. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  Nevertheless, "the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).

### B.  Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, a complaint must contain sufficient factual information, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A court must assume the truth of all well-pleaded factual allegations and construe reasonable inferences from

those allegations in favor of the plaintiff. *Sissel v. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). A court need not accept inferences drawn by a plaintiff if such inferences are not supported by facts set out in the complaint. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Further, a court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 556 U.S. at 678. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### III. ANALYSIS

#### A. Standing

Standing is part and parcel of Article III's limitations on the judicial power of the federal courts, which extends only to cases and controversies. U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority [and] to Controversies . . . ."); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015). The strictures of Article III standing are by now "familiar": standing requires (1) the plaintiff to have suffered an injury in fact that is both (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) the injury must be traceable to the defendants' actions; and (3) the injury must be redressable by a favorable decision of the court. *United States v. Windsor*, 570 U.S. 744, 757 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992)).

An organization can assert standing on its own behalf by demonstrating injury, causality, and redressability in the same way as a traditional plaintiff. *See, e.g.*, *Am. Legal Found. v. FCC*, 808 F.2d 84, 89 (D.C. Cir. 1987) (citing *Havens Realty Corp. v. Coleman*, 455

U.S. 363, 378-79 (1982)). Alternatively, an organization has "associational standing" to sue on behalf of its members when (1) at least one of its members would have standing to sue; (2) the interests it seeks to protect are germane to the organization's purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Elec. Privacy Info. Ctr. v. FAA*, 892 F.3d 1249, 1253 (D.C. Cir. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 181 (2000)). OTA claims standing for itself and on behalf of its members, several of whom provided declarations in this case.

As to OTA's associational standing claims, the government argues only that the identified members have not themselves suffered a concrete and particularized injury due to the OLPP Withdrawal Rule. OTA counters with several points. It begins with the argument that its members have "competitor standing" because they will face increased competition in the marketplace as a result of the OLPP Withdrawal Rule. The D.C. Circuit has "repeatedly . . . held that parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998). OTA's members state that they suffer competitive harm because they must continue to compete against other organic operators which "achieve lower production costs by ignoring the consensus organic . . . space requirements, while remaining certified." SAC, Ex. 15, Decl. of Gina Asoudegan (Asoudegan Decl.) [Dkt. 34-15] ¶ 8; *see also* SAC, Ex. 8, Decl. of John Lee (Lee Decl.) [Dkt. 34-12] ¶ 10. By clarifying and ultimately making more stringent the requirements for organic certification, the Final OLPP Rule would have brought the practices, and thus costs, of other operators who want to participate in the "organic" market in line with those of OTA's members. Asoudegan Decl. ¶ 9; *see also* RIA at 3 (finding organic egg and broiler producers "will face additional production costs as a result of

this rule"). In contrast, the OLPP Withdrawal Rule allows operators to remain in the organic market while using cheaper practices, keeping prices down and generally competing for "organic" sales.

USDA responds that the OLPP Withdrawal Rule "neither enlarged the pool of livestock producers eligible to compete in the organic livestock market nor created any competitive asymmetries; it has merely withdrawn regulatory requirements in a manner that affects all market participants equally." Reply at 12. This effect, the government argues, cannot support standing because the competitor standing doctrine applies only "to an agency action that itself imposes a competitive injury, *i.e.*, that provides benefits to an existing competitor or expands the number of entrants in the petitioner's market." *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002). But the OLPP Withdrawal Rule itself has such an effect. That is, under the Final OLPP Rule, USDA would have required all operators who wanted to compete in the certified organic market to satisfy new living space requirements for their livestock by the implementation dates in the Final OLPP Rule. Thus, the choices for operators lacking such space now were to either (a) conform to the new requirements, despite the resulting costs (that are already being expended by OTA's members), or (b) exit the organic market.[5] By removing the new living space requirements for livestock, the OLPP Withdrawal Rule no longer forces this choice. This result undoubtedly provides benefits to existing operators who, unlike OTA's members, are not already compliant with the requirements of the Final OLPP Rule by allowing them to continue to receive USDA certification and compete in the organic market without

---

[5] *See* RIA at 126 ("We estimate that up to 50 percent of organic egg producers could exit to the cage-free market.").

facing additional costs.  Put another way, it prevents a shrinkage of the pool of producers eligible to compete in the organic livestock market, to the detriment of OTA's members.

The government next argues that OTA's competition claim requires "impermissible speculation about the future market choices of third parties."  MTD at 28.  For example, the government argues that no market exit by competitors is certain.  Further, even if competitors exit, consumers may not switch to more expensive organic eggs, even as cheaper eggs lose the organic seal.

As the D.C. Circuit has explained, although there are "various formulations of the standard for determining whether a plaintiff asserting competitor standing has been injured[,] . . . the basic requirement is that the complainant show an actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact."  *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *see also Bristol-Meyers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499 (D.C. Cir. 1996) ("The injury claimed here is not lost sales, per se . . . .  Rather the injury claimed is *exposure* to competition." (emphasis added)); *La. Energy & Power Auth.*, 141 F.3d at 367 (finding competition results in injury regardless of whether pricing is competitive or predatory).  Here, no one need speculate about an increase in competition due to the OLPP Withdrawal Rule; organic operators already compete on the axis of livestock welfare standards, which would not have continued had the new standards gone into effect.  Even if those operators who do not currently satisfy the Final OLPP Rule standards had come into compliance with it and so continued to compete as "organic" operators—*i.e.*, even if the *number* of competitors stayed the same—no competitor in the organic market could have continued to compete by lowering their livestock welfare standards—*i.e.*, the *type* of competition would

certainly have been more limited.[6]  Put another way, the Final OLPP Rule would have required an existing type of competitor to drop out of the market, which type produced organic eggs at lower costs, keeping prices down.  As such OTA's members are "direct and current competitor[s] whose bottom line may be adversely affected by the challenged government action." *New World Radio*, 294 F.3d at 170.

As to whether consumers would continue to buy organic eggs if they rose in price under the Final OLPP Rule:  OTA's members only stand to gain since they are already willing to produce and sell organic eggs at current prices.  Further, nothing in USDA's analysis hints at consumers' complete abandonment of the organic egg market due to a rise in prices.  *See* RIA at 50 ("Clear standards will also help to maintain consumer demand for organic livestock products.").

OTA also argues that its members must currently pay for additional (private-sector) certification when they want to signal to consumers that their standards for animal welfare go beyond what is required by USDA, but the Final OLPP Rule would have put all organic producers on the same playing field and made such additional certifications unnecessary.  *See* SAC, Ex. 14, Decl. of George Siemon (Siemon Decl.) [Dkt. 34-15] ¶¶ 25-26; Asoudegan Decl. ¶ 9.  Because the Final OLPP Rule is being jettisoned, OTA's members will have to continue to pay for additional certifications.  Thus, the OLPP Withdrawal Rule injures OTA's members by depriving them of a benefit they would have otherwise received.  *Cf. Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 775-76 (D.C. Cir. 2005) (finding

---

[6] Although made unnecessary by the OLPP Withdrawal Rule, organic operators facing increased costs due to the Final OLPP Rule would appear to be sufficiently "injured" to challenge said rule.  As such, it is hard to see how the converse—that OTA lacks standing—can be true when that same injury to competitors is the benefit lost by OTA's members.

standing where the challenged agency action deprived the company of a "previously-held protection"); *Eldred v. Reno*, 239 F.3d 372, 375 (D.C. Cir. 2001) (same, where plaintiffs objected to extending the duration of copyright protections of prospective works).

The government responds that such certification costs are self-inflicted; nothing requires OTA's members to pay for additional certification now and they could compete at lower standards if they chose. *Cf. Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 178 (D.C. Cir 2012) (rejecting standing where regulated entities chose to incur costs not required by regulation to achieve a competitive advantage); *Food & Water Watch v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("[S]elf-inflicted injuries . . . [do] not give rise to standing."). This argument mischaracterizes the regulatory backdrop for the OLPP Withdrawal Rule, which takes as its baseline that the Final OLPP Rule remained in effect and so saved OTA's members the cost of private-sector certification. Accordingly, the OLPP Withdrawal Rule drops the baseline for USDA certification and alters the regulatory landscape to the detriment of OTA's members. Just as OTA's members would have had standing to challenge any rollbacks of USDA's organic certification program before the Final OLPP Rule, so too they have standing now to challenge rollbacks of the USDA's certification program as constituted after the Final OLPP Rule.

The Court recognizes that, given that several requirements of the Final OLPP Rule would have become effective on a rolling basis, including the broiler space requirements beginning in 2020, there is a question as to whether or not OTA's alleged injury is "imminent."[7] As the Supreme Court has instructed, "[a]lthough imminence is concededly a somewhat elastic

---

[7] Although certain provisions would have gone into effect in 2018, OTA's members' declarations focus largely on the competitive injury stemming from avian living space requirements, and less on mammalian living conditions, transport, and care. *See, e.g.*, Siemon Decl. ¶¶ 20-21; Asoudegan Decl. ¶ 7; RIA at 98 (noting that mammalian regulations "largely codify existing industry practices").

concept," its ultimate purpose "is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Lujan*, 504 U.S. at 564 n.2 (internal marks omitted) (emphasis in original); *see also id.* ("[W]e have insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all."). Parties often lack standing in those cases where the alleged injuries are highly probabilistic, contingent on other events, or "couched in language of uncertainty and futurity." *Animal Legal Def. Fund, Inc. v. Espy*, 29 F.3d 720, 726 (D.C. Cir. 1994); s*ee, e.g.*, *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015) (finding plaintiff lacked standing because future effects of policy "raised only 'some vague probability' that increased competition would occur"); *New World Radio*, 294 F.3d at 171 (same, because third party was several steps away from competing); *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 912 (D.C. Cir. 1989) ("[W]e may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions."). Here, although the commercial injury has not yet occurred, USDA has already taken concrete actions through the OLPP Withdrawal Rule that will produce the alleged injury. *See, e.g.*, *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152 (1970) (finding standing where competitors were already preparing to enter the market); *Int'l Bhd. of Teamsters v. Dep't of Transp.*, 724 F.3d 206 (D.C. Cir. 2013) (same, where the agency was already issuing operating permits to competitors); *cf. Lujan*, 504 U.S. at 564 (contrasting "'some day' intentions" with "concrete plans" and "specification of *when* the some day will be" (emphasis in original)). More to the point, the Final OLPP Rule laid out concrete plans and specified on what dates the benefits to OTA's members would accrue; those benefits were not speculative. That lead-time for

implementation was necessary and built into the Final OLPP Rule does not make the claim unripe, and the Court cannot identify a better time for OTA to sue. Indeed, a challenge to the OLPP Withdrawal Rule must be made now or never. *See* 28 U.S.C. § 2401 ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.").

The government does not contend that the competitive and financial interests of OTA's members are not germane to the organization, or that any individual member must participate in this action to secure relief. The Court concludes that the injury to OTA's members is concrete and particularized. Therefore, the Court finds that OTA has associational standing to challenge the OLPP Withdrawal Rule on behalf of its members.

Finally, USDA argues that even if OTA has standing to challenge the OLPP Withdrawal Rule, it did not have standing to challenge the Delay Rules when the Complaint was filed, needed standing at the commencement of the lawsuit to continue with the lawsuit, and cannot now cure this jurisdictional defect with its Second Amended Complaint. *See Friends of the Earth*, 528 U.S. at 698 (describing standing as the "requisite personal interest that must exist at the commencement of the litigation"). This argument had greater force when it was briefed by the government. More recently, however, the D.C. Circuit has held that "a plaintiff may cure a standing defect under Article III through an amended pleading alleging facts that arose after filing the original complaint. The alternative approach forces a plaintiff to go through the unnecessary hassle and expense of filing a new lawsuit when events subsequent to filing the original complaint have fixed the jurisdictional problem." *Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018) (citing *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043-44 (9th Cir. 2015)); *see also G&E Real Estate, Inc. v. Avison Young-Washington,*

*D.C., LLC*, 168 F. Supp. 3d 147, 160 (D.D.C. 2016) ("[S]tanding may be assessed by the timing of the filing of the operative complaint in an action—whether the original complaint or a supplemental or amended complaint.").[8]  Accordingly, the Court construes OTA's motion to amend its complaint pursuant to Rule 15(a) as a motion to supplement its complaint pursuant to Rule 15(d).  *Cf. G&E Real Estate*, 168 F. Supp. 3d at 160 n.9 ("It is of no moment that the operative complaint in this case was styled as [an] 'amended complaint' rather than a 'supplemental complaint.'").  It is noteworthy in this regard that OTA has articulated its competitive injury arguments since its opposition to the government's first motion to dismiss back in November 2018.  *See* Resp. in Opp'n to the Gov't's Mot. to Dismiss [Dkt. 16] at 10-11.  Further, OTA has consistently alleged that USDA acted arbitrarily and capriciously when it reversed course on the Final OLPP Rule, either by delay or by withdrawal, and so it cannot be said that the government has been without notice.  *Compare* Compl. ¶ 135 ("The options (b), (c), and (d) are an inexplicable departure from USDA's prior interpretation of the OFPA."), *with* FAC ¶ 174 ("Further delay on the grounds advanced in the Third Delay Rule is unjustified and is a sudden and inexplicable departure from USDA's prior interpretation of the OFPA."), *with* SAC ¶¶ 291-92 ("The Withdrawal Rule is arbitrary and capricious because USDA reversed course without adequate explanation.").  The government has already moved to dismiss the Second Amended Complaint.  At this point in the litigation, dismissing the case for lack of standing only to have it reappear in exactly the same form would do little to promote the efficient resolution of this case and instead force "the needless formality and expense of instituting a new action when

---

[8] The government acknowledged as much in its notice to the Court.  *See* Defs.' Notice of Supplemental Authority [Dkt. 75].

events occurring after the original filing indicate[] a right to relief." *Scahill*, 909 F.3d at 1183

(quoting Fed. R. Civ. P. 15(d), advisory committee notes to 1963 amendment).[9]

### B. Failure to State a Claim

#### 1. Challenging the Delay Rules

Count I of OTA's complaint is that USDA violated the APA and Organic Food

Products Act (OFPA) by twice delaying the effective date of the Final OLPP Rule without public

notice and comment (the February and May Delay Rules), and then again by delaying the

effective date by rule with inadequate public notice and comment (the November Delay Rule).

The APA requires a federal agency to provide public notice of proposed rulemaking and an

opportunity for public comment before promulgating new rules. *See* 5 U.S.C. § 553. However,

the government argues that this claim has been mooted by the OLPP Withdrawal Rule and the

Court agrees.

"The mootness doctrine . . . limits federal courts to deciding actual, ongoing

controversies." *Clarke v. United States*, 915 F.2d 699, 700-01 (D.C. Cir. 1990) (en banc)

(internal marks omitted). "[A] case is moot when the issues presented are no longer 'live' or the

parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486,

496 (1969). A case also becomes moot "[e]ven where litigation poses a live controversy when

filed . . . if events have so transpired that the decision will neither presently affect the parties'

rights nor have a more-than-speculative chance of affecting them in the future." *Clarke*, 915

F.2d at 701 (internal marks omitted); *see also Theodore Roosevelt Conversation P'ship v.*

*Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011) ("If it becomes impossible for the court to grant any

---

[9] The Court need not determine whether OTA also has standing to challenge the Delay Rules, since Count I will be dismissed for other justiciability reasons. *See infra*.

effectual relief whatever to a prevailing party on particular claim, that claim must be dismissed." (internal marks omitted)). Agencies can moot claims against them by promulgating new rules that cure previous procedural defects or supersede previous rules. *See Ctr. For Sci. in the Pub. Interest v. Regan*, 727 F.2d 1161, 1163-64 (D.C. Cir 1984) ("[I]t is not improper for an agency to engage in new rulemaking to supersede defective rulemaking.").

The November Delay Rule delayed the effective date of the OLPP Rule until May 14, 2018. USDA then finalized the OLPP Withdrawal Rule on March 13, 2018, before the November Delay Rule expired. OTA can receive no remedy if it successfully challenges the Delay Rules but unsuccessfully challenges the OLPP Withdrawal Rule—the Final OLPP Rule will remain withdrawn. Conversely, if OTA successfully challenges the OLPP Withdrawal Rule, there would still be no effective remedy vis-à-vis the November Delay Rule (or any earlier Delay Rule) as it is now well past May 14, 2018, and all the Delay Rules have expired.

Normally, a claim would be moot under these circumstances. OTA seeks to avoid this conclusion by arguing that the Delay Rules are "capable of repetition, yet evading review," and so its challenge to the practice is exempt from the mootness doctrine. *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016). "That exception applies only in exceptional situations, where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (internal marks omitted). "A controversy is capable of repetition only if the same parties will engage in litigation over the same issues in the future." *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1088 (D.C. Cir. 2017) (internal marks omitted). "A 'theoretical possibility' is not sufficient to qualify as 'capable of repetition'; there must instead be a 'reasonable expectation' or 'demonstrated

probability' that the action will recur." *Id.* (internal marks omitted) (quoting *Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939, 951 (D.C. Cir. 2005)); *see also Reid v. Inch,* No. 17-502 (D.C. Cir. Feb. 2, 2019)*.* While the government largely concedes that the Delay Rules were too short in duration to litigate while extant, it contests OTA's assertion that its claim will recur.

OTA identifies four legal wrongs which may recur. First, it argues that rules effecting short-term delays—as a general matter, not specific to the Final OLPP Rule—are by their nature of short duration and thus evade review. While accurate, the Final OLPP Rule cannot be delayed again because it has been withdrawn. OTA's responds "that no 'precedent requires that the very same facts must recur for the capable of repetition exception to apply.'" Opp'n at 32 (citing *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 325 (D.C. Cir. 2009)). This is also accurate. But as a general matter, the capable-of-repetition doctrine applies "only where the named plaintiff can make a reasonable showing that *he will again* be subjected to the alleged illegality," *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (emphasis added), and OTA does not plausibly allege that it will be party to another final rule that will be subject to repeated short-term delays.[10]

OTA's second identified legal wrong is that an opportunity to comment on a rule after the effective date is no substitute for an opportunity to comment before. Opp'n at 33 (citing *Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981)). True enough, but new public comment periods can cure defects in old ones. *See Util. Air Regulator*

---

[10] OTA's reliance on *Del Monte* is misplaced. In that case, Del Monte had applied for a license from the government, which application languished and was approved only after Del Monte sued. *Del Monte*, 570 F.3d at 320. The D.C. Circuit found that the injury to Del Monte was capable of repetition because Del Monte had to re-apply for the license each year and the government had confirmed that it expected similar delays in the future. *Id.* at 325-26. No similar facts are alleged here.

*Grp. v. EPA*, 744 F.3d 741, 749-50 (D.C. Cir. 2014) (finding APA challenge moot because the agency cured the procedural defect by re-promulgating the rule); *Ctr. For Sci. in the Pub. Interest v. Regan*, 727 F.2d at 1163-64. Even when past rulemaking has been legally deficient, there is no basis here to assume that USDA will ignore the APA in the same manner in future rulemaking. *Theodore Roosevelt Conversation P'ship*, 661 F.3d at 79 ("Our general presumption that a federal agency will follow its own regulations therefore stands.").

Third, USDA determined as part of the November Delay Rule that it was not required to consult with the National Organic Standards Board and so did not consult with the Board. OTA argues that this failure to consult violated the OFPA and APA, and that OTA has a legitimate basis to fear that USDA will violate the OFPA and APA in future rulemaking. For present purposes, OTA's argument is overly speculative; USDA could consult with the Board in the future as Congress intended. More importantly, USDA's statement about consultation with the Board also appeared in the OLPP Withdrawal Rule. OLPP Withdrawal Rule, 83 Fed. Reg. at 10,778. It can thus be reviewed as part of that rulemaking without evading review.

Fourth, OTA argues that USDA improperly relied on the Trump Moratorium to justify the February Delay Rule and that the Court should issue a "clarifying ruling" that any such delays require notice and comment rulemaking beyond presidential proclamation. Opp'n at 35. The concept of regulatory moratoria is relatively recent. *See* Kathryn A. Watts, Regulatory Moratoria, 61 Duke L.J. 1883, 1889-93 (2012) (cataloging the practice since the first administration of former President Ronald Reagan). These moratoria have only been used by incoming presidents six (6) times in the last thirty-seven (37) years, generally "as tools for presidents to control the phenomenon of midnight rulemaking by the prior administration." *See id.* at 1892 and n.34. Not all moratoria have been the same. As relevant to this case, only

moratoria issued by the administrations of former President Reagan, former President George W. Bush, and the current President directed agencies to delay the effective dates of published rules that had not yet become effective.  *See* 46 Fed. Reg. 11,227 (Jan. 29, 1981); 66 Fed. Reg. 7702 (Jan. 24, 2001); Trump Moratorium.  The moratorium issued by former President Barack Obama directed agencies to "consider" delaying the effective dates of published rules by sixty days.  *See* 74 Fed. Reg. 4435 (Jan. 26, 2009).  The moratoria issued by former Presidents Bill Clinton and George H.W. Bush did not mention delaying effective dates at all.  *See* 1 Pub. Papers 166 (Jan. 28, 1992); 58 Fed. Reg. 6074 (Jan. 25, 1993).

Such directions from incoming Presidents are quintessential exercises of Executive authority into which the federal courts are loath to explore.  More importantly, the legal issue is how the executive agencies respond to a presidential moratorium in light of the APA.  At present, it is overly speculative to predict how executive agencies might respond to a hypothetical future moratorium, since it is unclear if (1) a new administration will take office in 2021; (2) a new administration, much less a new administration of the same party, would issue a regulatory moratorium; (3) that moratorium would apply to already published rules; and (4) any such rule would affect OTA or its members.  OTA has not shown a reasonable expectation or demonstrated probability that each of the above will come to pass; there is insufficient evidence in the record to justify an exception to the mootness doctrine.

The Court concludes that OTA's complaint against the Delay Rules is moot and no longer presents an Article III case or controversy.  The likelihood of repetition is too speculative to render it a current controversy.  Count I in the Second Amended Complaint will be dismissed.

### 2. Challenging the Withdrawal Rule

Count II of OTA's Second Amended Complaint alleges that the OLPP Withdrawal Rule is arbitrary and capricious because it lacks sufficient reason or explanation for reversing course. The government wisely does not argue that OTA has failed to allege a legally sufficient claim against the OLPP Withdrawal Rule. Count II will move forward.

### 3. Failure to Consult the NOSB

Count III of the Second Amended Complaint alleges that USDA violated the OFPA by failing to consult with the National Organic Standards Board when it considered and finalized the OLPP Withdrawal Rule. Following congressional direction in § 6518 of the OFPA, the Secretary established the Board "to assist in the development of standards for substances to be used in organic production and to advise the Secretary on any other aspects of the implementation of this chapter." 7 U.S.C. § 6518(a). Section 6503 states that "the Secretary shall consult with" the National Organic Standards Board when developing both USDA's organic certification program and the National List of approved and prohibited substances under § 6517. *Id.* § 6503(a), (c); *see also id.* § 6517. Section 6509(d) states that the Board "shall recommend to the Secretary standards" regarding livestock. 7 U.S.C. § 6509(d)(2). Finally, § 6518(k)(1) states that the Board "shall provide recommendations to the Secretary regarding implementation of this chapter." *Id.* § 6518(k)(1). OTA argues that these collective provisions impose a statutory requirement *under the OFPA*, and distinct from the APA, that USDA consult with the National Organic Standards Board when promulgating or withdrawing organic livestock regulations.

"Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). The OFPA describes USDA's consultation

obligations with varying degrees of specificity. For example, § 6517 explicitly states that the "National List established by the Secretary shall be based upon a proposed national list . . . developed by the National Organic Standards Board" and that the "Secretary may not include exemptions . . . other than those exemptions contained in [the Board's proposed national list]." 7 U.S.C. § 6517(d)(1) and (2). That same section essentially gives the National Organic Standards Board veto power over the validity of exemptions and prohibitions on the National List. *Id.* § 6517(e). Similarly, § 6506(c), which specifically addresses wild seafood, states that USDA "shall . . . consult with" the Board when promulgating regulations specifically related to certifying wild seafood as organic. *Id.* § 6506(c)(2). By contrast, although § 6509(d), under "[a]nimal production practices and materials," states that the Board "shall recommend" livestock standards to USDA, § 6509(g) furthers states that USDA "shall develop detailed regulations" for livestock with notice and public comment but without requiring USDA to consult with the Board. *Id.* § 6509(d)(2) and (g).

The language in §§ 6517 and 6506 shows that Congress clearly knew how to compel consultation and involve the Board more closely in the promulgation of regulations. That said, § 6509 does not give the Board the same degree of input into livestock standards as it does for National List exemptions and prohibitions under § 6517. It does not even go as far as § 6506(c), on wild seafood, which specifically requires USDA to consult with the Board, instead of requiring the Board to make recommendations to USDA. Thus, the Court cannot find a blanket requirement for USDA to consult with the Board on livestock regulations because it would make those more specific statutory provisions superfluous. *Cf. Davis Cnty. Solid Waste Mgmt. v. EPA*, 101 F.3d 1395, 1404 (D.C. Cir. 1996) ("[I]t is of course a well-established maxim of statutory construction that courts should avoid interpretations that render a statutory provision

superfluous."); *but see Lamie v. United States Trustee*, 540 U.S. 526, 536 (2004) ("Surplusage does not always produce ambiguity and our preference for avoiding surplusage constructions is not absolute.").

That said, even if there is no *blanket* requirement for USDA to consult with the Board whenever it promulgates new rules affecting the organic certification program, the Court cannot decide on this briefing whether USDA was nonetheless required to consult with the Board before promulgating the OLPP Withdrawal Rule. It may be that specific requirements to consult ensure that rules affecting those specific issues, no matter how small, are always run past the Board. It may also be that the specific requirements to consult are not surplusage because not all small acts of rulemaking affecting the certification program require prior input from the Board. But it is also clear from the Senate Report that Congress intended the National Organic Standards Board to play a key role in developing the organic certification program. To restate the language: "The Committee regards this Board as an essential advisor to the Secretary on all issues concerning [the OFPA] and anticipates that many of the key decisions concerning standards will result from recommendations by this Board." Senate Report at 296; *see also id.* at 297 ("The Board is generally responsible for advising the Secretary on all aspects of the implementation of [the OFPA]."). Additionally, § 6503 *requires* the Secretary to consult with the Board when developing the organic certification program. The Final OLPP Rule was the largest and most important organic rule promulgated since the 2010 Access to Pasture Rule and USDA consulted over its development with the Board. As such, notwithstanding the uncertain consultation requirement for small rulemaking, § 6503 may have required USDA to consult on a

timely basis with the National Organic Standards Board before finalizing the OLPP Withdrawal Rule, which is similarly large and important.[11]

The Court will not decide this issue on the current briefing. Accordingly, Count III will not be dismissed.

## IV.    CONCLUSION

The government's Motion to Dismiss Second Amended Complaint, Dkt. 43, will be granted in part and denied in part. A memorializing Order accompanies this Memorandum Opinion.

Date: February 27, 2019

_____
ROSEMARY M. COLLYER
United States District Judge

---

[11] The government notes that the Board made its recommendation clear when it submitted a comment encouraging USDA to allow the Final OLPP Rule to go into effect. *See* NOSB Formal Recommendation. The Court is not satisfied that accepting a comment during a 30-day comment period on the OLPP Withdrawal Rule would meet the requirement to "consult," which connotes involvement at an earlier time in the development of at least major rules that affect the entire organic certification program.