# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ORGANIC TRADE ASSOCIATION,
444 North Capitol Street, N.W., Suite 445A
Washington,  D.C. 20001;

THE AMERICAN SOCIETY
FOR THE PREVENTION OF
CRUELTY TO ANIMALS
520 Eighth Avenue, 7th Floor
New York, New York 10018;

and

THE ANIMAL WELFARE INSTITUTE
900 Pennsylvania Avenue, S.E.,
Washington, D.C. 20003,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.
1400 Independence Ave., S.W.
Washington, DC 20250;

SONNY PERDUE, in his official capacity as
the Secretary of the United States Department
of Agriculture,
1400 Independence Ave., S.W.
Washington, DC 20250;

and

BRUCE SUMMERS, in his official capacity
as Administrator of the Agricultural
Marketing Service
1400 Independence Ave., S.W.
Washington, DC 20250,

      Defendants.

**Civil Case No: 1:17-cv-01875-RMC**
**SECOND AMENDED COMPLAINT**

# SECOND AMENDED COMPLAINT

1

Plaintiffs Organic Trade Association, the American Society for the Prevention of Cruelty to Animals and the Animal Welfare Institute bring this Complaint on behalf of themselves and their members seeking declaratory and equitable relief arising from the defendants' repeated and ongoing violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §701 *et seq.*, and the Organic Foods Production Act ("OFPA"), 7 U.S.C.§ 6501 *et seq.*[1]

## NATURE OF THIS ACTION

1. This action presents first-impression issues of major significance to all organic farmers, consumers of organic food products and advocates for farm animal well-being.  It challenges a single fourteen-month course of interlocking administrative actions that included four separate rulemakings, resulting in the withdrawal of the *Organic Livestock and Poultry Practices* ("OLPP") final rule.[2]  The OLPP had clarified and extended animal care assurances on organic farms. 83 Fed. Reg. 10775-783 (March 13, 2018) ("*Final Rule; Withdrawal*") (effective May 13, 2018) (hereinafter "Withdrawal Rule").

2. The OLPP was the product of more than ten years of agency and public process arising from "recommendations provided by USDA's Office of Inspector General and nine separate recommendations from the NOSB."[3]  82 Fed. Reg. at 7082.  The recommendations accepted by the agency were based on long-standing and well-settled agency constructions of the

---

[1] The parties are referred to herein as, Organic Trade Association ( "OTA" ); American Society for the Prevention of Cruelty to Animals ("ASPCA"); Animal Welfare Institute ("AWI") and collectively "Plaintiffs."  Defendants are referred to as "USDA or "the Secretary" and collectively "Defendants" depending on the context.

[2] 82 Fed. Reg. 7042-92 (January 19, 2017) ("OLPP").

[3] The National Organic Standards Board ("NOSB") is an expert advisory body created by Congress to advise the USDA on development and implementation of organic standards.  *See* 7 U.S.C. § 6503(c); 7 U.S.C. § 6509(d)(2); 7 U.S.C. § 6509(g); 7 U.S.C. § 6518(a); 7 U.S.C. § 6518(k)(1).

OFPA with regard to organic standards for livestock care and the role of the NOSB in developing those standards.

3. The Withdrawal Rule relied on a novel and erroneous construction of the OFPA that conflicts with, and contradicts, statutory mandates set by Congress for organic standards for livestock care, and the role of the NOSB in developing those standards. The Withdrawal Rule conflicts with every prior administration's approach to rulemaking under the OFPA and the NOSB.

4. In addition, the Withdrawal Rule is an arbitrary, capricious and unexplained departure from the conclusions reached in more than twenty years of prior rulemakings regarding organic livestock care, and those appearing in the now-withdrawn OLPP, upon which organic farmers and consumers had relied.[4] More specifically:

5. At the time of publication of the OLPP in January 2017, USDA said: "OFPA mandates that detailed livestock regulations be developed through notice and comment rulemaking and intends for the involvement of the National Organic Standards Board (NOSB) in that process." 82 Fed. Reg. at 7082.

6. At the time of withdrawal of the OLPP in March 2018, USDA reversed course and denied the NOSB a role in the process: "[O]FPA does not require AMS to consult with the NOSB prior to undertaking a rulemaking to withdraw the OLPP final rule." 83 Fed. Reg. 10,778, n. 6.

---

[4] The publication of the OLPP on January 19, 2017, effective in March 2017, made its provisions the law of the National Organic Program. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017.

7.  At the time of publication of the OLPP in January 2017, USDA said: "OFPA authorizes the further development of livestock production standards (7 U.S.C. 6513(c))."  82 Fed. Reg. at 7085.

8.  At the time of withdrawal of the OLPP in March 2018, USDA reversed course and said: "[O]FPA does not provide authority for the OLPP final rule. . ."[5]  83 Fed. Reg. at 10,776.

9.  At the time of publication of the OLPP in January 2017, USDA declared the OLPP necessary to "maintain consumer confidence in the USDA organic seal" and assure consumers organic livestock products "meet a consistent uniform standard," 82 Fed. Reg. at 7082, and to "ensure fair competition among producers by facilitating equitable certification and enforcement decisions." *Id.* at 7083.

10.  At the time of withdrawal of the OLPP in March 2018, USDA reversed course, stating: "the market is working and that additional regulation is unwarranted. . . . [T]he costs of the OLPP final rule outweigh potential benefits."  83 Fed. Reg. at 10,779

11.  Following the January 2017 publication of the OLPP, USDA published three final rules that unlawfully delayed the "effective date" of the OLPP without an APA-compliant opportunity for public comment and without the required pre-rulemaking consultation with the NOSB. Each of these serial, short-term periods of delay blocked the OLPP while the agency undertook a *sua sponte* reconsideration that it refused to fully disclose, in a manner that evaded judicial review. Each delay took the welfare of animals on organic farms further from

---

[5] Focusing on a single section of the OFPA, USDA also said "OFPA's reference to additional regulatory standards 'for the care' of organically produced livestock should be limited to health care practices similar to those specified by Congress in the statute, rather than expanded to encompass stand-alone animal welfare concerns." 83 Fed. Reg. at 10,776.

the improved conditions embodied in the new rule and blocked the other benefits of the

OLPP.

12. On December 18, 2017, USDA announced its intent to withdraw the OLPP. *See Proposed*

*Rule-Withdrawal*, 82 Fed. Reg.  59,988.

13. Following a short, thirty-day comment period over the 2017 holiday season, no consultation

with the NOSB, and denials of multiple requests for enlargement of the comment period

from these plaintiffs and others, and more than 77,000 comments, on March 13, 2018 USDA

unlawfully rescinded the OLPP.  In doing so, USDA relied solely on its own purported errors

in the original OLPP rulemaking and a breathtaking reversal of long-standing agency policy

and practice with regard to NOSB consultation and the agency's well-settled construction of

the OFPA ("the Withdrawal Rule"). Every one of the administrative stepping stones in this

cascade of administrative actions was defective and unlawful and each, in its turn, is also

invalidated by the unlawfulness of the prior administrative delay action upon which it relied.

14. Plaintiffs bring this action to enjoin and set aside or vacate each of the challenged actions or

portions of the challenged actions that violate the OFPA and the APA.  As explained further

below, the Withdrawal Rule violates 5 U.S.C. § 706(2) because it is contrary to the OFPA

provisions and because it is arbitrary, capricious, an abuse of discretion, and otherwise not in

accordance with law.

15. Plaintiffs respectfully request that the Court set aside or vacate the final rule withdrawing the

OLPP, and reinstate the final OLPP duly promulgated in January 2017. Finally, Plaintiffs

seek attorney's fees and costs pursuant to 28 U.S.C. § 2412(d).


**JURISDICTION AND VENUE**

5

16. This action arises under federal law, specifically the OFPA and the APA.  The declaratory, injunctive and other relief requested by Plaintiffs is authorized by 5 U.S.C. §§ 702, 704 and 706, 28 U.S.C. §§ 2201-02, and this Court's general equitable powers.

17. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and § 1361.

18. Venue is proper in this district because one or more Plaintiffs and Defendants reside in this judicial district and because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(c)(2), (e)(1).

19. An actual, live controversy exists between the parties within the meaning of 28 U.S.C. § 2201 regarding the three delay rules that have expired and the Withdrawal Rule issued March 13, 2018.

20. Plaintiffs seek fees, costs and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or other authority.

## PARTIES AND STANDING

A.  PLAINTIFFS

21. Plaintiff Organic Trade Association ("OTA") is a membership-based business association for organic agriculture and products in North America and is the leading voice for the organic trade in the United States, representing almost 9500 farms and organic businesses across fifty states. OTA members include organic product consumers, farmers and livestock growers, ingredient suppliers, processors, manufacturers, distributors, retailers, accredited certifying agents and those in international trade. OTA's members grow, make, distribute, and certify organic products including livestock products worldwide.

22. OTA's mission is to promote, develop and protect organic standards, ensure the due process rights of its members, and provide a unifying voice to federal and state entities. OTA worked

on the substance of the OLPP for many years and supported its adoption and publication.

OTA submitted written comments and provided testimony to the NOSB on each of the nine

NOSB recommendations referenced in the Final OLPP, 82 Fed. Reg. at 7044, and OTA

submitted written comments in the following related dockets:

- Proposed OLPP (April 13, 2016) (81 Fed. Reg. 21956);

- Final OLPP (January 19, 2017) (82 Fed. Reg. 7042);

- Third Proposed Delay Rule (May 10, 2017) (82 Fed. Reg. 21742)

- Proposed Withdrawal Rule (December 18, 2017) (82 Fed. Reg.  59,988).

23. USDA's repeated violations of the OFPA and APA injures both OTA as an organization and

OTA's members.  In response to USDA's delays and ultimate withdrawal of the OLPP since

February 2017, OTA has spent hundreds of staff hours to combat the delay of

implementation of the OLPP and its withdrawal, including this litigation. Because OTA has

had to use organizational resources to protect the OLPP and ensure its implementation, it has

been forced to divert resources from OTA's other work, including the promotion of organic

agriculture and products, as well as its other educational activities. USDA's unlawful

withdrawal of the OLPP following the administration change has frustrated OTA's

organizational mission.

24. OTA's members rely on the organic label to ensure that organic food was produced with high

and consistently-applied standards, including animal welfare standards. Inconsistent and

conflicting requirements for "outdoor access" were corrected in the final OLPP.  USDA's

unlawful delay rules and Withdrawal Rule harms OTA members by failing to assure

consumers that organically-produced products meet a consistent and uniform standard;

failing to ensure fair competition in the marketplace between organic egg producers and

handlers and organic meat producers and handlers; failing to eliminate conflicting interpretations of the organic regulations that certifying agents must enforce; damaging and diminishing consumer trust in the USDA organic seal; and failing to keep open the consultative channel with the NOSB, which is a key mechanism by which OTA members participate in the development of organic standards and policies. *See Exhibits 8, 11-19* (Declarations of OTA members)

25. OTA conducts public and policymaker education and outreach and, when necessary, litigation. OTA actively participates in hearings and other fact gathering events before the NOSB and routinely engages in policy discussions with the National Organic Program ("NOP"). OTA routinely submits comments on NOSB recommendations and NOP Guidance Documents and related matters that impact organic businesses, producers including livestock producers and product manufacturers and retailers, handlers, certifying agents and consumers.

26. Plaintiff American Society for the Prevention of Cruelty to Animals ("ASPCA") is a not-for-profit corporation whose mission is to provide an effective means for the prevention of cruelty to animals throughout the United States. The ASPCA was incorporated in 1866 by a special act of the New York State legislature, and is North America's oldest humane organization. The ASPCA is also one of North America's largest humane organizations, with roughly 2.7 million supporters nationwide.

27. As part of its mission, the ASPCA has a well-established farm animal welfare program that seeks to improve the lives of the billions of animals on American farms through outreach to consumers, advocates, farmers, industry, policymakers, and lawmakers.

28. For example, ASPCA experts with substantial knowledge of animal welfare science and welfare certification programs help farmers and other companies implement sustainable business models built on more humane practices and participation in meaningful animal welfare certification programs that consumers can trust.

29. The ASPCA also advocates for a range of laws, regulations, and policies that promote greater protection for farm animals, including bans on raising farm animals with cages, crates, and other intensive farming practices that maximize output at the expense of animal welfare; corporate policies adopting more humane husbandry, transportation, and slaughter practices; and regulatory and legislative requirements that ensure food product labels convey accurate information to consumers about farm animal welfare. These efforts are pursued through regulatory and legislative advocacy; corporate and institutional engagement; and consumer education and mobilization. Through this work, the ASPCA aims to improve farm animal welfare by, among other things, expanding the portion of the market comprised of meaningful third-party animal welfare-certified livestock products. Much of this work is reflected on the ASPCA's "Shop With Your Heart" campaign website, which is geared toward consumers, companies and advocates.

30. As part of its advocacy for meaningful animal welfare certifications, the ASPCA has worked on the many versions of the OLPP since the administrative process began and leading up to the USDA's promulgation of the final rule in January 2017. It submitted written testimony to the NOSB on six occasions and attended and testified at six NOSB meetings in person around the country. It has also met with NOSB members and other organic industry stakeholders at several NOSB meetings. Similarly, on multiple occasions, the ASPCA communicated directly with the USDA's NOP about organic animal welfare and the need for

stronger regulations, and also issued letters to NOP, met with NOP in person, and sent

information to NOP via email.

31.  With respect to the OLPP, the ASPCA has routinely submitted its own organizational

comments based in part on its members' input (both alone and jointly with other

organizations) and solicited comments from its supporters as members of the public. The

ASPCA has also generated letters and statements from scientists, veterinarians, and farmers

supporting the development of the OLPP.[6] In 2017, the ASPCA co-authored an extensively-

researched report on the history of NOP animal welfare regulations, the need for stronger

regulations, and the status of the OLPP.[7]

32. In furtherance of its mission, the ASPCA has regularly expended financial and personnel

resources to attend meetings at NOP's offices; to attend NOSB meetings in person (to deliver

testimony and meet directly with NOSB members and other organic industry stakeholders);

to commission a consumer survey of organic products; to prepare a jointly-authored report on

the state of organic animal welfare regulations; to purchase online advertisements

encouraging concerned members of the public to file comments with USDA in response to its

rule proposals; to become a dues-paying network affiliate member of the National Organic

Coalition; and to attend and speak at many events and conferences related to the OLPP and

organic animal welfare regulations.

---

[6] *See, e.g.*,
https://www.aspca.org/sites/default/files/organic_academic_statement._ian_duncan.pdf;
https://www.aspca.org/sites/default/files/160304_aspca_veterinary_statement_organic_standards
.pdf;
https://www.aspca.org/sites/default/files/organic_welfare_standards_farmer_endorsements_2016
.pdf.
[7] *See* https://www.aspca.org/sites/default/files/frmwlfr_orgnc_rprt_2017_14.pdf.

33. The ASPCA has also devoted financial resources to consumer education in the area of organic livestock products, both during the pendency of the OLPP and since its withdrawal. Based on a survey the ASPCA commissioned in April 2014, consumers have expectations with respect to the welfare of animals raised under the NOP that are often unmet.[8] The ASPCA has focused many of its efforts on narrowing this gap between consumer expectations and how animals are actually raised on farms participating in the NOP, both through consumer education and advocacy to improve animal welfare standards.

34. The ASPCA has also devoted resources to building relationships with organic farmers in order to gather information on the economic, animal welfare, and other impacts of various provisions of the OLPP, as well as to collaborate on advocacy efforts supporting the OLPP through coordinated strategy and messaging.

35. The ASPCA brings this action on its own behalf because the challenged actions directly conflict with, impair, and frustrate the ASPCA's organizational mission. For example, USDA's withdrawal of the OLPP undercuts the relationships ASPCA has been building with organic farmers and the consistency and consensus it has sought to foster. The withdrawal of the OLPP will encourage the development of additional and inconsistent organic certification schemes, each of which will include animal welfare provisions to varying degrees. This means a portion of the organic farming community will join some of those schemes, bringing additional complexity and confusion to marketplace labeling. That, in turn, will affect the ASPCA's ability to identify and track meaningful animal welfare schemes and form relationships with producers and companies that participate in those schemes. This is

---

[8] *See* https://www.aspca.org/sites/default/files/aspca_organic_labeling_public_memo_4-10-14.pdf.

particularly true in light of the ASPCA's ongoing work to support brands and farmers enrolled in meaningful third-party animal welfare-certified programs, some of which also participate in the NOP. Defendants' actions will make this already complex situation even more so as additional, inconsistent labels enter the marketplace and increase consumer confusion.

36. By repeatedly delaying the effective date of the OLPP, and then withdrawing it altogether, Defendants have also caused the ASPCA to divert and redirect its limited resources to challenge and respond to that unlawful conduct. Instead of working on other legislative, regulatory, corporate or consumer education initiatives, the ASPCA has diverted resources toward extensive communication with the public, journalists, and partner organizations to alert them to USDA's actions with respect to the OLPP. This includes issuing press releases; researching and releasing reports on the economic and ethical imperative for these rules; conducting extensive media interviews; coordinating with strategically-aligned groups and farmers; issuing multiple rounds of advocacy emails; and launching multi-platform social media campaigns, all urging public comment to USDA.

37. The ASPCA's pecuniary injury is traceable to USDA's unlawful conduct because the ASPCA would not have needed to undertake (or undertake to the same extent) these efforts and would not have needed to expend (or expend to the same extent) these resources absent USDA's failure to comply with its mandates under the law.

38. Plaintiff Animal Welfare Institute (AWI) is a nonprofit organization founded in 1951 with its principal place of business in Washington, D.C. and with the primary purpose of reducing animal suffering caused by people. AWI has more than 20,000 members, many of whom are specifically interested in the wellbeing of farm animals. Since its inception, AWI has pursued

regulatory, legislative, and judicial initiatives to improve the treatment of animals on farms, including cows, pigs, broiler chickens and layer hens, and turkeys.

39. AWI has spent considerable time and resources on behalf of its members advocating for implementation of the OLPP Rule. As early as 1998, AWI has advocated for regulations to promote higher animal welfare under the NOP. This advocacy has included participating in an advisory body to the NOSB Livestock Committee, submission of six written comments, and oral testimony at the advisory body meetings. AWI has also vigorously participated in the rulemaking process involving organic animal related standards, including submission of four comments to the USDA during the OLPP rulemaking.[9]

40. AWI also educates its members about the welfare impacts of farm policy and solicits their comments during relevant rulemakings.[10] For example, in 1998, AWI educated its members about the development of proposed NOP regulations.[11] More recently, AWI, ASPCA, and Farm Forward released a report about the need for the OLPP Rule to ensure that animal welfare is protected and that consistent standards are met under the NOP.[12] Throughout the comment period for the OLPP Rule, the three delays, and the withdrawal, AWI educated its

---

[9] Animal Welfare Institute, Farm Animal Policy Efforts "Miscellaneous" at https://awionline.org/content/farm-animal-policy-efforts (Listing AWI's comments to the USDA Lon organic welfare standards since 2010. This includes comments on the Proposed OLPP Rule, the Proposed Rule, the Second Delay, and the Proposed Withdrawal).

[10] *E.g.* Animal Welfare Institute, *Please Tell USDA to Prioritize Animal Welfare in Organic Production*, (May 7, 2015) https://awionline.org/archived-action-ealerts/please-tell-usda-prioritize-animal-welfare-organic-production (asking members and the public to submit comments to the NOP about animal welfare under the Certified Organic Label).

[11] *"Organic Standards": Government/Industry Whitewash*, 47 ANIMAL WELFARE INST. Q. Winter 1998 at 11 (detailing USDA's rejection of the NOSB's recommendations for organic standards during the Clinton administration).

[12] AWI, ASPCA, & Farm Forward, *Animal Welfare in the National Organic Program: The USDA Must Act Quickly to Protect Millions of Animals*, (Aug. 2017) https://awionline.org/sites/default/files/uploads/documents/FA-AWI-AnimalWelfare-NatOrganicProgram-2017-13.pdf.

members about the regulatory impact to animals and gathered comments for submission into the docket.[13]

41. AWI educates its members, organic consumers, and the public at large about how to choose and identify products from farms with high animal welfare standards, including certified organic farms. In order to do this, we rely on the NOP's duty to assure consistently applied organic production standards for animals. The current vague standards, where, for example, the term "outdoor access" is applied differently by different certifying agents hampers AWI's ability to educate members and consumers that organic always assures that animals are raised with legitimate outdoor access. This inconsistency in organic production practices leads to inconsistent products in the marketplace and degrades our ability to educate and direct concerned parties to organic products from animals that actually receive outdoor access that includes access to the earth.

42. AWI's associational and organizational interests in the wellbeing of livestock and poultry and in protecting them from cruel and inhumane practices, and its interest in educating consumers regarding organic products, are injured by AMS' decision to withdraw this rule. AWI and its members strongly desire increased protections for farm animals, especially those raised on organic farms.

43. AWI expends considerable resources advocating for its members' interests in the well-being of animals raised under the organic program. AWI members also purchase and consume or seek to purchase and consume organic animal products with the expectation that these

---

[13] *E.g.* Animal Welfare Institute, *Last Chance to Save the Organic Rule!*, (Jan. 11, 2018) https://awionline.org/action-ealerts/last-chance-save-organic-animal-welfare-rule; Animal Welfare Institute, *Stop Trump's USDA From Scrapping the Organic Animal Welfare Rule*, (May 25, 2017) https://awionline.org/archived-action-ealerts/tell-usda-you-support-better-treatment-organically-raised-animals.

products come from farms where animals are subject to higher welfare environments. The withdrawal of this rule directly and irreparably harms these interests because the current animal welfare measures in the organic regulations are unevenly and inconsistently applied from farm to farm, resulting in highly variable conditions for animals raised under the NOP. Implementation of the OLPP remedies this problem.

44. Each Plaintiff organization and their respective members, where applicable, has been harmed by the repeated violations of the OFPA and APA that are detailed in this complaint.  In addition, each Plaintiff organization continues to be harmed by the ongoing effects of the erroneous construction of the OFPA advanced in the Withdrawal Rule as efforts to ensure organic products meet a single, consistent national standard are increasingly ineffective. Each Plaintiff organization existed during multiple past presidential administrations and expects to continue to exist after the current administration.

45. Each Plaintiff organization and their respective members, where applicable, intends to continue to participate in organic policy and regulation development through advocacy regarding standards development, organic policy, proposed rules and final rules.

46. For purposes of the APA and OFPA challenges, associational standing and standing under Article III of the US Constitution allows the Plaintiff organizations, represent their members, where applicable. Their members would have standing to sue in their own right, the interests they seeks to protect are germane to the applicable organizations' purposes, members finance the organization's activities and rely on the organization to express their collective views and protect their collective interests in animal welfare, and the claims asserted and relief requested in this action do not require the participation of their members as parties.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  The Plaintiff organizations,

are additionally well-situated to represent the interests of their members, both individually and collectively, in this challenge to the lawfulness of the three delay rules and the Withdrawal Rule. The interests at stake are directly relevant to their purpose of representing the organic industry, and its consumers, and there is no need for any particular individual farmer, consumer or business to participate as a plaintiff in this challenge. The interests at stake are also relevant to ASPCA's and AWI's purpose of representing members concerned about animal wellbeing, and about the expectation that "organic" products are raised under a higher welfare standard.

47. All Plaintiffs have organizational standing for purposes of the APA and OFPA challenges. Each has concrete interests in uniform national organic standards that are consistently enforced, a vibrant federal organic program that protects and maintains consumer trust in the USDA's organic seal, organic livestock policies that impact the welfare of farm animals, and organic policy advocacy. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

B. DEFENDANTS

48. Defendant USDA is a department in the U.S. government charged with administering the Agricultural Marketing Service and implementing the OFPA.

49. Defendant Sonny Perdue ("Secretary") is sued in his official capacity as the Secretary of the USDA. The Secretary is the official ultimately responsible for the USDA's activities and policies and for compliance with the OFPA and the APA.

50. Defendant Bruce Summers is sued in his official capacity as the acting Administrator of the Agricultural Marketing Service. He is legally responsible for administering marketing programs of the USDA, including the National Organic Program.

51. Defendants are collectively referred to as "USDA."

## BACKGROUND

**A. The Organic Foods Production Act, National Organic Program and Role of the National Organic Standards Board.**

52. The Organic Food Products Act ("OFPA") was enacted in 1990 to correct a market failure arising from a patchwork of state and private organic production and processing standards that resulted in inconsistent organic products, consumer confusion, and fragmented markets for organic producers, processors and products.[14]

53. Congress sought to "facilitate interstate commerce" by "establishing national standards governing the production and marketing of certain agricultural products. . . ." in order to "assure consumers that organically produced products meet a consistent standard." 7 U.S.C. § 6501.  Further, Congress took an "opt-in" approach to regulating organic products by creating "national standards" solely for those persons who voluntarily choose to produce and market products bearing an "organic" marketing claim. 7 U.S.C. § 6504.

54. Congress directed the USDA to develop and implement the new "national standards."
7 U.S.C.§ 6503.

55. To guide USDA in this undertaking, Congress created an expert citizen-advisory board, the National Organic Standards Board ("NOSB"). 7 U.S.C. § 6518.  The NOSB meets at least twice a year and conducts all its meetings and voting on organic policy recommendations in public in accord with the "Government in the Sunshine Act." 5 U.S.C. § 552(b).

---

[14] Organic Foods Production Act of 1990, Pub. L. No. 101-624, § 2102, 104 Stat. 3359 (1990)(codified at 7 U.S.C. §§ 6501-6522) ("OFPA"); 7 C.F.R. Part 205 (National Organic Program); *see also* S. Rep. No. 101-357 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 4656, 4949.

56. The NOSB is composed of fifteen members appointed according to statutory criteria; the expertise necessary for each seat is set in the statute. 7 U.S.C. § 6518(b).

57. The OFPA requires the Secretary to seat four certified farmers, two certified handlers, one organic retailer, one accredited certifying agent, three members with environmental and resource conservation expertise, three members that represent, or are, public or consumer interest groups, and one member with expertise in toxicology, ecology or biochemistry. 7 U.S.C. § 6518(b).

58. In addition to setting criteria for the holder of each board seat, the statutory criteria also disclose the distinct perspectives that Congress expressly intended the Secretary to meaningfully consult when considering new organic standards, or amending existing ones. 7 U.S.C. § 6518. Unlike many advisory boards, the NOSB is not weighted towards those directly regulated by the National Organic Program. The additional perspectives include consumer interests, as the role of consumer expectations in shaping emerging organic norms has been increasingly recognized. *See e.g.*, 82 Fed. Reg. at 7043, 7066 (recognizing consumer expectations in deliberations of NOSB).

59. The NOSB: "[S]hall provide recommendations to the Secretary regarding the implementation of this chapter," 7 U.S.C. § 6518(k)(1).

60. The Secretary: "shall establish [the NOSB] ….to assist….and to advise the Secretary on any other aspects of the implementation of this chapter." 7 U.S.C. § 6518(a).

61. The Secretary: "[S]hall consult with the National Organic Standards Board…" 7 U.S.C. § 6503(c).

62. The Senate Organic Report states: "The Committee regards this Board as an essential advisor to the Secretary on all issues concerning this bill and anticipates that many of the key

18

decisions concerning standards will result from recommendations by this Board." Senate

Committee on Agriculture, Forestry and Nutrition, *Report of the Committee on Agriculture,*

*Forestry and Nutrition to Accompany S. 2830 Together with Additional and Minority Views,*

*101st Congress,* S. REP. NO. 101–357, at 289 (1990) ("Senate Organic Report")

63. The USDA's *NOSB Policy Manual* states: "The unique nature of the NOSB and its

relationship with the NOP, as established through OFPA, requires that the volunteer Board,

which regularly receives stakeholder input through public comment, must work

collaboratively with the NOP. Similarly, the NOP, as required through OFPA, must consult

and collaborate with the NOSB." *NOSB Policy Manual*, at 9 available at

https://www.ams.usda.gov/sites/default/files/media/NOSB-PolicyManual.pdf

64. The Senate Report demonstrates that the unique and novel public-private partnership adopted

by Congress for the USDA and the NOSB was understood and intentional. "[M]uch of this

title breaks new ground for the Federal government and will require the development of a

unique regulatory scheme." *Senate Organic Report*, at 293.

65. The Senate Report explains that the new approach of directly involving the advisory board in

the development of policy was to ensure a continual updating of organic standards, as

occurred here with the OLPP.  "The Committee is concerned that production materials and

practices keep pace with our evolving knowledge of production systems." *Senate Organic*

*Report* at 297.

66. The Senate also considered that there was, at the time, limited knowledge or consensus on

appropriate organic livestock standards. *Senate Organic Report* at 289.

67. The Senate found a special, express need for additional evaluation of organic livestock

production standards by the NOSB: "[T]he Committee expects that USDA, with the

assistance of the National Organic Standards Board will elaborate on livestock criteria." *Senate Report* at 289.

68. The Senate went further: "The Board shall recommend livestock standards, in addition to those specified in this bill, to the Secretary." *Id.* at 303.

69. When the House and Senate were reconciling their respective versions of the OFPA, Congress stated that the "Conference substitute adopts the House provision with an amendment which requires the Secretary to hold hearings and develop regulations regarding livestock standards *in addition to* those specified in this title." H.R. Rep. 101-916 at 1177-78 (Oct. 22, 1990) (emphasis added).

70. The legislative history confirms that Congress intended the agency to enact organic livestock standards in addition to those specified in the original language of the OFPA. All evidence suggests that Congress intended USDA's authority on this issue to be expansive, enabling the NOSB and USDA to refine and extend livestock standards as research on the subject grew. Congress "recognize[d] the need to further elaborate on the standards set forth in the title and expect[ed] that by holding public discussions with interested parties and with the National Organic Standards Board, the Secretary will determine the necessary standards." *Id.*

71. Congress specifically directed that the minimal livestock standards it placed in the OFPA be augmented: "[the NOSB] shall recommend to the Secretary standards in addition to those in [the foregoing section] *for the care of livestock to ensure that such livestock are organically produced*." 7 U.S.C. § 6509(d)(2) (emphasis added).

72. Congress further commanded: "[the Secretary] [S]hall hold public hearings *and shall develop detailed regulations*, with notice and public comment, to guide the implementation of the standards for livestock products…" 7 U.S.C. § 6509(g) (emphasis added).

73. Nearly ten years after passage of the OFPA, USDA published the National Organic Program Final Rule ("NOP") in December 2000.  *National Organic Program*, 65 Fed. Reg. 80,548 (Dec. 21, 2000) (codified at 7 C.F.R. pt. 205) ("Program Rule").

**B. The Administrative Procedure Act.**

74. The APA applies to executive agency actions including rulemaking, defined as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5).

75. A "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

76. Under the APA, an agency must publish a notice of proposed legislative rulemaking in the Federal Register and solicit public comment before adopting or repealing a rule, unless the rule constitutes an "interpretative rule," "general statement of policy," "rule of agency organization, procedure, or practice," or the agency "for good cause" finds that notice and comment are "impracticable, unnecessary, or contrary to the public interest." *Id.* § 553.

77. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* § 702.

78. Under the APA, a reviewing court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id*. § 706(2)(A), or that is "without observance of procedure required by law." *Id.* § 706(2)(D). An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

79. The APA also grants reviewing courts the power to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

**C. Executive Order 12866.**

80. Executive Order 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993), "primarily aims to improve planning and coordination in the regulatory process" *Envtl. Integrity Project v. Small Bus. Admin.*, 151 F. Supp. 3d 49, 55 (D.D.C. 2015).

81. "The regulatory process shall be conducted so as to meet applicable statutory requirements…" Exec. Order No. 12866 at Preamble.

82. "Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem." *Id.* at Section 1(b)(1).

83. "Each agency shall examine whether existing regulations (or other law) have created, or contributed to, the problem that a new regulation is intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively." *Id.* at Section 1(b)(2).

84. "Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." *Id.* at Section 1 (b)(6).

85. "Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation." *Id.* at Section 1 (b)(7).

86. "Each agency shall (consistent with its own rules, regulations, or procedures) provide the public with meaningful participation in the regulatory process. . . .  In addition, each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days. Each agency also is directed to explore and, where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking."  *Id.* at Section 6 (a).

**FACTUAL ALLEGATIONS**

87. The OFPA is the first federal law to establish a voluntary nationwide system requiring full disclosure of farming and food processing practices and the use of synthetic substances by any producer or handler of agricultural products. 7 U.S.C. § 6506.

88. The National Organic Program is a "voluntary labeling program."  *See* 82 Fed. Reg. at 7084; 83 Fed. Reg. at 10779 (["P]articipation in the NOP is technically voluntary…")

89. Since the first rule published under the OFPA, organic livestock standards have included provisions for animal care that are designed to improve the lives of farm animals by ensuring production practices that reduce the need for synthetic medications.

90. USDA has only issued new, or amended existing, standards for livestock production practices after providing extensive notice and comment, holding public hearings, consulting with NOSB, and receiving recommendations from NOSB regarding livestock practices.

91. The OLPP extended and clarified existing organic livestock production requirements. Its terms became the "status quo" or existing policy of the National Organic Program upon

publication.  "This final rule addresses care and production practices, transport, slaughter, and living conditions for organic livestock and poultry."  82 Fed. Reg. at 7043

92.  The Priebus Memorandum (discussed in detail *infra*) is the fifth instance where a President ordered an across-the-board freeze of regulatory action.  *See* Exec. Order No. 12,291, 3 C.F.R. 127, 131-32 (1981) (suspending the effective dates of all major rules that an agency promulgated in final form, and prohibiting executive agencies from, among other things, issuing regulations without an analysis of the costs and benefits of the regulations); *see also* Memorandum, Postponement of Pending Regulations, 46 Fed. Reg. 11,227, 11,227-28 (Feb. 6, 1981) (ordering executive agencies to postpone pending final regulations and proposed regulations for sixty days, with limited exceptions);  Memorandum on Reducing the Burden of Government Regulation, PUB. PAPERS 166-68 (Jan. 28, 1992) (detailing the George H. W. Bush Administration's ninety-day moratorium for proposed and final rules); Notice, Regulatory Review, 58 Fed. Reg. 6074, 6074 (Jan. 25, 1993) (reprinting a memorandum from the Office of Management and Budget (OMB), instructing regulatory agencies regarding the Clinton Administration's directives for "Regulatory Review," including directives to suspend publication); Memorandum for the Heads and Acting Heads of Executive Departments and Agencies, 66 Fed. Reg. 7702, 7702 (Jan. 24, 2001); and Memorandum, Postponement of Pending Regulations, 46 Fed. Reg. 11,227, 11,227 (Feb. 6, 1981) (reprinting a White House memorandum sent to executive agencies on January 29, 1981, directing agencies to "refrain, for 60 days following the date of this memorandum, from promulgating any final rule.").

**A. History of Organic Livestock Standards at the National Organic Program.**

93. As noted in greater detail in the Legal Background section *supra*, in the 1990 Farm Bill, Congress expressly required that livestock production practices for organic livestock operations be developed by the Secretary, in consultation with the NOSB, and that public hearings be held to create a robust record.  7 U.S.C. § 6509(d)(2); 7 U.S.C. § 6509(g).

94. Since the inception of the National Organic Program, USDA has worked with the NOSB and published organic livestock rules underpinned by clear statutory authority and a programmatic commitment to maintaining animal welfare on certified organic operations. For example, in the final rule that established the National Organic Program in 2000, USDA stated:

> Animals in an organic livestock operation must be maintained under conditions which provide for exercise, freedom of movement, and reduction of stress appropriate to the species. Additionally, all physical alterations performed on animals in an organic livestock operation must be conducted to promote the animals' welfare and in a manner that minimizes stress and pain.[15]

95. The 2000 rule also required each producer submit a written organic system plan[16] that included a "proactive approach to health management," based *inter alia* on "access to the outdoors, shade, shelter, exercise areas, fresh air, and direct sunlight." *Id.* at 80,561.

96. The 2000 rule also confirmed that these regulations were based upon and also satisfied Congress' intent to "assure consumers that organically produced products meet a consistent standard." *Id.* at 80664.

---

[15] *National Organic Program*, 65 Fed. Reg. 80,547, 80,560 (Dec. 21, 2000) ("the 2000 rule").
[16] *See* 7 U.S.C. § 6502 <u>Definitions</u> "Organic Plan" ([A] plan of management . . . that includes written plans concerning all aspects of agricultural production.."); 7 U.S.C. § 6513 (c) ("An organic livestock plan shall contain provisions designed to foster the organic production of livestock consistent with the purposes of this chapter.")

97. The 2000 rule is codified at 7 C.F.R. §§ 205.236 (Origin of Livestock); 205.237 (Livestock

    Feed); 205.238 (Livestock Healthcare practice standard); and 205.238 (Livestock living

    conditions).  These requirements reflected USDA's now well-settled policy that the care of

    organic farm animals involves much more than prohibiting non-organic feedstuffs and

    limiting the ingestion of synthetic substances for medical treatment. Notably, it also evinced

    that an animal's health and the concrete conditions of its overall living arrangements are

    interdependent, and that the OFPA requires the organic standards to take these interests into

    account when promulgating organic regulations.

98. The 2000 rule acknowledged that many livestock production questions remained

    unanswered: "We anticipate that additional NOSB recommendations and public comment

    will be necessary *for the development of space requirements*." 65 Fed. Reg. at 80,573

    (emphasis added); "The NOP will work with the NOSB to develop additional guidance for

    managing ruminant production operations." *Id.*; "We will continue to explore with the NOSB

    specific conditions under which certain species could be temporarily confined to enhance

    their well-being." *Id.*

99.  Since that time, USDA and NOSB have incrementally developed the management protocols

    and practice standards governing livestock on certified organic farms and have held many

    public, on-the-record meetings with experts and fact witnesses and developed and published

    many drafts and substantive recommendations for public comment.  *See, e.g.*, 82 Fed. Reg. at

    7045 (reviewing federal register notices of hearings on organic livestock regulations)*.* Shortly

    thereafter, the NOSB began soliciting public comments on livestock production practices at

    public meetings.

100.    In 2001, the NOSB recommended that the NOP issue more detailed standards for

ruminant livestock. *Available at*

*https://www.ams.usda.gov/sites/default/files/media/Recommendations on Pasture.pdf* (last

visited Sept. 12, 2017).

101.    In 2002, the NOSB made a recommendation for poultry regarding outdoor access, stating

that outdoor access should include open air and direct access to sunshine.  In addition, the

May 2002 recommendation stated that access to soil is necessary to meet the intent of the

NOP's requirement for outdoor access for poultry.  *Available at*

*https://www.ams.usda.gov/sites/default/files/media/Recommended Clarification on Access to*

*Outdoors Poultry.pdf* (last visited Sept. 12, 2017).

102.    In 2002, the USDA's Agricultural Marketing Service ("AMS") issued an administrative

appeal decision that reversed a certifying agent's denial of certification of a poultry

operation.  The original denial found that while the operation had covered concrete "porches"

it did not have "outdoor access" for its birds because the floor was concrete.  The appeal

decision reversed this finding.  81 Fed. Reg. at 21,980 (discussion of decision).

103.    In March 2005, the NOSB made recommendations regarding the temporary confinement

of livestock.  On October 24, 2008, AMS published a proposed rule on access to pasture for

ruminant livestock, 73 Fed. Reg. 63,584, and published the final rule, *Access to Pasture*

*(Livestock)* on February 17, 2010. 75 Fed. Reg. at 7154.  According to AMS, this rule was

based on several NOSB recommendations regarding ruminant livestock feed and living

conditions. *Id.* at 7154-55; 7183-85.

104.    In 2010, USDA published its *Access to Pasture Rule* and included animal welfare

provisions that built on those of the 2000 rule.  *National Organic Program; Access to*

27

*Pasture (Livestock)*, 75 Fed. Reg. 7154 (Feb. 17, 2010) (hereinafter "*Access to Pasture*")

(codified at 7 C.F.R. §§ 205.237; 205.239; 205.240). The final rule adopted additional

livestock production rules providing more specific feed and living conditions for ruminant

animals. The rules reflected the statutory authority to adopt organic production practices that

enhanced the care of farm animals, to reduce the need for synthetic medications, to ensure

organically raised animals meet a consistent standard of care, and to meet consumer

expectations. *Access to Pasture*, 75 Fed. Reg. 7154 (February 17, 2010).

105.    The *Access to Pasture Rule* reiterated the programmatic and statutory construction

principles first set forth ten years earlier in the 2000 rule that, "[o]ne of the tenants [sic] of

organic production is that animals are able to express their natural behaviors, and exercise

and move freely." *Id.* at 7171. The rule emphasized that this tenet was designed to align with

the expectations of consumers, and noted that thousands of commenters had expressed their

support. *Id.* When discussing temporary denial of access to the outdoors, the Agency stated

"[t]hese exceptions are intended for animal welfare concerns rather than production yields."

*Id.* at 7170.

106.    The *Access to Pasture* rule was developed based on multiple NOSB recommendations

between 1994 and 2005, five public hearings, and thousands of comments from stakeholders.

In 2016, USDA noted the *Access to Pasture* rule was promulgated "in response to the 2005

NOSB recommendation and extensive public input requesting clear outdoor access

requirements for ruminant livestock." 81 Fed. Reg. 21,956-01 (Apr. 13, 2016) ("*Proposed

OLPP*"). In 2017, USDA said the OLPP "would continue the process initiated with the

*Access to Pasture* rulemaking to establish clear and comprehensive requirements for all

organic livestock, consistent with recommendations provided by USDA's Office of Inspector

General and nine separate recommendations from the NOSB." OLPP, 82 Fed. Reg. 7042, 7044 (Jan. 19, 2017).

107.     The parallels between the 2010 *Access to Pasture* rulemaking and the 2017 OLPP procedure and statutory analysis are inescapably obvious:

> A stated purpose of the OFPA (7 U.S.C. 6501) is to assure consumers that organically produced products meet a consistent and uniform standard. This action is being taken to facilitate and improve compliance and enforcement and satisfy consumer expectations…. Sufficient specificity and clarity will bring uniformity in application of the livestock regulations and enable certifying agents and producers to assess compliance. The amendments set minimal objectives which align with consumer expectations and producer perspectives.

> 75 Fed. Reg. 7154, 7184 (Feb. 17, 2010).

108.     The *Access to Pasture Rule* stressed the need for greater uniformity – to "create equitable, consistent performance standards for all ruminant livestock producers," *Id.* at 7186 – that reflect "consumer preferences regarding the production of organic livestock and their products." *Id.*

109.     In addition to the *Access to Pasture Rule,* between 2009 and 2011, the NOSB issued a series of recommendations on livestock production practices that incorporated prior NOSB recommendations that AMS had not addressed.  A November 5, 2009 NOSB recommendation suggested revisions and additions to the livestock health care practice standards and living conditions standards.

110.     On October 13, 2010, USDA published draft guidance, *Outdoor Access for Organic Poultry* (NOP 5024), for public comment.  The draft guidance advised certifying agents to use the 2002 and 2009 NOSB recommendations as the basis for certification decisions regarding outdoor access for poultry.

111.    On May 6, 2011, USDA stated that, "Based upon the comments received, the NOP is not

finalizing the draft guidance, "NOP 5024—Outdoor Access for Poultry." The NOP intends to

initiate a separate rulemaking on the outdoor access requirements for poultry in 2011."

*Available at https://www.regulations.gov/document?D=AMS-NOP-10-0048-0001* (last

visited September 12, 2017).

112.    In October 2010, the NOSB passed a recommendation to allow the administration of

drugs in the absence of illness to prevent disease or alleviate pain, stating such a change

would improve the welfare of organic livestock.

113.    In March 2010, the USDA's Office of Inspector General conducted an audit of the NOP

and issued a report entitled *Oversight of the National Organic Program.* The Report found

inconsistent treatment of outdoor access for livestock by accredited certifying agents and

noted that AMS "agreed that additional guidance would be beneficial." *Oversight of the*

*National Organic Program,* OIG Audit Report No. 01601-03-Hy, 22 ("OIG Report")

*available at* https://www.usda.gov/oig/webdocs/01601-03-HY.pdf.

114.    On December 2, 2011, the NOSB unanimously adopted a Recommendation entitled

"*Animal Welfare and Stocking Rates*" that combined its prior work on animal space

requirements and handling, with its prior recommendations regarding animal welfare,

handling, transport, and slaughter.[17]

---

[17] NOSB, *Formal Recommendations by the NOSB to the NOP, Animal Welfare Stocking Rates*, 1
*available at*
https://www.ams.usda.gov/sites/default/files/media/NOP%20Livestock%20Final%20Rec%20An
imal%20Welfare%20and%20Stocking%20Rates.pdf; NOSB, *Formal Recommendation by the*
*NOSB to the NOP, Animal Handling and Transport to Slaughter*, 1 *available at*
https://www.ams.usda.gov/sites/default/files/media/NOP Livestock Final Rec Animal Handling
and Transport to Slaughter.pdf.

115.    On March 21, 2012, the Secretary acknowledged the NOSB recommendation on animal

welfare and said it would conduct assessments of its regulatory burdens and particularly how

certifying agents would monitor and enforce the proposed welfare requirements.[18]

116.    In total, between 1994 and 2011, NOSB made nine recommendations regarding livestock

health and welfare in organic production.

117.    The NOSB invited public testimony on animal raising practices on approximately eleven

occasions between 2001 and 2012. Among them were specific instances of public comment

opportunities appearing in Federal Register Notices: 67 Fed. Reg. 19,375 (April 19,

2002); 74 Fed. Reg. at 46,411 (September 9, 2009); 75 Fed. Reg. at 57,194 (September 20,

2010); and 76 Fed. Reg. at 62,336 (October 7, 2011).

118.    From the creation of the NOP in December 2000 until the OLPP's publication in January

2017, the USDA published only one final rule covering livestock production practices. *See*

75 Fed. Reg. 7154 (February 17, 2010).

119.    In the eighteen years since the NOP was created, USDA has also issued guidance

documents that are still in use.  Two documents are particularly relevant here.

120.    USDA's *Guidelines for Organic Certification of Poultry* states: "Animal health is the

result of preventative and on-going management efforts to create living soils, provide

nourishing forage and feed, and improve the quality of livestock life. Animals must be kept

in healthy, low stress environments."[19]  This guidance was "based on the USDA organic

---

[18] USDA-AMS, *Memorandum to the National Organic Standards Board*, 4 *available at*
https://www.ams.usda.gov/sites/default/files/media/recommendationsga.pdf.

[19] U.S. Department of Agriculture, *Guidelines for Organic Certification of Poultry, available at*
https://www.ams.usda.gov/sites/default/files/media/Poultry%20-%20Guidelines.pdf.

regulations" and in compliance with the standards described as required for organic

certification. *Id.*

121.    USDA's *Guidelines for Organic Certification of Dairy Livestock* contains identical

language as appears in the poultry guidance cited above.[20]

**B. The Proposed Organic Livestock and Poultry Practices Rule.**

122.    On April 16, 2016, the Secretary published the *Organic Livestock and Poultry Practices*

*Rule* ("the Proposed Organic Livestock Rule" or "Proposed OLPP") in an extremely detailed

54-page publication.  81 Fed. Reg. at 21,956-22,009 (April 13, 2016).

123.     "AMS is proposing this rulemaking to maintain consumer confidence in the high

standards represented by the USDA organic seal." 81 Fed. Reg. at 21,980.

124.    The Secretary said, "[T]he provisions for outdoor access for poultry have a long history

of agency and NOSB actions and are a focal issue [here]."  81 Fed. Reg. at 21,957.

125.    The Secretary said, "AMS has determined that the current USDA organic regulations (7

CFR part 205) covering livestock health care practices and living conditions need additional

specificity and clarity to better ensure consistent compliance by certified organic operations

and to provide for more effective administration of the National Organic Program (NOP) by

AMS. * * * By facilitating improved compliance and enforcement of the USDA organic

regulations, the proposed regulations would better satisfy consumer expectations that organic

livestock meet a uniform and verifiable animal welfare standard."  *Id.*

126.    The Secretary said, "Potentially affected entities include * * * Existing livestock farms

and slaughter facilities that are currently certified organic under the USDA organic

---

[20] U.S. Department of Agriculture, *Guidelines for Organic Certification of Dairy Livestock*,
*available at* https://www.ams.usda.gov/sites/default/files/media/Dairy%20-%20Guidelines.pdf.

regulations. Certifying agents accredited by USDA to certify organic livestock operations and organic livestock handling facilities." *Id.*

127.    The Secretary proposed regulatory language for all *mammalian livestock*: "The producer of an organic livestock operation must establish and maintain year-round livestock living conditions which accommodate the health and natural behavior of animals, including: (1) Year-round access for all animals to the outdoors, soil, shade, shelter, exercise areas, fresh air, clean water for drinking, and direct sunlight, suitable to the species, its stage of life, the climate, and the environment. . . "  81 Fed. Reg. at 22,006.

128.    The Secretary proposed regulatory language for all *poultry*: "An organic poultry operation must establish and maintain year-round poultry living conditions which accommodate the health and natural behavior of poultry, including: Year-round access to outdoors; shade; shelter; exercise areas; fresh air; direct sunlight; clean water for drinking; materials for dust bathing; adequate outdoor space to escape from predators and aggressive behaviors suitable to the species, its stage of life, the climate and environment."  81 Fed. Reg. at 22,007.

129.    The Secretary assessed consumer expectations: "We believe that organic consumers generally have high regard for animal welfare-friendly products." 81 Fed. Reg. at 21,988.

130.    The Secretary said: "We believe that the space and outdoor access requirements in this proposed rule would enable consumers to better differentiate the animal welfare attributes of organic eggs and maintain demand for these products." 81 Fed. Reg. at 21,988.

131.    The Secretary considered consumer expectations and the impact of extended implementation periods: "Conversely, a 10-year implementation period could erode consumer demand for organic eggs if the organic label requirements do not keep pace with

growing consumer preferences for more stringent outdoor living conditions. Prolonging the

disparity in organic egg production practices and the resulting consumer confusion would be

detrimental to the numerous organic egg producers who could readily comply with this

proposed rule." 81 Fed. Reg. at 21,986.

132.    The Secretary specifically concluded: "This proposed rule will maintain consumer trust

in the value and significance of the USDA organic seal, particularly on organic livestock

products. Clear and consistent standards for organic livestock practices, especially maximum

stocking density and outdoor access for poultry, are needed and broadly anticipated by most

livestock producers, consumers, trade groups, certifying agents, and OIG. This action

completes the process, as intended by OFPA and reiterated in the USDA organic regulations,

to build more detailed standards for organic livestock. By resolving the ambiguity about

outdoor access for poultry, this action furthers an objective of OFPA: Consumer assurance

that organically produced products meet a consistent standard." 81 Fed. Reg. at 21998.

**C. The Final Organic Livestock and Poultry Practices Rule.**

133.    On January 19, 2017, the USDA issued a 51-page final rule, entitled *Organic Livestock*

*and Poultry Practices*, which contained extremely detailed standards for production of

animals on organic farms"." 82 Fed. Reg. at 7042-92 (January 19, 2017) ("the final rule" or

"the Final OLPP" or the "Final Organic Livestock Rule").

134.    The Secretary said: "Based on recommendations from the Office of Inspector General

and the National Organic Standards Board, AMS determined that the current USDA organic

regulations covering livestock care and production practices and living conditions needed

additional specificity and clarity to better ensure consistent compliance by certified organic

operations and to provide for more effective administration of the National Organic Program

(NOP) by AMS." 82 Fed. Reg. at 7042.

135.    The Secretary said: "The provisions in this rule on outdoor access for organic poultry

have a significant history of AMS actions that are based on National Organic Standards

Board (the NOSB) recommendations. Outdoor access is a prominent issue in this final rule."

82 Fed. Reg. 7043.

136.    The Secretary said: "To assist with this rulemaking, the NOSB developed a series of

recommendations to further clarify organic livestock and poultry care and production

practices, transport, slaughter, and living conditions, including outdoor access for poultry.

The NOSB deliberations on these recommendations revealed that there is considerable

support for these recommendations within the organic community and consumers have

specific expectations for organic livestock care, which includes outdoor access for poultry."

*Id.*

137.    The Secretary said: "This rule would continue the process initiated with the Access to

Pasture rulemaking to establish clear and comprehensive requirements for all organic

livestock, consistent with recommendations provided by USDA's Office of Inspector General

and nine separate recommendations from the NOSB."  82 Fed. Reg. at 7044.

138.    With regard to the specific nature of the recommendation from the Inspector General the

Secretary said:

> AMS issued an administrative appeal decision in 2002 that allowed the
> certification of one operation that used porches as outdoor access to protect
> water quality. This decision served to address a fact-specific enforcement
> issue. Some certifying agents used this appeal decision to grant certification to
> poultry operations using porches to provide outdoor access. Thereafter,
> certification and enforcement actions have remained inconsistent and
> contributed to wide variability in living conditions for organic poultry, as well
> as consumer confusion about the significance of the organic label with regard

to outdoor access. In accordance with OFPA, this action will clarify USDA statutory and regulatory mandates and establish consistent, transparent, and enforceable requirements. Further, it will align regulatory language and intent to enable producers and consumers to readily discern the required practices for organic poultry production and to differentiate the products in the marketplace"

OLPP RIA at p. 12

139.    "This variability perpetuates an uneven playing field among producers and sows consumer confusion about the meaning of the USDA organic label." 82 Fed. Reg. at 7082

140.    The Secretary dropped specific space requirements for turkeys from the final rule specifically noting the "absence of an NOSB recommendation." 82 Fed. Reg. at 7066.

141.    The Secretary recognized the OFPA mandated notice and comment rulemaking for livestock standards and said, "Section 6509(g) directs the Secretary to develop detailed regulations through notice and comment rulemaking to implement livestock production standards. * * * [T]he statute contemplated that the assurance of organic integrity for livestock products would require more specific guidelines and provided the authority for that future regulatory activity." *Id.*

142.    "The provision on indoor and outdoor space requirements in this rule are based on nine separate NOSB recommendations submitted to the Secretary. In developing these recommendations at their public meetings, the NOSB considered technical information and public comments, including comments from organic livestock producers, animal welfare experts and the scientific community." 82 Fed. Reg. at 7075.

143.    The work of the NOSB was thoroughly integrated into the Final OLPP: "The NOSB deliberated and made the recommendations described in this proposal at public meetings announced [in the Federal Register] on April 19, 2002; September 9, 2009; September 20, 2010; and October 7, 2011."  82 Fed. Reg. at 7045.

144.   From 2002 through 2011, the NOSB produced six unanimously-supported

recommendations in 2011 that eventually ended up in the OLPP. 81 Fed. Reg. at 21,981

("The proposed provisions were developed by the NOSB in consideration of other animal

welfare certification programs, industry standards, input from organic producers, and input

from public comment."). 82 Fed. Reg. at 7045.

145.   At a public meeting in April 2017, the NOSB unanimously recognized that the 2011

NOSB recommendation upon which the Final OLPP was based "was the product of a decade

of public NOSB meetings, lengthy discussions, public comment periods and consultation

from organic producers, processors, consumers, and the veterinary and scientific

community." *See* National Organic Standards Board, April 20, 2017 Meeting Transcript at p.

185: line 4—p. 191:  line 11

146.   In addition, the NOSB stated: "consumers' trust in the organic label and industry growth

depends on the strength and consistent application of organic regulations."  *Id.* at p. 185:

lines 4-8.

147.   "AMS believes that aligning with other third-party animal welfare standards . . . is the

most sensible approach. * * * [T]his approach avoids creating separate requirements for

producers which could be confusing and burdensome." 82 Fed. Reg. at 7048 (citing standards

from third party welfare programs, Certified Humane and the Global Animal Partnership).

148.   "AMS received comments that current organic regulations require access to the outdoors

and that these new rules are not necessary for AMS to require outside access or for AMS to

prohibit porches as outside access. The comments cited existing regulations at §

205.239(a)(1), which include a requirement that producers establish and maintain "year-

round access for all animals to the outdoors . . . Continuous total confinement of any animal

indoors is prohibited. (Response) AMS acknowledges that current organic regulations require

outdoor access for poultry, but we disagree with the argument that current regulations could

achieve the same results as the regulations revised by this final rule. As recommended by the

NOSB, AMS is implementing this final rule to establish specific regulations for the care of

livestock, as authorized under OFPA." 7 U.S.C. 6509(d)(2); 83 Fed. Reg. at 7074.

149.    The record demonstrates a deep collaboration between the NOP and the NOSB and

repeated and ongoing efforts to gather the necessary information and make the best decisions.

**D. The Final Regulatory Impact Statement.**[21]

150.    In the Executive Summary of the final RIA USDA said:

> This rule will have broad, important benefits for the organic sector as a
> whole which are difficult to quantify. Clear and consistent standards,
> which more closely align to consumer expectations, are essential to
> sustaining demand and supporting the growth of the $43 billion U.S.
> organic market. Clear parameters for production practices will ensure fair
> competition among producers by facilitating equitable certification and
> enforcement decisions.

> 83 Fed. Reg. 7083

151.    The "qualitative benefits" of the Final OLPP were listed: "Protects the value of the

USDA organic seal to consumers; Facilitates level enforcement of organic livestock and

poultry standards; Alleviates the need to maintain additional third-party animal welfare

certification and the associated costs and resources."  Final RIA at 9.

152.    "Larger organic egg operations will likely bear higher costs because they face greater

constraints in providing adequate outdoor areas that comply with the new minimum space

requirements for birds outdoors." Final RIA at 11.

---

[21] Hereinafter " Final RIA." The Final Regulatory Impact Statement is summarized in the Final
OLPP.  *See* 83 Fed. Reg. 7082-84.  The full RIA is a 154-page document and is available at
https://www.ams.usda.gov/rules-regulations/organic-livestock-and-poultry-practices-historical

153.    "Administrative costs: The total in this table do not include the estimate costs associated

with reporting and recordkeeping requirements as described in the Paperwork Reduction Act.

AMS estimates that the undiscounted value of these costs will be $3.9 million annually."

Final RIA at 11.

154.    "AMS issued an administrative appeal decision in 2002 that allowed the certification of

one operation that used porches as outdoor access to protect water quality. This decision

served to address a fact-specific enforcement issue. Some certifying agents used this appeal

decision to grant certification to poultry operations using porches to provide outdoor access.

Thereafter, certification and enforcement actions have remained inconsistent and contributed

to wide variability in living conditions for organic poultry, as well as consumer confusion

about the significance of the organic label with regard to outdoor access. In accordance with

OFPA, this action will clarify USDA statutory and regulatory mandates and establish

consistent, transparent, and enforceable requirements. Further, it will align regulatory

language and intent to enable producers and consumers to readily discern the required

practices for organic poultry production and to differentiate the products in the

marketplace." Final RIA at 12.

155.    "This variability leads to consumer confusion about the meaning of the USDA organic

label and perpetuates an uneven playing field among producers. This rule enables AMS and

certifying agents to efficiently administer the NOP. In turn, the consistency and transparency

in certification requirements will facilitate consumer purchasing decisions." Final RIA at 12.

156.    "AMS believes that in the context of organic livestock and poultry production,

particularly egg production, variations in practices result in consumers receiving inadequate

and inconsistent information about livestock products. * * * Currently, the absence of clear

standards and inconsistent practices across organic livestock and poultry producers are critical barriers to informing consumers and effectively marketing organic products.  * * * Clear standards and consistent production practices are necessary to clearly and accurately illustrate to consumers the meaning of the organic seal on these products, and to differentiate organic products from other products in the market."  Final RIA at 15.

157.    "This rule adds requirements for the production, transport, and slaughter of organic livestock and poultry. The provisions for outdoor access and space for organic poultry production are the focal areas of this rule. Currently, organic poultry are required to have outdoor access, but this varies widely in practice. Some organic poultry operations provide large, open-air outdoor areas, while other operations provide minimal outdoor space or use screened and covered enclosures commonly called ''porches'' to meet outdoor access requirements. This variability perpetuates an uneven playing field among producers and sows consumer confusion about the meaning of the USDA organic label. This final rule will resolve the current ambiguity about outdoor access for poultry and address the wide disparities in production practices among the organic poultry sector. Greater clarity about the significance of the USDA organic seal in the marketplace will help to maintain consumer confidence in the organic label, which drives the $43 billion in sales of organic products, and support a fair, viable market for producers who chose to pursue organic certification."  Final RIA at 2-3.

158.    "This final rule (1) establishes clear standards that will create the foundation necessary to present clear and consistent information to consumers about animal living conditions to distinguish organic products from competing labeling terms in the market, (2) alleviates the need for multiple certifications, which is assumed to result in the elimination of duplicative

paperwork, on-site inspections, and additional costs of third party certifications." Final RIA at 15.

159.    "This disparity in outdoor access has economic implications for producers and jeopardizes consumer confidence in the organic label." Final RIA at 139.

**E. The Three Delay Rules, the New Proposed Livestock Rule, and the Proposed Additional Rulemaking.**

**1. The First Unlawful Administrative Stay--60 Days.**

160.    The Final OLPP was originally set to take effect on March 20, 2017.  On February 9, 2017, the effective date was delayed to May 19, 2017.  82 Fed. Reg. at 9967 (February 9, 2017) ("First Delay Rule").

161.    President Trump was inaugurated at noon on Friday, January 20, 2017. Later that day, White House Chief of Staff Reince Priebus issued a "Memorandum for the Heads of Executive Departments and Agencies" ("*Priebus Memorandum*"). The Priebus Memorandum was published in the Federal Register on Tuesday, January 24, 2017. 82 Fed. Reg. 8346 (Jan. 24, 2017).

162.    Among other things, the *Priebus Memorandum* purports to direct agencies that have promulgated "regulations that have been published in the [Federal Register] but have not taken effect" to "temporarily postpone their effective date for 60 days from the date of the memorandum." *Id.*

163.    The *Priebus Memorandum* plainly stated agencies were directed to postpone any published but not yet effective rule only "as permitted by law." *Priebus Memorandum,* at ¶ 3 (emphasis added).)

164.    The USDA claimed the First Delay Rule was undertaken to comply with the *Priebus*

Memorandum.  82 Fed. Reg. at 9967.  The *Priebus Memorandum* is not an independent legal

source of agency authority for delay of any provision of a duly published and finalized rule.

165.    The First Delay Rule was not exempt from notice and comment requirements under the

D.C. Circuit Court precedent and the APA.  It was a final rule that amended an existing,

important and duly promulgated regulation.

166.    USDA also claimed the First Delay Rule was exempt from notice and comment under the

APA because it was "impracticable, unnecessary, or contrary to the public interest pursuant

to 5 U.S.C. 553(b)(B)."  82 Fed. Reg. at 9967.  No factual explanation was given.  Because

the final rule's effective date was delayed, there was no reason that notice and comment

could not be received, and as further delay was imposed until May 2018, the unexplained

impracticability of receiving comments in February 2017 appears incorrect.

167.    On April 28, 2017, three hundred and thirty-four certified organic livestock and poultry

producers with estimated revenue of $1.95 billion dollars sent a letter to the Secretary

requesting immediate implementation of the OLPP.  The producers said, "As organic

farmers, our very survival is dependent upon the trust that we have built with the American

consumer. We are proud to be delivering a product that meets the highest standards possible

and is in line with consumer expectations of what the USDA organic label means. The

decision to become certified organic is voluntary, if consumers lose confidence in the organic

seal it will have catastrophic impacts throughout the industry."  *Available at*

https://www.regulations.gov/document?D=AMS-NOP-17-0031-0006.

168.    The NOSB conducted its semi-annual public meeting on April 19-21, 2017.  81 Fed.

Reg. at 85,205 (Nov. 25, 2016) (meeting notice).  During the meeting, the NOSB voted

unanimously to recommend that the final rule not be delayed any longer and be released and become effective at the conclusion of the 60-day delay period established in the Secretary's First Delay Rule. USDA, *National Organic Standards Board Public Hearing Transcript*, *available at*:

https://www.ams.usda.gov/sites/default/files/media/TranscriptsNOSBApril2017.pdf).

169.    The USDA ignored this request.

**2. The Second Unlawful Administrative Stay--180 Days.**

170.    On May 10, 2017, USDA issued another stay of the effective date, this time to November 14, 2017. 82 Fed. Reg. at 21,677 (May 10, 2017) (the Second Delay Rule).

171.    The Second Delay Rule, entitled "Final rule; delay of effective date," was published without prior notice or an opportunity for public comment, or any meaningful consultation with the NOSB, and delayed the effective date of the Organic Livestock Final Rule by an additional 180 days. 82 Fed. Reg. at 21,677.

172.    USDA claimed, "Because there are significant policy and legal issues addressed within the final rule that warrant further review by USDA, AMS is delaying the effective date of this rule by 180 days. . . ." 82 Fed. Reg. at 21677.

173.    USDA again claimed "good cause" existed for waiving notice and comment, and further claimed the 180-day stay was exempt from notice and comment under the APA because it was "impracticable, unnecessary, or contrary to the public interest pursuant to 5 U.S.C. 553(b)(B)." *Id.* Because the final rule's effective date was delayed, there was no reason that notice and comment could not be received, and as further delay was imposed until May 2018, the unexplained impracticability of receiving comments in February 2017 appears incorrect. 82 Fed. Reg. at 9967.

43

174.   The Second Delay Rule was not exempt from notice and comment requirements under

the APA or for any of the reasons cited by USDA.  It was a final rule that unlawfully

amended an existing, important and duly promulgated regulation without notice and

comment.

**3. The Proposed Third Delay Rule.**

175.   USDA published a proposed rule presenting four procedural options, three of which

resulted in further delay:

      a.   Let the Organic Livestock Rule become effective on November 14, 2017;
      b.   Suspend the Organic Livestock Rule indefinitely;
      c.   Further delay the effective date of the Organic Livestock Rule; or
      d.   Withdraw the Organic Livestock Rule.

82  Fed. Reg.  21,742 (May 10, 2017) ("Proposed Third Delay Rule").

176.   The Proposed Third Delay Rule posited no substantive inquiry; identified no deficiency

in the existing administrative record made over approximately ten years; identified no

outstanding issue of law, fact or policy; and did not mention the NOSB's role or its view on

the proposed rule.  *Id.*  Although the final rule said, "[T]here are significant policy and legal

issues addressed within the FR that warrant further review by USDA. . ."  there was no

description of the issues and no request for comment thereon.  *Id.* The sole legal authority

cited was the *Priebus Memorandum.*

177.   A single sentence purportedly guided commenters: "USDA is asking the public to

comment on the possible actions USDA should take in regards to the disposition of the FR."

82 Fed. Reg. at 21,742.

**4. The Third Administrative Stay--180 Days.**

178.   On November 14, 2017, USDA issued its third stay of the effective date, this time to May

14, 2018, a date more than 14 months after the original effective date of the final rule.  The

44

stay was styled "Final rule; delay of effective date." ("Third Delay Rule") 82 Fed. Reg.
52,643.

179.    The Third Delay Rule was published without any consultation with the NOSB in

contravention of the requirements set forth in the OFPA.

180.    The comments received in the 30-day comment period regarding the Third Delay New

Proposed Rule reportedly exceeded 47,000. 82 Fed. Reg. 52,643.  AMS acknowledged that

"more than 34,600" comments supported immediate implementation of the Organic

Livestock Rule.  *Id*. at 52643.  Upon information and belief, the full administrative record

will disclose closer to 45,000 comments supported Option 1.

181.    In any event, a single comment supported USDA's selection of Option 3, "…only one

chose 'Option 3: Delay.'" 82 Fed. Reg. 52643. Citation to a single comment out of more than

47,000 comments is insufficient to constitute a rational or non-arbitrary basis for extending,

for a third time, the effective date of a duly published and properly promulgated final rule.

182.    USDA concluded two rationales existed for further delay. First, it contended delay was

necessary "so that important questions regarding USDA's statutory authority to promulgate

the OLPP rule and the likely costs and benefits of that rule, can be more fully assessed

through the notice and comment process prior to AMS making a final decision on whether

the OLPP final rule should take effect,"  82 Fed. Reg. 52,643. And second, "AMS believes

that OFPA's reference to additional regulatory standards "for the care" of organically

produced livestock is limited to health care practices similar to those specified by Congress

in the statute rather than as reflecting a stand-alone concern for animal welfare."  82 Fed.

Reg. at 52,643.

183.    USDA then explained the first rationale: "In the course of reviewing the record for the

Organic Livestock Rule final rule, AMS discovered a significant, material error in the

mathematical calculations of the benefits estimates."  Based on this, USDA concluded: "It is

not appropriate for AMS to allow a final rule to become effective based on a record

containing such a material error." 82 Fed. Reg. 52,643-44.

184.    The Proposed Third Delay rule did not mention a need to reconsider the record made in

the OLPP rulemaking.  The notice failed to fairly disclose that USDA intended a

reconsideration of the OLPP and certainly did not ask the commenters to focus on the pre-

existing record or whether that record disclosed (1) a lack of statutory authority or (2)

technical errors in calculating the cost-benefit analysis.  Most importantly, USDA failed to

provide the technical reports and documents it ultimately relied upon to conclude the costs

exceeded the benefits. Thus, it obscured the source of, and precluded substantive comment

upon, the ground for delay upon which it ultimately relied.

185.    In a subsequent, related rulemaking, in December 2017, USDA disclosed the technical

reports that should have been disclosed in the May 2017 Notice.  *See* "Supporting

Documents Folder" (OLPP-PRIA) and "Benefit+Cost Workbook for OLP Notice" *available*

*at* https://www.regulations.gov/docket?D=AMS-NOP-15-0012.

186.    Similarly, the substance of the agency's concerns, *e.g*., whether statutory authority

existed for a final rule that had been published approximately six months prior to the

issuance of the Notice in this rulemaking, was unspoken.  Commenters could have

reasonably presumed the agency thought there was sufficient statutory authority since it had

just concluded it had sufficient authority in January 2017. No specific references to the

OFPA appeared in the notice of proposed rulemaking. Thus, there was no reason for any

commenters to surmise that this had changed in July 2017.

187.    The Third Delay Rule failed to comply with the APA's notice and comment

requirements. Although USDA listed possible procedural outcomes in its Notice, it did not

meaningfully disclose the scope and intent of its reconsideration of the existing OLPP record

and it was thus impossible to formulate targeted and meaningful responsive submissions. In

actual fact, the questions the USDA claimed to be resolving were not only presented in the

OLPP, but were resolved.  *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017)

(vacating administrative stay; noting reconsideration was unlawful because "all of the

issues Administrator Pruitt identified could have been, *and actually were*, raised (and

extensively deliberated) during the comment period.")) (emphasis in original).

188.    The Third Delay Rule fits a pattern of serial, fixed-period delays that were designed to

evade judicial review due to their short duration and subsequent expiration and replacement

by a new delay final rule.  Each of the three delay rules is a final rule, and is subject to

review by this court under the exception to mootness for agency action that is capable of

repetition but evading review. *Grant v. Vilsack*, 892 F. Supp. 2d 252, 257 (D.D.C. 2012) ("a

claim for declaratory relief will not be moot if the specific claim fits the exception for cases

that are capable of repetition, yet evading review."); *Del Monte Fresh Produce Co. v. United

States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (internal quotation marks omitted).

**F. USDA's Withdrawal of the Final OLPP Violates the APA and the OFPA.**

189.    On December 8, 2017, OTA filed its First Amended Complaint, challenging each of the

three delay rules *inter alia* as inexplicable and irrational policy changes from the policy

expressed in the final OLPP, and alleging an unlawful practice of using serial delay orders

that expire and are renewed to evade review by this court, along with a pattern of refusing to

consult the NOSB prior to undertaking rulemakings that altered existing organic policy. *See*

Dkt. No. 13.

190.    Days later, on December 18, 2017, USDA published "*National Organic Program (NOP);*

*Organic Livestock Production Practices—Withdrawal*" proposing to withdraw the OLPP and

limiting the comment period to 30 days.[22]   82 Fed. Reg. 59,988-992 (Dec. 18, 2018) (the

"Proposed Withdrawal").  There was no consultation with the NOSB prior to publishing the

proposed withdrawal.  *See e.g. Dkt. No. 16, Exhibit 3: Declaration of NOSB Chair Tom*

*Chapman* at ¶¶'s 15, 18, 20, 22, 26;

191.    USDA asserted two principal grounds for withdrawal. First, USDA said:

> [I]t now believes OFPA does not authorize the animal welfare provisions of the [OLPP]
> final rule. Rather, the agency's current reading of the statute, given the relevant language
> and context, suggests OFPA's reference to additional regulatory standards 'for the care'
> of organically produced livestock should be limited to health care practices similar to
> those specified by Congress in the statute, rather than expanded to encompass stand-alone
> animal welfare concerns.

> 82 Fed. Reg. at 59,988.

192.    The second rationale advanced was based on re-examining the Final Regulatory Impact

Statement in support of the Final OLPP:

> In reviewing the OLPP final rule, AMS found that the calculation of benefits contained
> mathematical errors in calculating the discount rates of 7% and 3%. AMS also the
> estimated benefits over time were handled differently than were the estimated costs over
> time. In addition, the range used for estimating the benefit interval could be replaced with
> more suitable estimates.

> 82 Fed. Reg. at 59,990.

---

[22] USDA received over 72,000 comments, the vast majority of which supported the OLPP. 83
Fed. Reg. at 10775 ("AMS received approximately 72,000 comments . . . over 63,000, opposed
the withdrawal * * * Approximately fifty comments supported withdrawal. . ." ); *see also*
https://www.regulations.gov/document?D=AMS-NOP-15-0012-6686 (recording more than
seventy-two thousand comments) (last visited March 21, 2018)

193.    In sum, "AMS finds little, if any, economic justification for the OLPP final rule.  The

RIA for the OLPP final rule did not identify a significant market failure to justify the need

for rule." 82 Fed. Reg. at 59,991.

194.    USDA did not present its revised cost-benefit calculations in the Federal Register notice

but instead placed its proposed Regulatory Impact Analysis ("PRIA") online. 82 Fed. Reg. at

59,991 ("Copies of the full analysis are available on the Regulations.gov website."); *Id.*

("The PRIA also provides additional information regarding the estimated benefits and

explains why they likely were overstated in the OLPP final rule RIA.").  *Id.*

195.    On December 22, 2017 OTA submitted a written request that USDA enlarge the time for

comment from 30 to 90 days, due in part to the complexity of the cost-benefit analysis issue

raised and the reduced staffing and trade association membership coordination associated

with the winter holidays.[23] On Jan. 10, 2018, USDA rejected the requested enlargement by

letter ruling.  *See Exhibit 1*

196.    Plaintiffs AWI and ASPCA also requested enlargements of time, and were also denied.

*See Exhibits 2 and 3*  (attached hereto)

197.    On Jan. 18, 2018 OTA submitted its comment to USDA on "*National Organic Program

(NOP); Organic Livestock Production Practices—Withdrawal*" and again asked for

enlargement of time to prepare comments. *See Exhibit 4*; *see also Exhibit 5*

**G. Withdrawal and the Final Regulatory Impact Analysis ("RIA").**

---

[23] *See, e.g.*, 83 Fed. Reg. at 10,775 (March 13, 2018) ("Commenters also requested an extension of the public comment period, from 30 to 90 days, specifically noting they needed more time to study the revisions discussed in the Preliminary Regulatory Impact Analysis (PRIA) and develop meaningful comments.")

198.    On March 13, 2018 USDA published "*Final Rule; Withdrawal*" *See* 83 Fed. Reg. 10,775-

783 (March 13, 2018) ("Withdrawal").  Despite over 63,000 comments to the contrary (and

only 50 in support of withdrawal), USDA made the following key conclusions:

   a.   "AMS is withdrawing the OLPP final rule because it now believes OFPA does not

authorize the animal welfare provisions of the OLPP final rule." 83 Fed. Reg. at

10,776; *accord* at 10,781 ("AMS maintains that the OLPP final rule exceeds AMS'

scope of authority...");

   b.   "Further, AMS maintains that the costs of the OLPP final rule outweigh potential

benefits.  After publication of the OLPP final rule, AMS discovered a mathematical

error in the calculation of benefits." 83 Fed. Reg. at 10,779; and

   c.   "OFPA does not require AMS to consult with the NOSB prior to undertaking a

rulemaking to withdraw the OLPP final rule." 83 Fed. Reg. 10,778 at n. 6.

199.    USDA agreed with comments that the "OFPA requires USDA to consult with the NOSB

on certain matters and to receive recommendations from it," 83 Fed. Reg. 10778, but

concluded such duty was limited to "developing the organic certification program (section

6503(c)), exemption for certain processed food (section 6505(c)), and certification and

labeling of wild seafood (section 6506(c))" *Id.* at fn 6.

200.    USDA completely ignored 7 U.S.C. §§ 6509(d)(2) and (g) in its discussion of the role of

the NOSB in the Withdrawal Rule.  Section 6509(d)(2) provides the NOSB, "shall

recommend to the Secretary standards in addition to those appearing in paragraph (1) for the

care of livestock to ensure such livestock are organically produced."

201.    The conclusions expressed in the Withdrawal Rule directly conflict with those appearing

in the OLPP just a year ago.

202.    To assist with this rulemaking, the NOSB developed a series of recommendations to

further clarify organic livestock and poultry care and production practices, transport,

slaughter, and living conditions, including outdoor access for poultry."  83 Fed. Reg. at 7043.

203.    Section 6509(d)(2) authorizes the NOSB to recommend standards in addition to the

OFPA provisions for livestock health care to ensure that livestock is organically produced.

Further, "Section 6509(g) directs the Secretary to develop detailed regulations through notice

and comment rulemaking to implement livestock production standards. * * * [T]he statute

contemplated that the assurance of organic integrity for livestock products would require

more specific guidelines and provided the authority for that future regulatory activity.  82

Fed. Reg. 7044

204.    Instead, the Withdrawal Rule concluded "nothing in OFPA requires AMS to consult the

NOSB at every phase of the rule making process or makes the NOSB's recommendations

binding on the Secretary, nor could it."  83 Fed. Reg. 10778

205.    Plaintiffs have not suggested that "every phase" of rulemaking is subject to NOSB

consultation.  Instead Plaintiffs simply point out that the USDA has never enacted or

amended an existing organic livestock regulation without first consulting with, and obtaining

a recommendation from the NOSB.  To the extent USDA believes that consultation on the

amendments to the OLPP after it was published are somehow not substantive, or are merely

work on an unimportant "phase" of rulemaking, the view is inconsistent with the controlling

law in the D.C. Circuit.  *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) ("order

delaying the rule's effective date ... [is] tantamount to amending or revoking a rule."); *Id.* at 9

(agency is "bound by the rule until that rule is amended or revoked.")

206.     The Withdrawal Rule claimed that 7 U.S.C. §§ 6509(d)(2) and (g) authorize USDA only

to issue livestock regulations that that are "similar to those specified" in Section 6509(d) and

that are necessary to meet the congressional objectives outlined in 7 U.S.C. 6501. 83 Fed.

Reg. at 10,776.  USDA then reduced organic livestock production to the "aspects of animal

care that are similar to the examples provided in the statute and relate to ingestion or

administration of non-organic substances." *Id.* at 10,776; *id.* at 10,778. ("[T]he authority for

care of organic livestock is to ensure that organic livestock is raised with minimal

administration of chemical and synthetic substances.").

207.     This construction language of Section 6509 ignores other OFPA sections, which are not

so limited (discussed below), the legislative history of the OFPA and USDA's own decades-

old interpretation of its authority and its current regulations.  The Congressional mandate in

Section 6509(d)(2) and (g) to create additional standards "for the care" of livestock is not

limited to substances, by its plain language or by its placement within the statute.

208.     The foregoing construction ignores that the reference to "organically produced" in

Section 6509(d)(2) is not limiting, but rather part of the whole clause commanding NOSB to

recommend additional standards for livestock to ensure that animal products labeled organic

were in fact raised organically. 7 U.S.C. § 6509(d)(2); Senate Report 101-357 at 292 (July 6,

1990); H.R. Rep. 101-916, at 1777-78 (1989).  It also ignores that the existing definition of

"organic production" is not limited to restrictions on synthetic substances. 7 C.F.R. § 205.2

(defining "organic production" as "a production system that is managed in accordance with

the Act and regulations in this part to respond to site-specific conditions by integrating

cultural, biological, and mechanical practices that foster cycling of resources, promote

ecological balance, and conserve biodiversity.").

209.   Plaintiffs ASPCA and AWI each offered constructions of Section 6509 that harmonized

with the USDA's historical construction of its authority to enact organic standards for the

care and welfare of farm animals and the scientific evidence of the link between animal

welfare and animal healthcare.  *See Exhibit 5 ("Comment of ASPCA and AWI")* at p. 13-17.

210.   USDA rejected alternative constructions of Section 6509, claiming those constructions of

"care" were "largely divorced from the surrounding context of the OFPA," 83 Fed. Reg.

10,777. It also rejected comments that argued that "animal health and welfare are

'inextricably linked.'" *Id.*

211.   USDA's conclusions ignored the record of scientific consensus regarding the

interdependence of animal healthcare and animal welfare set forth in the *Comment of ASPCA*

*and AWI*, specifically:

212.   "USDA cannot reasonably distinguish between animal health care practices and animal

welfare practices because according to scientific research, international standards, and

USDA's own research and materials, the concepts are intertwined."  *See Comment of ASPCA*

*and AWI at 2.*

213.   Definition of animal welfare from the American Veterinary Medical Association--

"Animal welfare means how an animal is coping with the conditions in which it lives. An

animal is in a good state of welfare if (as indicated by scientific evidence) it is healthy,

comfortable, well nourished, safe, able to express innate behavior, and if it is not suffering

from unpleasant states such as pain, fear, and distress. Good animal welfare requires disease

prevention and veterinary treatment, appropriate shelter, management, nutrition, humane

handling and humane slaughter. Animal welfare refers to the state of the animal; the treatment that an animal receives is covered by other terms such as animal care, animal husbandry, and humane treatment. Protecting an animal's welfare means providing for its physical and mental needs."[24] *Comment of ASPCA and AWI at 2.*

214.    According to the OIE[25], animal welfare standards should be science-based and "should always seek to maintain health as a basis of welfare."[26]  In its *Guiding Principles for Animal Welfare*, the OIE asserts that there is "a critical relationship between animal health and animal welfare."[27]  The *Principles* also note that "improvements in farm animal welfare can often improve productivity and food safety, and hence lead to economic benefits."[28] *Comment of ASPCA and AWI at 3.*

215.    "[Authors] identify reduced resistance to disease as a consequence of poor welfare. They note: "This has been known for a long time in the medical and veterinary professions and is part of the more general process whereby poor welfare, whatever its cause, can lead to increased susceptibility to disease."[29] *Comment of ASPCA and AWI at 4-5.*

---

[24] AVMA, *Animal Welfare: What Is It? available at* https://www.avma.org/KB/Resources/Reference/AnimalWelfare/Pages/what-is-animal-welfare.aspx.
[25] World Organization for Animal Health (commonly referred to as "OIE"—Office of International des Epizooties). With 181 member countries, including the United States,
[26] World Organization for Animal Health, *Animal Welfare at a Glance. Available at* http://www.oie.int/en/animal-welfare/animal-welfare-at-a-glance/.
[27] World Organization for Animal Health, *Terrestrial Animal Health Code*, Introduction to the Recommendations for Animal Welfare, Chapter 7.1.1, (2017).
[28] *Id.*
[29] Fraser, A.F. & Broom, D.M. (1997) *Farm Animal Behaviour and Welfare (3rd ed.),* New York, NY: CAB International, p. 295.

216.    With regard to Congressional intent and the plain meaning of Section 6509, USDA's

statutory construction assumptions run contrary to evidence before the agency, the OFPA's

legislative history, and USDA's own prior statements on the interdependence of animal

"health" and "welfare."  USDA has not shown, nor can it show, that Congress believed the

two were distinct and that the OFPA authorizes only those standards pertaining to the use of

synthetic substances with regard to animals' physical/medical condition.  Additionally, the

standards authorized by Congress in subsection (d)(2) are even broader than "health care"

standards. Subsection (d)(2) contemplates standards "for the *care* of livestock to ensure that

such livestock is organically produced." 7 U.S.C. § 6509(d)(2) (emphasis added). *See*

*Comment of ASPCA and AWI* at 13-17.

217.    Nothing in the OFPA or common definitions commands "health" or "care" refer to a

limitation to just substances or drugs to treat illness.  Moreover, the phrase "*raised* in

accordance with this chapter" (7 U.S.C. § 6509(a)) belie constructions relating only medical

care standards. Nor is Section 6509(g) limited to substances or medical regulations, but

rather provides that USDA "shall" develop detailed regulation to implement any "standards

for livestock products" in Section 6509. *Id.* § 6509(g). *See Comment of ASPCA and AWI* at

13-17.

218.    Despite asking for comment on whether the OFPA authorized the OLPP, USDA

irrationally rejected references to additional sections of the OFPA that plainly authorized the

OLPP.  *Compare* 82 Fed. Reg. at 59,988 ("OFPA does not authorize the animal welfare

provisions of the OLPP final rule."); 83 Fed. Reg. at 10776 ("OFPA does not authorize the

animal welfare provisions of the OLPP final rule."); *accord* at 10,781 ("AMS maintains that

the OLPP final rule exceeds AMS' scope of authority...")

219.    In its Proposed Withdrawal, USDA claimed the narrow reading it gave Section 6509

could be understood by comparison to 7 U.S.C. § 2151, which provides: "The Secretary is

authorized to promulgate such rules, regulations, and orders as he may deem necessary in

order to effectuate the purposes of this chapter," because "[U]SDA also believes Congress

knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it

wishes to enlarge, USDA's discretion." 82 Fed. Reg. at 59989 n. 3; *see also* 83 Fed. Reg.

10,777 at n. 6.

220.    As OTA pointed out in its comment, the characterization of the OFPA as having a single

authorizing section for regulations that might touch upon livestock production practices is

manifestly incorrect.  *See Exhibit 4,* at pp. 7-9  OFPA grants the very authority that USDA

claimed was missing: "A program established under this chapter shall—require such other

terms and conditions as may be determined by the Secretary to be necessary." 7 U.S.C. §

6506(a)(11).

221.    USDA largely ignored this comment and focused *solely* on Section 6509.   83 Fed. Reg.

10,776.  (USDA concluded Section 6509 "was used as justification for the OLPP final rule.")

USDA attempted to bolster this misplaced focus on a single section of the OFPA by claiming

it is "entitled to deference when it interprets the scope of its authority narrowly." *Id*. at

10,777; *see also id.* at 10,776 ("USDA believes its construction is entitled to deference…").

Whether USDA's construction of Section 6509 is entitled to deference is largely immaterial

in light of the express rulemaking query: Whether the OFPA as a whole, with each Section

read in *pari materia,* authorized the OLPP, not whether its authorization could be exclusively

located in Section 6509.

222.    To avoid the plain language of Section 6506, USDA offered a single line of analysis that

Section 6506(a)(11) could not be relied upon because it authorizes the OLPP's provisions

"only if the Secretary determines that they are necessary, which the OLPP final rule is not."

83 Fed. Reg. 10,778.  This conclusion is not rooted in statutory construction principles, it is

an unsupported policy statement.

223.    Similarly, the OFPA provides: "If a production . . . practice is not prohibited or otherwise

restricted under this chapter, such practice shall be permitted unless it is determined that such

practice would be inconsistent with the applicable organic certification program."  7 U.S.C. §

6512.

224.    This section plainly and unambiguously authorizes the Secretary to determine that

poultry "porches" that do not have "outdoor access" are disallowed under the NOP, provided

solely that the Secretary determines, as was done in the OLPP, that such "porches" are not

consistent with the requirements of the NOP.   Standing alone this provision would authorize

the provisions of the OLPP that the Notice of Withdrawal principally concerns itself with.

225.    USDA expressly rejected a construction of the OFPA that comported with the historic

views of the agency and noted Withdrawal *of all of the organic livestock production rules*

may be compelled by its new statutory interpretation.  83 Fed. Reg. at 10,779 (questioning

"whether [§§ 205.238, 205.239, and 205.240] are in accordance with AMS's statutory

authority.").

**H. The Final Regulatory Impact Analysis**

226.    The Proposed Regulatory Impact Analysis ("PRIA") and Final Regulatory Impact

Analysis ("Withdrawal RIA") are identical.  83 Fed. Reg. at 10,781 ("This RIA on

withdrawal remains unchanged from the PRIA because AMS did not receive new

information via public comments on the December 18, 2017 proposed rule that would have altered the RIA.").

227.   It is unsurprising that USDA did not receive much detailed response to its economic analysis.  The calculations were not published in the Federal Register and thirty days was an insufficient amount of time to review, develop and prepare fully-considered comments. Several commenters requested additional time to prepare comments due to the complexity of the issues raised.  *See Exhibit 2* (AWI request for extension); *Exhibit 3* (ASPCA request for extension); Exhibit X (collected denial letters from USDA)

228.   USDA made several conclusions based on its Withdrawal RIA:

229.   "AMS did not identify a market failure in the OLPP final rule RIA and AMS has now concluded that regulation is unwarranted."  83 Fed. Reg. at 10,779;

230.   "The RIA for the OLPP final rule did not identify a significant market failure to justify the rule. * * * Variance in production practices and participation in private, third-party certification programs, however, do not constitute evidence of market failure." 83 Fed. Reg. at 10,782;

231.   "AMS considered the costs and benefits of the outdoor access and space requirements (i.e., stocking density) for organic poultry production, as these were focal areas in the OLPP Final Rule (82 FR 7082). Based on this review, the revised benefits of these provisions, and the uncertain and difficult to quantify benefits of the outdoor access and space requirements for organic poultry production, would not justify their quantifiable costs and paperwork burden." Withdrawal RIA at 7;

232.   "The range of $0.21-$0.49 reflects consumer willingness to pay for a dozen eggs produced by chickens raised in a cage-free environment, without induced molting, and with

outdoor access. The first two items are already required in the production of organic eggs. Only the latter requirement, outdoor access, was added by the OLPP final rule.") Rather than $0.21-$0.49 per dozen, the appropriate range is $0.16-$0.25 per dozen…" Withdrawal RIA, at 10;

233.   "The cost/benefit analysis underlying the OLPP rule largely did not consider the costs and benefits of the remainder of the rule's requirements (i.e., the mammalian health care, living conditions, transport, and slaughter provisions." Withdrawal RIA at 9.

234.   Several errors undermine or rebut the conclusions advanced in the Withdrawal RIA. First, USDA reduced the "benefits range" based on its mistaken belief that two of the three factors that influence consumers' willingness to pay ("WTP") were already part of the organic program.  In fact, the outdoor access and forced molting provisions in the OLPP are not part of current organic requirements.  Thus, the benefit range reduction was unjustified. This fatally distorted the cost-benefit calculations upon which the Withdrawal relied.

235.   USDA also determined that "AMS has estimated that a sizeable portion of organic livestock producers already meet the requirements of the [Organic Livestock Rule]."). 83 Fed. Reg. at 10,780.  USDA did not account for these already-compliant operations when it determined the number of operations that would need to come into compliance. Thus, it erroneously assessed the costs to the industry of OLPP compliance, resulting in erroneous and inflated cost figures.

236.   The OLPP RIA listed three principal qualitative benefits of the OLPP: (1) it protects the value of the USDA organic seal to consumers; (2) it facilitates level enforcement of organic livestock and poultry standards; and (3) it alleviates the need to maintain additional third-party animal welfare certification and the associated costs and resources.  *See* OLPP Final

RIA at 9.  The OLPP also repeatedly cited qualitative programmatic benefits based on statutory factors regarding enforcement, USDA seal integrity, competition, and consumer assurances that are referenced throughout this pleading.

237.    USDA erroneously dismissed the qualitative benefits in the OLPP record and failed to assess their necessity, value or purpose in any way: "AMS finds that the qualitative benefits are speculative . . . . " 83 Fed. Reg. 10,779.

238.    The approach to qualitative benefits conflicts with EO 12866 at Section 1(a): "Costs and benefits should be understood to include. . . .qualitative measures of costs and benefits that are difficult to quantify, but nevertheless *essential to consider.*" (emphasis added).

239.    The approach also conflicts with OMB's *Economic Analysis of Federal Regulations Under Executive Order 12866* (Jan. 1996) ("*OMB Guidelines*").  The *OMB Guidelines* ask regulators to determine that: "[T]he potential benefits to society justify the potential costs, recognizing that not all benefits and costs can be described in monetary or even in quantitative terms, unless a statute *requires another regulatory approach*." *Id.* at 2. (emphasis added).  Marketing program statutes, like the OFPA, require special consideration because the statutory purposes belie a simple quantitative cost-benefit analysis and are voluntary programs that create gateways to marketplaces, the costs of which participants are free to accept or decline.

240.    With regard to consumer attitudes the Withdrawal RIA ignored the findings in the OLPP rulemaking record:

a.    The OLPP found the: "The NOSB deliberations on these recommendations revealed that there is considerable support for these recommendations within the organic community

and consumers have specific expectations for organic livestock care, which includes

outdoor access for poultry." 82 Fed. Reg. at 7043;

b.   The OLPP record contained findings that the pre-OLPP regulations "threaten[] consumer

confidence in the organic label and continue[] the economic disadvantage for farmers

using more stringent practices."  82 Fed. Reg. at 7066;

c.   The OLPP cited a Consumer Reports survey conducted in 2015 that concluded:

"[S]lightly more than two-thirds (68 percent) of participants think that the organic label

*should* mean that animals went outdoors."  OLPP RIA at 29. *See Exhibit 21 Consumer*

*Report Survey.*

241.   The OLPP concluded: "Consumer perceptions of organic claims are critical to

characterizing the benefits of this rule." OLPP RIA at 29.

242.   Although USDA has characterized the withdrawal rulemaking as a "reconsideration" of

the OLPP, it failed to consider the OLPP record in this proceeding except when it supported

the deterministic outcome produced by USDA here.  83 Fed. Reg. at 10,777 (noting authority

to "reconsider" prior rulemaking).  USDA also failed to examine the costs and benefits of

"the remainder of the rule's requirements (i.e., the mammalian health care, living conditions,

transport, and slaughter provisions."  Withdrawal RIA at 9.  As the Comment of the ASPCA,

AWI and the Humane Society of the United States demonstrates, there are significant

benefits to the other provisions of the OLPP final rule.  *See generally Exhibit 5,* at pp. 1-13.

243.   With regard to "enforcement," the Accredited Certifiers Association Comment noted that

USDA's revised reading of Section 6509 appeared "to place certifying agents in a conflicted

position under the statute" because correct application and enforcement of the existing

organic livestock regulations in light of the new construction of Section 6509 is at best

unclear and possibly impossible. *See Exhibit 7, Comment of Accredited Certifiers Association,* at  2.

244.    With regard to the benefit of improved animal welfare outcomes, USDA summarily concluded: "The assertion that the OLPP final rule would result in economic benefits from healthier animals is not supported by information or research linking outdoor access on pasture or vegetation to improved economic outcomes for producers."  83 Fed. Reg. 10,779.

245.    USDA erroneously focused its benefits analysis only on "outdoor access on pasture" whereas the OLPP addressed many other welfare factors.  The Withdrawal ignored and failed to respond to the substantive scientific references appearing in the Comment of the ASPCA, AWI and the Humane Society of the United States, which referenced both qualitative and quantitative support for concluding that improved animal welfare improves economic outcomes for livestock producers, including reduced use of synthetic medications, a key if not exclusive statutory goal of the OFPA according to the Withdrawal.  83 Fed. Reg. at 10,776; *see also Exhibit 5, Comment of ASPCA and AWI at pp. 1-12.*

246.    The OLPP RIA stated: "The final rule will resolve the current ambiguity about outdoor access for poultry and address the wide disparities in production practices among the organic poultry sector. Greater clarity about the significance of the USDA organic seal in the marketplace will help to maintain consumer confidence in the organic label, which drives the $43 billion in sales of organic products, and support a fair, viable market for producers who chose to pursue organic certification."  OLPP RIA at 3.

247.    Despite this, USDA has now concluded that continued growth in the total dollars of the organic sector is evidence that revisions to the livestock standards are not needed, *id.*, but it relied on stale data to reach this conclusion, *see e.g.*, *Exhibit 8, Declaration of Jack Lee,* and

did not provide sufficient time to commenters to prepare and submit more current economic

information.  *See e.g.*, *Exhibit 4* (OTA request for extension); *Exhibit 2* (AWI request for

extension); *Exhibit 5* (ASPCA request for extension).

248.    The gap between USDA's conclusions in the Withdrawal and its accompanying RIA, on

the one hand, and what the APA and OFPA require, on the other, is vast.  Many significant

factors that should have been considered were ignored or summarily dismissed. This

deficiency can be readily seen when the record is compared to recent conclusions of the

USDA's own Economic Research Service regarding federal labeling programs like the

NOP[30].  For example:

    a.    "Government intervention in labeling in the United States has served three main

        purposes: to ensure fair competition among producers, to increase consumers' access

        to information, and to reduce risks to individual consumer safety and health … a

        motivation for many government labeling laws has been to ensure fair competition."

        ERS Report No. 239 at 1;

    b.    Federal product identity standards and labeling requirements need continual

        refreshing and upkeep to inform consumers:  "Once a single, mandatory, federally set

        standard is achieved, it does not automatically result in improved consumer

        understanding."  ERS Report No. 39 at 1;

    c.    Information asymmetry between what organic consumers expect and the reality can

        do serious damage to the organic market.  "Credence attributes" are those that the

        consumer cannot verify by looking at, buying or eating a product, *i.e.*, the organic

---

[30] *A Report Summary from the Economic Research Service, Beyond Nutrition and Organic Labels—30 Years of Experience With Intervening in Food Labels*, Report No. 39 (November 2017) ("ERS Report No. 39").

label: "If consumers are skeptical about claims they cannot verify, their skepticism is likely to reduce their willingness to pay, and… markets for attributes may vanish." ERS Report No. 39, at 5;

d. Clarity regarding federal product identity standards and labeling requirements are necessary to prevent anti-competitive outcomes: "Consumers sometimes confuse Government standards with other standards. For example, the USDA Organic seal is often confused with other label claims, such as 'natural' or 'raised without antibiotics' that have fewer and/or lower standards and lower production costs." ERS Report No. 239 at 2;

e. Mandatory federal product identity standards and labeling requirements for organic products corrected a market failure:  "Setting a national organic standard ended variance among State standards. This gave the organic sector more access to interstate and international markets, increasing sales." ERS Report No. 239 at 2;

f. OFPA was designed to regulate "competition" and "information." ERS Report No. 239 at 5, Table 1; and

g. "[O]rganic labeling cases illustrate the strong role that the Federal Government may play in setting standards, establishing certification, and providing enforcement mechanisms." ERS Report No. 239 at vi.

249.   Overall, USDA failed to adequately address the impact on consumer confidence and trust; consumer information needs; unfair competition in the marketplace; reduced enforcement consistency and accuracy by accredited certifying agents; the integrity of the USDA organic seal as the proxy for the government's standard setting discussed in the OLPP rulemaking record, which it purported to be reconsidering; and the adverse impact of

withdrawing widely supported standards perceived as embodying stricter and higher integrity measures.  USDA failed to explain contradictory evidence and its own prior conclusions appearing in the OLPP rulemaking that arose from the pre-OLPP inconsistencies and conflicts in the NOP.

**I. Market Failure**

250.    EO 12866 identifies "failures of private markets or public institutions" as grounds justifying regulatory action.  EO 12866 at Section 1(b)(1).  Public institution failures arise when "existing regulations (or other law) have created, or contributed to, the problem that a new regulation is intended to correct."  EO 12866 at Section 1(b)(2). Although "market failure" was discussed in the Withdrawal, USDA did not respond at all to comments alleging a market failure arising from public institution failures, or the OLPP record establishing the failure of the NOP to meet the OFPA requirements of consistent national standards for certification of organic products. *See e.g. Exhibit 4* (OTA comment at 4); *Exhibit 5 Comment of ASPCA and AWI* at 17-19.

251.    Despite the requirement under EO 12866 that USDA consider such failures, it summarily concluded that "AMS did not identify a market failure in the OLPP final rule RIA and therefore AMS has now concluded that regulation is unwarranted." 83 Fed. Reg. at 10,779.

252.    This statement ignores the findings made by USDA in January 2017 in support of the OLPP, and the record made since that time, that the consumer confusion regarding the meaning of organic certification with regard to the "outdoor access" requirements for poultry operations is real and unabated.

253.    Congress determined there was an organic market failure in 1990, and enacted the OFPA as the remedy. *See generally* Senate Committee on Agriculture, Forestry and Nutrition,

*Report of the Committee on Agriculture, Forestry and Nutrition to Accompany S. 2830*

*Together with Additional and Minority Views*, =S. Rep. No. 101-357, (1990) (discussion of

need for single national standard; inability of marketplace to solve the problem); *see also* 7

U.S.C. § 6501 (purposes of enactment).

254.    It is against this market failure backdrop that the OFPA's provisions regarding consumer

assurances and uniformity of organic regulations, Section 6501, were adopted and must be

construed today. The *OMB Guidelines* notes that compelling uniform product standards by

agency regulation should be avoided unless a "particularly demanding burden of proof" is

applied in order to avoid "unintentional harmful effects on the efficiency of market

outcomes." *OMB Guidelines* at 4. This concern is legally and factually insignificant here

because Congress already determined the existence of a market failure and imposed

mandatory and uniform standards in the marketplace. That is precisely what marketing

programs at AMS, like the organic program, are designed to do.

255.    Despite this background, USDA surprisingly concluded: "Variance in production

practices and participation in private, third-party certification programs, however, do not

constitute evidence of significant market failure." 83 Fed. Reg. at 10,782.  USDA dismissed

the need to layer other animal welfare certification programs on top of organic certification

as an indication of market failure, saying: "[A] variety of production methods may be

employed to meet the same standard. * * * Thus, variation in production practices is

expected and does not stand as an indicator of a significant market failure."  83 Fed. Reg. at

10,782

256.    The USDA's conclusions in the Withdrawal Rule ignore the market failure recognized by

Congress in 1990. This market failure requires constant vigilance and attention to forestall.

66

Small variance in production practices is not the same as a definition of "access to the outdoors" that defies consistent application by certifying agents, distorts competition, undermines consumer expectations and fails to assure that a consistent national standard is applied. *See* 7 U.S.C. § 6501

257.    The USDA's position in the Withdrawal Rule also conflicts with the position taken in 2010 in the *Access to Pasture* (Livestock) rulemaking. The *Access to Pasture* rulemaking was undertaken to clarify the requirements for access to pasture and imposed quantitative measures designed to ensure pasture access was adequate, proveable and that all organic products of ruminants met a consistent national standard. *See generally* 75 Fed. Reg. at 7154 (Feb. 17, 2010).  As was repeatedly pointed out in the OLPP and the OLPP RIA, the OLPP rulemaking was undertaken for the same reasons.

258.    According to *OMB Guidelines for Analysis* there are several kinds of market failures that may be remediated by regulations.  Among the failures described are those arising from "inadequate or asymmetric information."  *Id*. at 4 ("[I]nadequate information can generate a variety of social costs, including …*inefficient resource allocation resulting from deception of consumers*.") (emphasis added).

259.    The Withdrawal Rule failed to correctly apply the analysis required by EO 12866.  For example, OMB endorses "mandatory uniform quality standards for goods and services" as one solution to such consumer deception. Here, of course, Congress determined that the organic market was failing in 1990 and adopted the OFPA to require that organic livestock products must meet a single, mandatory, national standard and must be consistently applied by the USDA. *See* 7 U.S.C. § 6501. With specific regard to organic livestock standards

Congress imposed a continual updating mechanism as represented by the NOSB's role under Section 6509.

260.    The premise of the federal organic labeling regulations is to correct a market failure that existed in 1990 when there were multiple definitions of organic practices.  From the outset of the publication of the first organic standards in 2000, "Access to the outdoors" has been required for all organically raised animals.  7 C.F.R. § 205.239(a)(1).  But today, this requirement is causing rather than correcting a market failure. There is demonstrable evidence in the OLPP rulemaking record and in the findings of the OLPP of "consumer deception" with regard to organic products, despite the existing NOP requirement that all poultry have "access to the outdoors." A market failure therefore exists as to this part of the organic program.

261.    Harm arising from the delay and withdrawal of the OLPP is reflected in the record.  Two class action lawsuits have been filed since the OLPP was delayed, each alleging that "certified organic" eggs are not from chickens that have access to the outdoors. *See e.g. Exhibit 9*[31]  (hereinafter "Gibson Complaint"); Exhibit 10[32]  ("Silva Complaint").  Each Complaint alleges that a major retailer is selling certified organic eggs that are marketed as coming from certified organic laying birds that have "outdoor access" (as required by the NOP) when the birds do not, in fact, have "outdoor access" that a reasonable consumer would accept.  Instead, the complaint argues that the laying hens at these facilities, although certified organic, "do not actually have access to the outdoors." *Gibson Complaint* at ¶ 6; *see*

---

[31] *See Gibson v. WalMart and Cal-Maine Foods*, No. 3:18-cv-00134 (N.D. Cal. Jan. 8, 2018).
[32] *See Silva v. WalMart et al.*, No. 2:18-cv-324 (W.D.Wash.Mar. 2, 2018).

*also Silva Complaint* at ¶ 6 ("confines its laying hens to industrial barns without outdoor access").

262.    It is alleged in each case:

> The industrial barns have two main parts: the central interior and the enclosed porches that run along the side.  The porches, which purportedly provide outdoor access, are fully roofed and screened, without access to the soil and vegetation surrounding the industrial barns.  A reasonable consumer would not deem this outdoor access.

*Gibson Complaint* at ¶ 22; *Silva Complaint* at ¶ 22.

263.    The kinds of operations at issue in the California and Washington cases were described in the OLPP:

> Poultry practices for outdoor access currently vary, especially practices implemented for layer operations. Some organic poultry operations provide large, open-air outdoor areas, while other operations provide minimal outdoor space or use screened and covered enclosures commonly called "porches" to meet outdoor access requirements. In a 2010 audit, the USDA Office of Inspector General identified inconsistencies in how accredited certifying agents (or "certifiers") consider porches under outdoor access while implementing certification of organic poultry operations.

> 83 Fed. Reg. at 7043

264.    To reduce regulatory variance, and thereby eliminate the informational asymmetry in the marketplace, the OLPP defined 'Outdoor space' and "requires that outdoor spaces for organic poultry include soil and vegetation."  82 Fed. Reg. at 7042.  The OLPP stated this action was necessary to "[A]lign regulatory language and intent to enable producers and consumers to readily discern the required practices for organic poultry production *and to differentiate the products in the marketplace.*[33] 82 Fed. Reg. at 7044 (emphasis added).

265.    In January 2017, the USDA rejected the very arguments that it now accepts:

---

[33]At the time of publication of the OLPP, the Secretary said "We believe that the space and outdoor access requirements in this proposed rule would enable consumers to better differentiate the animal welfare attributes of organic eggs and maintain demand for these products." 81 Fed. Reg. at 21,988.

> AMS disagrees with comments that argued that consumers are satisfied with the use of porches, or that demand for organic eggs is evidence of their satisfaction. AMS received a vast number of comments that indicate that consumers are unaware that porches have been used for outdoor access inorganic production. The comments received indicate that there is a gap between how consumers think birds are raised on organic farms and the actual practices of some—but not all—organic producers.

83 Fed. Reg. at 7068

266.   The delay and withdrawal of the OLPP has resulted in the precise market failure anticipated by the OLPP and identified in the OMB guidance: namely, consumer deception. This market failure should be precluded by the OFPA's mandate that consistently applied, uniform standards are the core market-correcting purpose of the National Organic Program. This demonstrable market failure would be corrected had the delay and withdrawal of the OLPP not occurred.

267.   The class actions cited above demonstrate that consumers are confused by the "access to the outdoors" requirements as currently applied, and that simplistic explanations that "the market is working" because there is some overall growth, are insufficient. The Withdrawal misstates the purpose of uniform and consistently-applied product standards by concluding that "variation in production practices is expected and does not stand as an indicator of a significant market failure." 83 Fed. Reg. at 10,782. Site-specific variations in organic practices are acceptable only if the range of variation in such practices conforms to the requirements of the regulation. The "porches" described in the OLPP rulemaking and the class action lawsuits are not variations; they are departures from common sense application of mandatory requirements that were properly eliminated by the OLPP rulemaking. It is inescapable that the OLPP would eliminate this kind of informational asymmetry and the Withdrawal Rule's failure to account for the marketplace realities is fatal.

268.   Even assuming the Withdrawal is correct in its repeated statements that there is no market
failure, there is a failure of governmental processes that amounts to a failure to comply with
the OFPA.   The *OMB Guidelines* expressly recognizes a new regulation may be necessary in
the absence of a market failure upon a "demonstration of compelling public need, such as
improving governmental processes…"  *OMB Guidelines* at 3.  The OIG findings, the NOSB
recommendations, and the record of the OLPP rulemaking expressly addressed this concern.
OFPA expressed the need to continually improve and update livestock standards with
increased specificity. 7 U.S.C. § 6509.  This point was squarely presented in the OTA and
ASPCA/AWI Comments, but went unheeded. *See Exhibit 4*, *Comment of OTA* at 4. 4;
*Exhibit* 5, *Comment of ASPCA and AWI* at 17-19

269.   Congress mandated adoption of national standards for organically-produced products and
commanded that these standards be consistently enforced.  7 U.S.C. § 6501.

270.   In March 2010, the USDA's Office of Inspector General's report, entitled *Oversight of
the National Organic Program*, found inconsistent treatment of outdoor access for livestock
by accredited certifying agents and noted that AMS "agreed that additional guidance would
be beneficial." *Oversight of the National Organic Program,* OIG Audit Report No. 01601-
03-Hy at 22 ("OIG Report")*, available at* https://www.usda.gov/oig/webdocs/01601-03-
HY.pdf.

271.   Later, "AMS determined that rulemaking was necessary to reduce the variation in
outdoor access practices for organic poultry…"  82 Fed. Reg. at 7043.  The OLPP is the
rulemaking solution. Its analysis, rather than the analysis appearing in the Withdrawal Rule,
is consistent with the principles under the relevant Executive Orders and OMB Guidance
documents.

272.    "Modifications to existing regulations should be considered if those regulations have

changes to existing regulations should be considered if those regulations have

created or contributed to a problem that the new regulation is intended to correct, and if such

changes can achieve the goal more efficiently or effectively." *OMB Guidelines* at 4.

273.    The OLPP's clarifications solve the problem of "inconsistent" application of federal

organic standards by certifying agents and comports with Congressional intent.

**COUNT I**
**VIOLATION OF THE OFPA AND APA**
**(Arbitrary and Capricious Agency Action and Action in Excess of Statutory Authority)**

274.   Plaintiffs adopt and incorporate by reference each foregoing paragraph as if fully set forth

herein.

275.   USDA is an agency subject to the requirements of the APA. 5 U.S.C. § 701(b)(1).

276.   USDA is an agency subject to the requirements of the OFPA. 7 U.S.C. § 6501 *et seq.*

277.   In accordance with the OFPA, USDA consulted with the NOSB and obtained its

recommendations prior to publication of its 54-page final OLPP on January 19, 2017 with an

effective date of March 20, 2017.  Publication was in accordance with the APA notice and

comment requirements.  No party sought reconsideration.

278.   In violation of the APA and OFPA, the USDA published three final rules[34] *seriatim* that

each unlawfully amended the effective date and temporarily revoked the OLPP. *Clean Air*

*Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (stating that an "order delaying the rule's

effective date ... [is] tantamount to amending or revoking a rule.")

279.   USDA published the First and Second Delay Rules without publishing a notice of

proposed rulemaking or providing an opportunity for public comment in violation of 5

U.S.C. § 553 and without adequate justification under 5 U.S.C. § 553(b).

280.   USDA published the Third Delay Rule following publication of a notice of proposed rule

that was deficient under the APA because it failed to disclose (1) the legal authority upon

which it intended to rely to amend the OLPP in violation of 5 U.S.C. § 553(b)(2); (2) that

USDA intended to conduct a *de facto* reconsideration of the entire OLPP, and ultimately

---

[34]82 Fed. Reg. at 9967 (February 9, 2017) (first delay); 82 Fed. Reg. at 21677 (May 10, 2017)
(second delay); 82 Fed. Reg. 52643 (Nov. 14, 2017) (third delay).

rescind it, based on (a) a lack of statutory authority under the OFPA and (b) technical errors in calculating the cost-benefit analysis in the OLPP; and (3) it failed to provide the technical reports and documents it ultimately relied upon to issue the Third Delay Rule and to later rescind.

281.    USDA's publication of each of the three delay rules violated the OFPA because the USDA failed to complete the pre-rulemaking consultation with the NOSB prior to each amendment to the effective date of the OLPP, failed to disclose or provide an opportunity to the NOSB to address the substantive concerns that had apparently arisen since publication of the OLPP, and failed to consult the NOSB regarding the "implementation" of the livestock standards. & U.S.C. §§ 6503(c); 6509(d)(2); 6509(g); 6518(a); 6518(k)(1).

282.    Each of the three delay final rules was unlawfully and intentionally framed to expire and be succeeded by another unlawful delay which constituted an administrative practice and pattern designed to be repeated while evading judicial scrutiny rather than an excusable procedural anomaly that could be treated as a harmless or isolated misstep or error.

283.    Each of the three delay final rules became effective immediately, in violation of the APA's requirement that an agency must publish a substantive rule not less than thirty days before its effective date. 5 U.S.C. § 553(d).

284.    Each of the three delay final rules relied in part on the *Priebus Memorandum* as legal authority for the action.  The *Priebus Memorandum* is not authority for failing to comply with the binding requirements of the APA or OFPA.

285.    The Third Delay Rule was not a logical outgrowth of the rulemaking noticed by the

USDA, and the Department's unspoken reliance on cost/benefit calculations not disclosed

until December 2017, prevented meaningful comment.[35]

286.    Because the First, Second, and Third Delay Rules are arbitrary, capricious, an abuse of

discretion and are otherwise not in accordance with law and exceed USDA's statutory

authority under the OFPA, Plaintiffs are entitled to relief under 5 U.S.C. § 706(2)(A) and (C).

**COUNT TWO**
**VIOLATION OF THE APA AND OFPA**
**(Arbitrary and Capricious Agency Action and Action in Excess of Statutory Authority)**

287.    Plaintiffs adopt and incorporate by reference each foregoing paragraph as if fully set forth

herein.

288.    USDA is an agency subject to the requirements of the APA. 5 U.S.C. § 701(b)(1).

289.    USDA is an agency subject to the requirements of the OFPA. 7 U.S.C. § 6501 *et seq.*

290.    In accordance with the OFPA, USDA consulted with the NOSB and obtained its

recommendations prior to publication of its 54-page final OLPP on January 19, 2017 with an

effective date of March 20, 2017.  Publication was in accordance with the APA notice and

comment requirements.  No party sought reconsideration.

291.    At the time of publication of the OLPP in January 2017, USDA made repeated, extensive

and unequivocal statements regarding the agency's statutory authority for the rule, the

reliance of regulated parties on the anticipated changes accomplished by the OLPP, the

failure of the existing organic regulations to assure consumers of a consistent national

standard for livestock products, the adverse impact on competition among organic poultry

---

[35] *See* "Supporting Documents Folder" (OLPP-PRIA) and ("Benefit+Cost Workbook for OLP
Notice"), available at https://www.regulations.gov/docket?D=AMS-NOP-15-0012.

producers, the adverse impact on certifying agents that enforce the organic regulations, the support of consumers, the role of the NOSB in developing organic standards generally and its role in the specific standards appearing in the OLPP including the statutory requirement of its participation, the loss of consumer trust in the USDA organic seal arising from confusion and inconsistent rulings, the benefits of increased animal welfare on the health and well-being of organic farm animals, the overwhelming consumer acceptance of the rule changes, and how many of the programmatic deficiencies that lowed from the use of "porches" in organic poultry production.  that would be corrected by adoption of the OLPP

292.    The Withdrawal Rule is arbitrary and capricious because USDA reversed course without adequate explanation when it (1) determined USDA lacked statutory authority for the OLPP; (2) offered a novel construction of Section 6509 that conflicted with the past practice of every prior administration, and ignored the context and placement of Section 6509 in the OFPA and the plain meaning of other authorizing sections in the OFPA; (3) determined it had no duty to consult with and obtain the views and recommendations of the NOSB when amending the OLPP three times to delay the effective date before proposing withdrawal; (4) determined no duty existed to consult with or seek a recommendation from the NOSB prior to withdrawing the OLPP; (5) determined that organic livestock production practices were restricted to avoidance of synthetic medications and determined all existing organic livestock regulations may be extinguished under the new construction of the OFPA; (6) abandoned its prior conclusions about the importance of the Congressional directive to develop detailed standards for certified organic livestock and poultry producers, the need for additional specificity and clarity to better ensure consistent compliance by certified organic operations, and to provide for more effective administration of the National Organic Program.

293.    The Withdrawal Rule is arbitrary and capricious because USDA failed to adequately

explain (1) why it denied multiple requests for extensions of time to comment on the Notice

of Proposed Withdrawal especially when it had undertaken a rolling reconsideration that had

lasted nearly a year without seeking any public input  and failed in three prior rulemakings to

describe the substance of its inquiry or the legal authority for it in contravention of 5 U.S.C. §

553(b) and (c); (2) why it ignored substantial and compelling evidence in the record of a

market failure and programmatic failure arising from its existing confusing and

inconsistently applied regulations governing "outdoor access" for poultry; (3) why it ignored

substantial and compelling scientific evidence in the record that better animal welfare

reduces the need for synthetic healthcare substances; (4) why it ignored substantial and

compelling evidence that certifying agents are harmed by the failure to correct the "outdoor

access" section of the rules; (5) why it ignored or excluded many requirements of Executive

Order 12866 and OMB Guidelines on how to conduct proper and complete cost/benefit

analyses; (6) why it ignored the many findings and conclusions stated in the OLPP and

evidence in the rulemaking record regarding the qualitative benefits of the OLPP cited in the

OLPP RIA, particularly in light of the OFPA's statutory purposes; and (7) why it failed to

recognize, when conducting its Regulatory Impact Assessment, that the NOP is a voluntary

marketing program.

294.    Because the Withdrawal Rule is arbitrary, capricious, an abuse of discretion and is

otherwise not in accordance with law, and exceeds USDA's statutory authority under the

OFPA, Plaintiffs are entitled to relief under 5 U.S.C. § 706(2)(A) and (C).

## COUNT THREE
## VIOLATION OF THE OFPA AND APA
### (Failure to Consult NOSB; Failure to Obtain a Recommendation from NOSB)

295.   Plaintiffs adopt and incorporate by reference each foregoing paragraph as if fully set forth

herein.

296.   USDA is an agency subject to the requirements of the APA. 5 U.S.C. § 701(b)(1).

297.   USDA is an agency subject to the requirements of the OFPA. 7 U.S.C. § 6501 *et seq.*

298.   USDA published the OLPP on January 19, 2017 pursuant to Congressional mandates set

forth in the OFPA and in compliance with the requirements of the APA. The OLPP was

thereafter binding on USDA unless lawfully amended.  *Clean Air Council v. Pruitt,* 862 F.3d.

1, 9 (D.C. Cir. 2017)

299.   Amendments to the effective date published in the OLPP and the Withdrawal Rule each

constitute legislative rules subject to the APA.  5 U.S.C. §§ 551 (4)-(5).

300.   The OFPA imposes unique pre-rulemaking duties on the USDA that are in addition to the

requirements of the APA.  The statutory duties require the Secretary to consult with the

NOSB and obtain its recommendation for standards "for the care" of livestock. 7 U.S.C. §

6503(a) and (c); § 6509(d)(2)

301.   Since the creation of the NOSB and the inception of the National Organic Program,

USDA has observed a well-settled practice of publishing proposed and final organic

livestock standards solely upon the receipt and consideration of a recommendation from the

NOSB following significant public input.

302.   The USDA failed to consult with the NOSB on each of the three delay rules that amended

the effective date, temporarily revoking the OLPP, and failed to consult on the proposed and

final Withdrawal Rule  Each final rule that resulted in amendment to the OLPP, up to and

including the Withdrawal, were published in excess of USDA's "statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

303.    The USDA has failed to discharge its duties under the OFPA.

304.    The First, Second and Third Delay rules, the proposed Withdrawal, and final Withdrawal Rule  contravene the USDA's duty to consult the NOSB prior to enacting or amending a substantive, existing organic regulation only following receipt of an NOSB recommendation. The three delay final rules and the Withdrawal are *ultra vires*, harm Plaintiffs and their members, and should be vacated.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and award the following relief:

305.    enter a declaratory judgment that USDA's First, Second and Third Delay Rules each exceeded USDA's statutory authority under the OFPA and were arbitrary, capricious, an abuse of discretion, and are otherwise not in accordance with law in violation of 5 U.S.C. §§ 702-706 (2)(D);

306.    enter a declaratory judgment that the Withdrawal Rule exceeded USDA's statutory authority under the OFPA and was arbitrary, capricious, an abuse of discretion, and are otherwise not in accordance with law in violation of 5 U.S.C. §§  702-706 (2)(D);

307.    vacate and set aside the First, Second and Third Delay Rules *ab initio* and vacate and set aside the Withdrawal Rule challenged in this Complaint;

308.    issue an Order that the OLPP is "effective" as of a date appearing therein, following a court proceeding to adjust the implementation dates to avoid prejudice to any party;

309.    enjoin USDA from further delay in implementing the OLPP;

310.    award Plaintiffs their reasonable attorneys' fees, costs and expenses associated with this

litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or other authority;

and

311.    grant Plaintiffs any and all other additional relief as this Court may deem just and proper.

Respectfully Submitted:

___/s/ William J. Friedman_____

William J. Friedman (*admitted pro hac vice*)
107 S. West St.
Alexandria, VA 22314
Tel.:  571.217.2190
Email:  pedlarfarm@gmail.com

/s/ Andrea M. Downing_____

Andrea M. Downing
Wade, Grimes, Friedman,
Meinken & Leischner, PLLC
616 North Washington Street
Alexandria, Virginia 22314
(t) 703-836-9030
(f) 703-683-1543
downing@oldtownlawyers.com

Counsel for OTA

/s/_____

Jennifer H. Chin (admitted *pro hac vice*)
Vice President, Legal Advocacy
jennifer_chin@aspca.org
Jaime K. Olin (admitted *pro hac vice*)
Legal Advocacy Counsel
jaime.olin@aspca.org
AMERICAN SOCIETY FOR THE PREVENTION OF
CRUELTY TO ANIMALS
520 Eighth Avenue, 7th Floor
New York, New York 10018
(212) 876-7700
/s/_____
Cathy A. Harris, DC Bar No. 467206

charris@katorparks.com
Daniel Clark, DC Bar No. 156052
dclark@katorparks.com

KATOR, PARKS, WEISER & HARRIS, P.L.L.C.
1200 18th Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 898-4800


Counsel for ASPCA


/s/_____
Erin Thompson
*Pro Hac Vice Admission Pending*
Oregon State Bar # 164912
900 Pennsylvania Ave., SE
Washington, DC 20003
(202) 446-2147
erin@awionline.org

Counsel for AWI